UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NADEZDA STEELE-WARRICK,<br><br>individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>          *-against-*<br><br>MICROGENICS CORPORATION and THERMO FISHER SCIENTIFIC, INC.,<br><br>          Defendants. | No. _____<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Nadezda Steele-Warrick, on behalf of herself and all others similarly situated, and by and through her attorneys, Prisoners Legal Services (PLS) and Emery Celli Brinckerhoff & Abady LLP, alleges as follows:

### PRELIMINARY STATEMENT

1.     This is a class action on behalf of hundreds of current and former incarcerated New Yorkers who were unjustly punished for false positive drug test results in 2019.

2.     Defendant Microgenics Corporation ("Microgenics") is the company hired by the New York Department of Corrections and Community Supervision (DOCCS) to provide, install, maintain, and train DOCCS employees on urinalysis analyzers used to conduct drug testing at all DOCCS facilities.

3.     Microgenics was required to ensure that the urinalysis analyzers ran properly and produced accurate results.  Due to its negligent failure to fulfill this basic responsibility, hundreds of individuals incarcerated in New York State prisons tested positive for Suboxone/buprenorphine, and perhaps other substances, in 2019 even though they had not

consumed that substance, any substance known to trigger a false positive result, or any other illicit substance.

4.     Microgenics knew that DOCCS would use positive drug tests to discipline individuals in DOCCS's custody, and that is what DOCCS did.  Relying on the false positive results generated by Microgenics's urinalysis machines, DOCCS charged and severely punished hundreds of individuals for drug use when they were innocent of those charges.

5.     The punishments DOCCS levied for false positive results were devastating to Class members, who had done nothing wrong and were bewildered by the false accusations.

6.     These punishments included, but were not limited to, weeks or months in solitary confinement, weeks or months in keeplock (where the wrongfully accused individuals were not permitted to leave their cell or dorm area), loss of privileges like recreation, commissary, mail packages, and phone, loss of  visitation, loss of good time credit, loss of merit time, loss of an open conditional release date, loss of a preferred work assignment, denial of parole release, denial of participation in the Family Reunion Program, removal from a necessary or desired program, and transfer from a preferred facility or hub.  In some cases, individuals who lost good time credit or who had open parole dates rescinded were held in prison months beyond their scheduled release dates because of the faulty test results.

7.     Microgenics and its parent company, Thermo Fisher Scientific, are liable to the individuals currently and formerly incarcerated in New York State prisons who received false positive test results due to their negligent failure to ensure accurate and reliable test results.

**PARTIES**

8.     Plaintiff Nadezda Steele-Warrick is a 36-year-old woman who resides in Queens County, New York.  From 2014 to 2019, Ms. Steele-Warrick was in the custody of DOCCS.

2

9.      Defendant Microgenics Corporation is a Delaware company that is based in Fremont, California, and which specializes in the development, manufacture, marketing, and sale of products relating to clinical diagnostics.  Microgenics Corporation is a wholly owned corporate subsidiary of Defendant Thermo Fisher Scientific, Inc.  In 2018, Microgenics Corporation contracted with DOCCS to provide Indiko Plus urinalysis analyzers at 52 DOCCS facilities, and to install, maintain, and train DOCCS employees on those machines.

10.     Defendant Thermo Fisher Scientific, Inc. is a Delaware company that is based in Waltham, Massachusetts.  Thermo Fisher Scientific, Inc. is the corporate parent company of Microgenics Corporation.  Thermo Fisher Scientific markets itself as the manufacturer of the Indiko Plus urinalysis analyzers, as well as the owner of the assays used to conduct drug testing on those machines.

## JURISDICTION AND VENUE

11.     This is a diversity action.  This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332.  The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

12.     Venue in this case is based upon 28 U.S.C. § 1391(b)(3).  The Eastern District of New York is the proper venue because it is the judicial district where the Plaintiff currently resides and where Defendants are subject to the Court's personal jurisdiction.

## STATEMENT OF FACTS

### DOCCS Hires Microgenics to Provide Urinalysis Analyzers

13.     In October 2017, DOCCS issued Invitation for Bids (IFB) 2017-14 for urinalysis analyzers.  Per the IFB, DOCCS sought "bench top urinalysis analyzer services to be used in its

correctional facilities for inmates.  The bidder must also include the installation, training, technical support, and maintenance of equipment in DOCCS facilities."

14.     In September 2018, DOCCS entered into a five-year contract, #CC161458, with Microgenics to provide Indiko Plus urinalysis analyzers and related services for 52 correctional facilities in New York.

15.     The Indiko Plus urinalysis analyzer is an automated benchtop chemistry system that can conduct urinalysis drug testing.  Thermo Fisher Scientific markets itself as the manufacturer of the Indiko Plus, as well as the owner of the assays used in connection with that machine.  The product is sold and distributed by medical distributors across the country, including Microgenics, its wholly owned subsidiary.

16.     On information and belief, the contract between DOCCS and Microgenics provides that Microgenics is responsible for ensuring that the Indiko Plus machines in DOCCS's facilities run properly and provide accurate results.

17.     Microgenics knew that positive drug test results from the Indiko Plus machines in DOCCS' facilities would be used to discipline individuals in DOCCS' custody.

18.     DOCCS began to use the Indiko Plus urinalysis analyzers provided by Microgenics at DOCCS's facilities in late 2018 or early 2019.

***Plaintiff Nadezda Steele-Warrick Tests Positive For
Suboxone/buprenorphine Despite Not Using It***

19.     Plaintiff Nadezda Steele-Warrick was incarcerated at Albion Correctional Facility ("Albion"), a DOCCS facility, from June 2015 to May 2019.

20.     Ms. Steele-Warrick was a model prisoner, with a pristine and unblemished record of good behavior.  While incarcerated, she participated in numerous prison programs, obtained

4

her GED, and was employed as a teacher's assistant.  She also taught cardiovascular and mash-up exercises classes at the Albion gym.

21.     As soon as she was eligible, after six months at Albion, Ms. Steele-Warrick applied for and received preferred housing on the basis of her exemplary behavior.

22.     Preferred housing offers many advantages over general-population housing.  In preferred housing, Ms. Steele-Warrick lived with a smaller group of women, making for quieter and calmer surroundings, and she had better access to stoves, showers, and toilets.  She obtained a private room, where she had a night stand, closet, radio, safe keeping for her personal belongings, and overall much greater measure of privacy and quiet.

23.     At the same time, when she became eligible after six months at Albion, Ms. Steele-Warrick applied to the Family Reunification Program (FRP), a DOCCS program that allows incarcerated individuals to meet privately and spend overnights with family members. She was admitted to the FRP after approximately seven months on the waiting list.

24.     Through the FRP, Ms. Steele-Warrick saw her husband and young son for overnight visits every four weeks.  Her husband and son would arrive on Friday mornings and spend two days with Ms. Steele-Warrick in a private setting where they could cook, eat, sleep, and be alone together as a family unit.  Her husband and son would depart on Sunday morning.

25.     DOCCS protocol requires, as Ms. Steele-Warrick was well-aware, that all individuals participating in the FRP provide a urine sample for drug testing at the following times: (1) between two to ten days prior to an FRP visit; (2) immediately prior to an FRP visit; and (3) immediately following an FRP visit.

26.     Pursuant to that protocol, Ms. Steele-Warrick provided a urine sample at approximately 8:30 a.m. on April 14, 2019, following an FRP visit.

27.     That same day, at approximately 10:53 a.m., DOCCS officials processed the urine sample on the Indiko Plus urinalysis analyzer using the DRI + CEDIA Drug Testing System.

28.     The results came back with a false positive for Suboxone/buprenorphine, even though Ms. Steele-Warrick had not taken that substance, any substance known to trigger a positive result, or any other illicit substance.

29.     At approximately 11:20 a.m., as per protocol, DOCCS staff re-tested the urine sample again on the Indiko Plus urinalysis analyzer using the DRI + CEDIA Drug Testing System.

30.     Again, the test results indicated a positive result for Suboxone/buprenorphine. Prior to this incident, Ms. Steele-Warrick had never tested positive for any illegal substance, nor had she ever incurred any prison misconduct charges, for drugs or otherwise, during her entire period of incarceration.

31.     As DOCCS confirmed months later, Ms. Steele-Warrick's test results were a faulty false positive.


***Ms. Steele-Warrick Is Unjustly Charged and Sentenced***

32.     On Thursday, April 18, 2019, a DOCCS correction officer and sergeant came to Ms. Steele-Warrick's room and advised her she was being charged with drug use.

33.     When the sergeant and correction officer informed her of the charge, Ms. Steele-Warrick thought at first they were joking, as she knew it was not possible for her to have a true positive result.  She quickly learned they were serious when they handcuffed her, walked her out of her housing unit, and confined her in a disciplinary keeplock cell where she remained for 11 days.

34.     Individuals assigned to keeplock have limited access to their property, packages, telephones, correspondence, and visitors, and their commissary privileges are suspended, pending a disciplinary determination.

35.     Ms. Steele-Warrick felt tremendous shame and humiliation as she was marched away in handcuffs past her peers and friends.

36.     Unlike her private room, which had a door she could self-close and open, Ms. Steele-Warrick's keeplock cell was behind locked and secured steel bars.  The room had only a locker, sink, and toilet.  It did not have the night stand, radio, or closet that Ms. Steele-Warrick had in her private room.  Her meals were delivered through a "feed-up slot" in the bars.

37.      Ms. Steele-Warrick did not have access to any of her belongings in her keeplock cell.  Her first day there, she could not access her toothbrush, shampoo, or soap.  Although she eventually obtained those items, she did not have any of her other personal belongings, including her books or magazines.

38.     While Ms. Steele-Warrick was confined in keeplock, correction officers emptied out her private room, searching and cataloguing all of her personal belongings and securing away most of it in storage.

39.     A package of food from Ms. Steele-Warrick's husband arrived while she was in keeplock, and correction officers confiscated all the fresh vegetables and produce, later leaving Ms. Steele-Warrick with only a couple of canned items.

40.     Ms. Steele-Warrick was traumatized during her time in the keeplock cell.  She was shocked that she had received what she knew had to be a faulty and false positive drug test result and that she had been summarily confined and was facing serious disciplinary charges.  She was petrified of the possible punishment she faced and the blackmark on her previous

7

unmarred record of behavior.  She cried every day, and people around her began to express concerns about her mental health.

41.      She even confided in a mental-health counselor that she was feeling depressed due to the false positive result.

42.      Ms. Steele-Warrick faced a formal disciplinary hearing for her charge of alleged drug use.  The hearing took place over three separate days while DOCCS continued to hold Ms. Steele-Warrick in a keeplock cell.

43.      Ms. Steele-Warrick pleaded not guilty to the charge.  She testified at the hearing that she did not ingest any substances containing Suboxone/buprenorphine.  Her husband testified that he had not delivered any illegal substances to Ms. Steele-Warrick in the DOCCS facility, and she submitted medical documents from her husband's doctor explaining that the false positive result may have been triggered by a medication he had been prescribed.

44.      Despite her testimony, the testimony of her husband, and her husband's medical records, the DOCCS hearing officer found Ms. Steele-Warrick guilty of drug use, relying on the fact that the "test result forms were found to be credible and truthful."

45.      Ms. Steele-Warrick was sentenced to 11 days in keeplock (which was equivalent to her time served therein) and thirty days loss of recreation, packages, and commissary privileges.  She lost the coveted preferred housing she had previously earned and enjoyed, and was moved back to general population dorm housing.

46.      As a result of her sentence, Ms. Steel-Warrick lost her eligibility for the FRP program.

47.      Originally, Ms. Steele-Warrick was told that the thirty-day loss of privilege portion of her disciplinary sanctions included her eleven days in keeplock.  But when she was

8

given her final paperwork, it stated that the thirty days did not begin to run until the time that she

was released from keeplock status.  Because Ms. Steele-Warrick's maximum expiration date was

May 22, 2019, she was released from DOCCS custody before her disciplinary sanctions were

fully satisfied.

48.     The disciplinary disposition and sanctions and other resulting consequences were

devastating for Ms. Steele-Warrick.  She felt much less safe and secure in general population

housing, where she lived in a large, crowded, open dormitory-style room with about sixty other

women.  Compared to her private room in preferred housing, it was much noisier, more

dangerous, and difficult to access simple amenities like toilets, showers, and the kitchen.  She

had no privacy, little real personal space, and had trouble sleeping.  Some of her personal items

were stolen by other individuals.

49.     Due to her loss of recreation privileges, Ms. Steele-Warrick was no longer able to

go to the gym or serve as a gym class instructor.  She was restricted to her dormitory and the

mess hall, except for a limited time when she was permitted to go outdoors.

50.     Worst of all, Ms. Steele-Warrick was denied her last FRP visit with her husband

and son, which was scheduled to occur in May before her release.  Because of ongoing

immigration proceedings in which she faced possible removal from the United States, Ms.

Steele-Warrick did not know what would happen to her when she was released from DOCCS

custody.  She feared that she would be detained by Immigration and Customs Enforcement (ICE)

or even deported.  The previously scheduled and much anticipated and desired May 2019 FRP

visit was the last time she knew for certain that she would see and spend personal and private

time with her husband and son.  When the FRP visit was cancelled as part of and because of her

wrongful disciplinary sanction, Ms. Steele-Warrick feared that she may never see and spend real time with her family again.

51.     Ms. Steele-Warrick also worried about the possible adverse effects of her drug charge on the course and outcome of her immigration proceedings.  To enhance her chances of being permitted to remain with her family in the United States, she needed to demonstrate that she was not a dangerous person or a flight risk.  The false drug charge posed a reasonable threat to those efforts and potential outcome.

52.     The mental and emotional adverse effects of Ms. Steele-Warrick's disciplinary disposition and sanctions cannot be understated.  She had worked tirelessly and successfully to become and remain a model prisoner and get her life back on track, and it felt like her world was crashing down due to incomprehensible and unfair circumstances outside her control.  She kept thinking, "why is this happening to me?" and she cried to God for answers.

53.     On May 22, 2019, Ms. Steele-Warrick was released from DOCCS' custody to post-release supervision.


***Ms. Steele-Warrick's Drug Test Disciplinary Disposition Is Overturned***

54.     In September 2019, Ms. Steele-Warrick's disciplinary hearing result was overturned because of the false positive Suboxone/buprenorphine result.

55.     On information and belief, DOCCS is in the process of overturning all positive Suboxone/buprenorphine results generated by Indiko Plus urinalysis analyzers from 2019.

56.     DOCCS has informed class members that the false positives were the result of a "cross reactivity" issue relating to the Indiko Plus urinalysis analyzers.

57.     Even before Ms. Steele-Warrick tested positive for Suboxone/buprenorphine, she heard about other prisoners in the FRP program receiving false positive results.

58.     For example, Ms. Steele-Warrick's friend received a false positive result and was handcuffed in front of her family during an FRP visit and sentenced to sixty days in solitary confinement.  She also heard of another elderly woman in another housing unit who tested positive, even though everyone believed the result was likely false.

59.     Even before Ms. Steele-Warrick had a false positive result, correction officers told her that they believed something was wrong with the machines.

60.     On information and belief, DOCCS officials and the New York State Inspector General are both investigating Defendants to determine the cause of the widespread and rampant false positive test results.


## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on her own behalf and on behalf of a class of all persons similarly situated.

62.     Plaintiff seeks to represent a certified Plaintiff class consisting of all persons who obtained positive testing results for Suboxone/buprenorphine generated by Indiko Plus urinalysis analyzers while in DOCCS custody in 2019.

63.     The members of the Class are too numerous to be joined in one action, and their joinder is impracticable.  Upon information and belief, the class is comprised of hundreds of individuals.

64.     Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. These common questions of fact and law include, but are not limited to: (1) whether Defendants were negligent in providing Indiko Plus

machines that generated false positive results to DOCCS' facilities; (2) whether Defendants negligently trained DOCCS corrections officers, resulting in false positives; (3) whether Defendants negligently operated and maintained the Indiko Plus machines, resulting in false positives; (4) what precautions Defendants took to ensure that Indiko machines were running properly at DOCCS facilities; (5) what disciplinary actions DOCCS took against Class members after Class members received false positive drug testing results; and (6) what damages should be awarded to redress the harms suffered by Class members.

65.     Defendants' actions and the claims alleged in this Complaint are common to all members of the Class.

66.     Plaintiff's claims are typical of those of the Class.  Plaintiff received a false positive drug test result for Suboxone/buprenorphine in 2019 due to a test on the Indiko Plus testing apparatus while she was in DOCCS custody and she was subjected to disciplinary sanctions and various other direct adverse consequences as a result.

67.     The legal theories on which Plaintiff relies are the same or similar to those on which all Class members would rely, and the harms suffered by her are typical of those suffered by all the other Class members.

68.     Plaintiff will fairly and adequately protect the interests of the Class.  The interests of the Class representative are consistent with those of the Class members.  In addition, Plaintiff's counsel are experienced in class action, civil rights, and prison-related litigation.

69.     Plaintiff's counsel know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

70.     Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue

financial, administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

71.     This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.  The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt individual redress for damages.

72.     There will be no extraordinary difficulty in the management of this case as a class action.

**FIRST CAUSE OF ACTION**
(Negligence)

73.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

74.     Plaintiff brings this claim on her own behalf and on behalf of the Class.

75.     Plaintiff and the Class received false positive drug test results while in DOCCS' custody, resulting in serious sanctions and punishment, as well as a common and typical suite of other adverse consequences, including but not limited to those denoted in paragraphs 5-6 above.

76.     Defendants owed a duty to Plaintiff and the Class to ensure that the Indiko Plus urinalysis analyzers produced accurate and reliable test results by manufacturing the Indiko Plus urinalysis analyzers, marketing and selling those machines to DOCCS, and installing, maintaining, and training DOCCS employees on the use of those machines.

77.     Defendants breached their duty to Plaintiff and the Class by failing to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable test results.

78.     Defendants knew that DOCCS was relying on test results from the Indiko Plus

urinalysis analyzers to discipline individuals in its custody, and it was reasonably foreseeable to Defendants that its failure to ensure accurate and reliable test results would result in unjust discipline of those individuals and the naturally foreseeable adverse consequences of such discipline.

79.     As a result of Defendants' negligent failure to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable results, Plaintiff and Class members were subjected to serious discipline, including, but not limited to, solitary confinement, keeplock, being held beyond their scheduled release date, and loss of privileges.

80.     Because of Defendants' unlawful conduct, Plaintiff and Class members have suffered pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

## PRAYER FOR RELEIF

WHEREFORE, Plaintiff Nadezda Steele-Warrick and Class members respectfully

request that the Court enter a class-wide judgment:

A.    Certifying this suit as a class action;

B.    Awarding reasonable and just compensatory and punitive damages to Plaintiff and

the Class for the injuries they suffered;

C.    Awarding attorneys' fees and costs.

D.    Ordering other and further relief as this Court deems just, proper and equitable.

Dated:   New York, New York
         November 20, 2019

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____
       Matthew D. Brinckerhoff
       Andrew G. Celli
       Alanna Kaufman

       600 Fifth Avenue, 10th Floor
       New York, NY 10020
       (212) 763-5000

PRISONERS LEGAL SERVICES OF
NEW YORK

By:   /s/ Karen L. Murtagh
       Karen L. Murtagh
       Michael Cassidy**
       David Bentivegna*
       Betsy Hutchings*
       Nicole Jolicoeur*

       41 State Street, Suite M112
       Albany, NY 12207
       (518) 445-6050

       **admission pending
       *pro hac vice application forthcoming

15

*Attorneys for Plaintiff and the Putative Class*