UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NADEZDA STEELE-WARRICK, individually
and on behalf of all others similarly situated,

                      Plaintiff,

-*against*-

MICROGENICS CORPORATION and THERMO
FISHER SCIENTIFIC, INC.,

                      Defendants.

No. 19 Civ. 6558

**FIRST AMENDED
CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED**

Nadezda Steele-Warrick, on behalf of herself and all others similarly situated, and by and through her attorneys, Prisoners Legal Services (PLS) and Emery Celli Brinckerhoff & Abady LLP, alleges as follows:

**PRELIMINARY STATEMENT**

1. This is a class action on behalf of thousands of currently and formerly incarcerated New Yorkers who were unjustly punished for false positive drug test results in 2019.

2. Defendant Microgenics Corporation ("Microgenics"), doing business as Thermo Fisher Scientific, is the company with which the New York Department of Corrections and Community Supervision (DOCCS) contracted to provide, install, maintain, and train DOCCS employees on urinalysis analyzers used to conduct drug testing at all DOCCS facilities.

3. Microgenics was required to ensure that the urinalysis analyzers were used in accordance with applicable standards and produced accurate results. Due to its negligent failure to fulfill this basic responsibility, thousands of individuals incarcerated in New York State

1

prisons received positive drug test results in 2019 even though they did not ingest any illicit substance.

4. When it entered into the contract with DOCCS, Microgenics knew that DOCCS would use positive drug tests to discipline individuals in DOCCS's custody, and that is what DOCCS did. Relying on false positive results generated by Microgenics's urinalysis machines, DOCCS charged and severely punished thousands of individuals for drug use.

5. The punishments DOCCS levied for false positive results were devastating to Class members, who had done nothing wrong and were bewildered by the false accusations.

6. These punishments included, but were not limited to, weeks or months in solitary confinement or keeplock, lost privileges, denial of visitation, and rescission of open parole or conditional release dates. In some cases, individuals were held in prison months for beyond their release dates as a direct result of false positive drug tests.

7. Microgenics and Thermo Fisher Scientific are liable to the individuals currently and formerly incarcerated in New York State prisons who received false positive test results due to their negligent failure to ensure that their drug testing devices and assays were used in accordance with applicable standards and produced reliable test results.

**PARTIES**

8. Plaintiff Nadezda Steele-Warrick is a 36-year-old woman who resides in Queens County, New York. From 2014 to 2019, Ms. Steele-Warrick was in the custody of DOCCS.

9. Defendant Microgenics Corporation is a Delaware company that is based in Fremont, California, and which specializes in the development, manufacture, marketing, and sale of products relating to clinical diagnostics. Microgenics Corporation is a wholly owned

corporate subsidiary of Defendant Thermo Fisher Scientific, Inc.  In 2018, Microgenics Corporation contracted with DOCCS to provide Indiko Plus urinalysis analyzers at 52 DOCCS facilities, and to install, maintain, and train DOCCS employees on those machines.

10.     Defendant Thermo Fisher Scientific, Inc. is a Delaware company that is based in Waltham, Massachusetts.  Thermo Fisher Scientific, Inc. is the corporate parent company of Microgenics Corporation.  Thermo Fisher Scientific markets itself as the manufacturer of the Indiko Plus urinalysis analyzers, as well as the owner of the assays used to conduct drug testing on those machines.  Thermo Fisher Scientific is responsible for all FDA submissions made regarding the Indiko Plus urinalysis analyzers and assays used to conduct drug testing on those machines.  For purposes of the contract with DOCCS, Microgenics is identified as doing business as Thermo Fisher Scientific.

## JURISDICTION AND VENUE

11.     This is a diversity action.  This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332.  The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

12.     Venue in this case is based upon 28 U.S.C. § 1391(b)(3).  The Eastern District of New York is the proper venue because it is the judicial district where the Plaintiff currently resides and where Defendants are subject to the Court's personal jurisdiction.

## STATEMENT OF FACTS

*Defendants Contracted with DOCCS to Provide Urinalysis Analyzers*

13.     In May 2018, DOCCS issued IFB 2018-06 seeking "reagent rentals of bench top urinalysis analyzer services to be used in its 52 correctional facilities for inmates," with a contract term of September 1, 2018 to August 31, 2023.

14. Defendants submitted a bid in response to the Invitation for Bids on behalf of "Microgenics Corporation Part of Thermo Fisher Scientific."

15. Microgenics is a wholly owned subsidiary of Thermo Fisher Scientific.

16. Defendants' bid was submitted on Thermo Scientific letterhead.

17. The web address identified by Microgenics on the bid was [www.thermoscientific.com/diagnostics](www.thermoscientific.com/diagnostics).

18. The two individuals identified by Microgenics as "authorized to negotiate on its behalf regarding all matters pertaining to this bid" were sales representatives with email addresses ending with "@thermofisher.com."

19. In attachments A and C to its bid, Microgenics submitted marketing materials for Thermo Fisher Scientific relating to its urinalysis systems.

20. In attachment B to its bid, Microgenics submitted literature regarding "ThermoFisher Microgenics Reagant information."

21. In the bid signature page, Defendants identified "Microgenics Corporation" as the "Legal Business Name of Company Bidding" and stated that Microgenics was "D/B/A – Doing Business As" "Thermo Fisher Scientific."

22. In September 2018, DOCCS entered into a five-year contract, #CC161458, with Defendants (the "Contract") to provide Indiko Plus urinalysis analyzers and related services for 52 correctional facilities in New York.

23. The Indiko Plus urinalysis analyzer is an automated benchtop chemistry system that is marketed as a device to conduct urinalysis drug testing.

4

24. Thermo Fisher Scientific is the manufacturer of the Indiko Plus urinalysis analyzer and the assays used in connection with that machine. It is responsible for the FDA submissions relating to both the machine and assays.

25. The Indiko Plus urinalysis analyzer is sold and distributed by medical distributors across the country, including Microgenics.

26. The Contract required Defendants to conduct onsite training at all 52 DOCCS facilities and to conduct a mandatory master trainer class so that DOCCS could train and certify new testers. Defendants conducted such trainings and certified that DOCCS employees were proficient to operate Defendants' machines.

27. The Contract required Defendants to provide support and maintenance for their urinalysis services, including unlimited 24/7 telephone support; preventative maintenance visits; 24-hour response time; repair, replacement, and maintenance of machines; helpdesk operations; user feedback procedures; and warranties, returns, and exchanges.

28. The Contract required Defendants' employees to testify at disciplinary hearings for incarcerated individuals who received positive drug test results from the Indiko Plus machines.

29. Defendants testified about the professed reliability of their testing at numerous disciplinary hearings in 2019—even when the tests had actually produced false positive results. DOCCS relied on the test results and Defendants' supporting testimony when disciplining incarcerated persons for positive drug tests.

30. The Contract required that Defendants' products be "substantially uninterrupted or error-free in operation." It further required that Defendants warrant and represent that

5

products delivered under the contract conform to the manufacturer's specifications, performance standards, and documentation.

31. Both Microgenics and Thermo Fisher Scientific were responsible for providing services under the Contract, and both entities negligently provided such services, breaching their duty of care to Ms. Steele-Warrick and putative class members and causing them foreseeable harm.

### *Defendants Failed to Comply with Applicable Standards and Their Test Results Were Unreliable*

32. DOCCS began to use the Indiko Plus urinalysis analyzers provided by Microgenics at DOCCS's facilities in late 2018 or early 2019.

33. As the entities responsible for providing drug testing services in DOCCS' facilities (including machines, assays, services, training, installation, and maintenance), Defendants owed incarcerated persons in those facilities a duty to abide by applicable drug testing standards and to ensure that the testing was accurate and reliable. Defendants breached those duties.

34. Defendants' standards for the Indiko Plus urinalysis analyzers state that the machines should be used as an initial screen only, and confirmatory testing is required to verify any positive result.

35. Despite these standards, Defendants negligently provided products and services to DOCCS knowing that the results generated by the Indiko Plus urinalysis analyzers would be used to discipline inmates without any confirmatory testing.

36. Defendants negligently failed to inform DOCCS of the applicable standards for the Indiko Plus urinalysis analyzers when negotiating the Contract and providing its contracted products and services.

37. Defendants negligently failed to train DOCCS employees on the applicable standards for the Indiko Plus urinalysis analyzers.

38. Defendants negligently testified at disciplinary hearings that the results from the Indiko Plus urinalysis analyzers could be relied on as a basis for disciplining incarcerated individuals, even though Defendants knew that the results were only preliminary screens.

39. Defendants negligently failed to ensure that their products and services were used in accordance with applicable standards even though they had full control over the nature of the use.

40. Defendants knew that positive drug screen results from the Indiko Plus urinalysis analyzers would be used to discipline individuals in DOCCS' custody—without verification by an outside laboratory using gas chromatography or any other verification method—and they did nothing to stop such discipline from being imposed. On the contrary, Defendants' employees supported and endorsed such use.

41. Nothing in the Contract required DOCCS to verify Defendants' drug test results through an outside laboratory using gas chromatography or any other method prior to disciplining incarcerated persons.

42. Not only did Defendants negligently fail to abide by applicable standards, they were also negligent in failing to ensure that the Indiko Plus urinalysis analyzers produced accurate preliminary drug test screens.

43.     Contrary to Defendants' representations that their services would be error-free, they failed to ensure that their machines and assays functioned properly, resulting in widespread cross-reactivity issues that caused thousands of false positive results for Suboxone/buprenorphine, AB Pinaca, opiates, and THC.

44.     The cross-reactivity issues that ensued were the direct result of Defendants' negligence in their installation, training, and maintenance of the machines.

45.     Further, Defendants continued to testify at disciplinary hearings that their test results were reliable even though they should have known that there were serious reliability concerns—especially given the sheer number of incarcerated persons reporting false results.

46.     Ultimately, DOCCS determined that the positive results generated by Indiko Plus urinalysis analyzers were so unreliable that it reversed the disciplinary decisions for every positive result for Suboxone/buprenorphine, AB Pinaca, Opiates, and THC generated by the machines in 2019.

47.     DOCCS's decision to overturn every positive result for these substances indicates the magnitude of the issue.  The problem with Defendants' testing was so widespread that not a single positive finding was reliable enough to discipline putative class members.

48.     In January 2020, DOCCS terminated its contract with Defendants for cause, based on Defendants' failure to comply with the terms and conditions of the Contract.

49.     DOCCS officials and the New York State Inspector General are both investigating Defendants given the rampant and voluminous unreliable and false positive test results.

50.     On February 28, 2020, DOCCS sued Defendants in New York State Supreme Court, County of Albany, alleging that Defendants' equipment, products, procedures, and

services were inadequate and deficient, failed to operate according to their intended use, and produced false positive test results.

51. The natural and foreseeable consequence of Defendants' negligent failure to ensure that its products and services complied with applicable standards and produced accurate results was that thousands of incarcerated persons were punished for false and unreliable positive drug tests.

52. The punishments DOCCS imposed on putative class members included, but were not limited to, weeks or months in solitary confinement; weeks or months in keeplock (where the wrongfully accused individuals were not permitted to leave their cell or dorm area); loss of privileges like recreation, commissary, mail, packages, and phone calls; loss of visitation; loss of good time credit; loss of merit time; loss of an open conditional release date; loss of a parole open date; loss of a preferred work assignment; denial of parole release; denial of conditional release; denial of participation in the Family Reunion Program; removal from a necessary or desired program, such as an education or treatment program; and transfer from a preferred facility or hub.  In some cases, individuals who lost good time credit or who had open parole or conditional release dates rescinded were held in prison months beyond their release dates as a direct consequence of the faulty test results.

***Plaintiff Nadezda Steele-Warrick Tested Positive for***
***Suboxone/buprenorphine Despite Not Using It***

53. Plaintiff Nadezda Steele-Warrick was incarcerated at Albion Correctional Facility ("Albion"), a DOCCS facility, from June 2015 to May 2019.

54. Ms. Steele-Warrick was a model prisoner, with a pristine and unblemished record of good behavior.  While incarcerated, she participated in numerous prison programs, obtained

9

her GED, and was employed as a teacher's assistant. She also taught cardiovascular and mash-up exercise classes at the Albion gym.

55. As soon as she was eligible, after six months at Albion, Ms. Steele-Warrick applied for and received preferred housing on the basis of her exemplary behavior.

56. Preferred housing offers many advantages over general-population housing. In preferred housing, Ms. Steele-Warrick lived with a smaller group of women, making for quieter and calmer surroundings, and she had better access to stoves, showers, and toilets. She obtained a private room, where she had a night stand, closet, radio, safe keeping for her personal belongings, and an overall much greater measure of privacy and quiet.

57. At the same time, when she became eligible after six months at Albion, Ms. Steele-Warrick applied to the Family Reunification Program (FRP), a DOCCS program that allows incarcerated individuals to meet privately and spend overnights with family members. She was admitted to the FRP after approximately seven months on the waiting list.

58. Through the FRP, Ms. Steele-Warrick saw her husband and young son for overnight visits every four weeks. Her husband and son would arrive on Friday mornings and spend two days with Ms. Steele-Warrick in a private setting where they could cook, eat, sleep, and be alone together as a family unit. Her husband and son would depart on Sunday morning.

59. DOCCS protocol requires, as Ms. Steele-Warrick was well-aware, that all individuals participating in the FRP provide a urine sample for drug testing at the following times: (1) between two to ten days prior to an FRP visit; (2) immediately prior to an FRP visit; and (3) immediately following an FRP visit.

60. Pursuant to that protocol, Ms. Steele-Warrick provided a urine sample at approximately 8:30 a.m. on April 14, 2019, following an FRP visit.

61. That same day, at approximately 10:53 a.m., DOCCS officials processed the urine sample on the Indiko Plus urinalysis analyzer using the DRI + CEDIA Drug Testing System.

62. The results came back with a false positive for Suboxone/buprenorphine, even though Ms. Steele-Warrick had not taken that substance, any substance known to trigger a positive result, or any other illicit substance.

63. At approximately 11:20 a.m., as per protocol, DOCCS staff re-tested the urine sample again on the Indiko Plus urinalysis analyzer using the DRI + CEDIA Drug Testing System.

64. Again, the test results indicated a positive result for Suboxone/buprenorphine. Prior to this incident, Ms. Steele-Warrick had never tested positive for any illegal substance, nor had she ever incurred any prison misconduct charges, for drugs or otherwise, during her entire period of incarceration.

65. As DOCCS confirmed months later, Ms. Steele-Warrick's test results were a faulty false positive.

*Ms. Steele-Warrick Was Unjustly Charged and Sentenced*

66. On Thursday, April 18, 2019, a DOCCS correction officer and sergeant came to Ms. Steele-Warrick's room and advised her she was being charged with drug use.

67. When the sergeant and correction officer informed her of the charge, Ms. Steele-Warrick thought at first they were joking, as she knew it was not possible for her to have a true positive result. She quickly learned they were serious when they handcuffed her, walked her out of her housing unit, and confined her in a disciplinary keeplock cell where she remained for 11 days.

11

68. Individuals assigned to keeplock have limited access to their property, packages, telephones, correspondence, and visitors, and their commissary privileges are suspended, pending a disciplinary determination.

69. Ms. Steele-Warrick felt tremendous shame and humiliation as she was marched away in handcuffs past her peers and friends.

70. Unlike her private room, which had a door she could self-close and open, Ms. Steele-Warrick's keeplock cell was behind locked and secured steel bars. The room had only a locker, sink, and toilet. It did not have the night stand, radio, or closet that Ms. Steele-Warrick had in her private room. Her meals were delivered through a "feed-up slot" in the bars.

71. Ms. Steele-Warrick did not have access to any of her belongings in her keeplock cell. Her first day there, she could not access her toothbrush, shampoo, or soap. Although she eventually obtained those items, she did not have any of her other personal belongings, including her books or magazines.

72. While Ms. Steele-Warrick was confined in keeplock, correction officers emptied out her private room, searching and cataloguing all of her personal belongings and putting most of it in storage.

73. A package of food from Ms. Steele-Warrick's husband arrived while she was in keeplock, and correction officers confiscated all the fresh vegetables and produce, later leaving Ms. Steele-Warrick with only a couple of canned items.

74. Ms. Steele-Warrick was traumatized by her time in the keeplock cell. She was shocked that she had received what she knew had to be a faulty and false positive drug test result and that she had been summarily confined and was facing serious disciplinary charges. She was petrified of the possible punishment she faced and the black mark on her previous unmarred

record of behavior. She cried every day, and people around her began to express concerns about her mental health.

75. She even confided in a mental-health counselor that she was feeling depressed due to the false positive result.

76. Ms. Steele-Warrick faced a formal disciplinary hearing for her charge of alleged drug use. The hearing took place over three separate days while DOCCS continued to hold Ms. Steele-Warrick in a keeplock cell.

77. Ms. Steele-Warrick pleaded not guilty to the charge. She testified at the hearing that she did not ingest any substances containing Suboxone/buprenorphine. Her husband testified that he had not delivered any illegal substances to Ms. Steele-Warrick in the DOCCS facility, and she submitted medical documents from her husband's doctor explaining that the false positive result may have been triggered by a medication he had been prescribed.

78. Despite her testimony, the testimony of her husband, and her husband's medical records, the DOCCS hearing officer found Ms. Steele-Warrick guilty of drug use, relying on the fact that the "test result forms were found to be credible and truthful."

79. Ms. Steele-Warrick was sentenced to 11 days in keeplock (which was equivalent to her time served therein) and thirty days loss of recreation, packages, and commissary privileges. She lost the coveted preferred housing she had previously earned and enjoyed, and was moved back to general population dorm housing.

80. As a result of her sentence, Ms. Steel-Warrick lost her eligibility for the FRP program.

81. Originally, Ms. Steele-Warrick was told that the thirty-day loss of privilege portion of her disciplinary sanctions included her eleven days in keeplock. But when she was

13

given her final paperwork, it stated that the thirty days did not begin to run until the time that she was released from keeplock status.  Because Ms. Steele-Warrick's maximum expiration date was May 22, 2019, she was released from DOCCS custody before her disciplinary sanctions were fully satisfied.

82. The disciplinary disposition, sanctions, and other resulting consequences were devastating for Ms. Steele-Warrick.  She felt much less safe and secure in general population housing, where she lived in a large, crowded, open dormitory-style room with about sixty other women.  Compared to her private room in preferred housing, it was much noisier, more dangerous, and difficult to access simple amenities like toilets, showers, and the kitchen.  She had no privacy, little real personal space, and had trouble sleeping.  Some of her personal items were stolen by other individuals.

83. Due to her loss of recreation privileges, Ms. Steele-Warrick was no longer able to go to the gym or serve as a gym class instructor.  She was restricted to her dormitory and the mess hall, except for a limited time when she was permitted to go outdoors.

84. Worst of all, Ms. Steele-Warrick was denied her last FRP visit with her husband and son, which was scheduled to occur in May before her release.  Because of ongoing immigration proceedings in which she faced possible removal from the United States, Ms. Steele-Warrick did not know what would happen to her when she was released from DOCCS custody.  She feared that she would be detained by Immigration and Customs Enforcement (ICE) or even deported.  The previously scheduled and much anticipated and desired May 2019 FRP visit was the last time she knew for certain that she would see and spend personal and private time with her husband and son.  When the FRP visit was cancelled as part of and because of her

wrongful disciplinary sanction, Ms. Steele-Warrick feared that she may never see and spend real time with her family again.

85. Ms. Steele-Warrick also worried about the possible adverse effects of her drug charge on the course and outcome of her immigration proceedings. To enhance her chances of being permitted to remain with her family in the United States, she needed to demonstrate that she was not a dangerous person or a flight risk. The false drug charge posed a reasonable threat to those efforts and potential outcome.

86. The mental and emotional adverse effects of Ms. Steele-Warrick's disciplinary disposition and sanctions cannot be understated. She had worked tirelessly and successfully to become and remain a model prisoner and get her life back on track, and it felt like her world was crashing down due to incomprehensible and unfair circumstances outside her control. She kept thinking, "why is this happening to me?" and she cried to God for answers.

87. On May 22, 2019, Ms. Steele-Warrick was released from DOCCS custody to post-release supervision.

88. In September 2019, Ms. Steele-Warrick's disciplinary hearing result was overturned because of the false positive Suboxone/buprenorphine result.

89. DOCCS informed Ms. Steele-Warrick and other putative class members that the false positives were the result of a "cross reactivity" issue relating to the Indiko Plus urinalysis analyzers.

90. Even before Ms. Steele-Warrick tested positive for Suboxone/buprenorphine, she heard about other prisoners in the FRP program receiving false positive results.

91. For example, Ms. Steele-Warrick's friend received a false positive result and was handcuffed in front of her family during an FRP visit and sentenced to sixty days in solitary

confinement. She also heard of another elderly woman in another housing unit who tested positive, even though everyone believed the result was likely false.

92. Even before Ms. Steele-Warrick had a false positive result, correction officers told her that they believed something was wrong with the machines.

## CLASS ACTION ALLEGATIONS

93. Ms. Steele-Warrick brings this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on her own behalf and on behalf of a class of all persons similarly situated.

94. Ms. Steele-Warrick is just one of thousands of individuals wrongly and unjustly punished as a result of Defendants' negligent failure to ensure that its tests were used in accordance with applicable standards and produced reliable results.

95. Plaintiff seeks to represent a class consisting of all persons subjected to the Defendants' unreliable testing devices and services provided under the contract and who received positive drug test results generated by Indiko Plus urinalysis analyzers while in DOCCS custody in 2019 and subsequently had those positive drug tests reversed.

96. The members of the Class are too numerous to be joined in one action, and their joinder is impracticable. Upon information and belief, the class is comprised of thousands of individuals.

97. Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. These common questions of fact and law include, but are not limited to: (1) whether Defendants were negligent in providing Indiko Plus machines that generated false positive results to DOCCS' facilities; (2) whether Defendants were negligent in failing to ensure that its products and services were used in accordance with applicable standards; (2) whether Defendants negligently trained DOCCS corrections officers

16

regarding the applicable standards for using their machines; (3) whether Defendants negligently testified that its machines were reliable for purposes of issuing discipline, when they knew that they should be used as a preliminary screen only; (4) what precautions Defendants took to ensure that Indiko machines were running in accordance with applicable standards; (5) what disciplinary actions DOCCS took against Class members after Class members received false positive drug testing results; and (6) what damages should be awarded to redress the harms suffered by Class members.

98. Defendants' actions and the claims alleged in this Complaint are common to all members of the Class.

99. Plaintiff's claims are typical of those of the Class.  Plaintiff received a false positive drug test result for Suboxone/buprenorphine in 2019 due to a test on the Indiko Plus testing apparatus while she was in DOCCS custody and she was subjected to disciplinary sanctions and various other direct adverse consequences as a result.

100. The legal theories on which Plaintiff relies are the same or similar to those on which all Class members would rely, and the harms suffered by her are typical of those suffered by all the other Class members.

101. Plaintiff will fairly and adequately protect the interests of the Class.  The interests of the Class representative are consistent with those of the Class members.  In addition, Plaintiff's counsel are experienced in class action, civil rights, and prison-related litigation.

102. Plaintiff's counsel know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

103. Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue

17

financial, administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

104.	This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable. The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt individual redress for damages.

105.	There will be no extraordinary difficulty in the management of this case as a class action.

**FIRST CAUSE OF ACTION**
(Negligence)

106.	Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

107.	Plaintiff brings this claim on her own behalf and on behalf of the Class.

108.	Plaintiff and the Class received false positive drug test results while in DOCCS' custody, resulting in serious sanctions and punishment, as well as a common and typical series of other adverse consequences, including but not limited to those denoted in paragraphs 5-6 above.

109.	Defendants owed a duty to Plaintiff and the Class to ensure that the Indiko Plus urinalysis analyzers were used in accordance with applicable standards and produced accurate and reliable test results.

110.	Defendants breached their duty to Plaintiff and the Class by failing to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable test results; entering a contract for use of the Indiko Plus urinalysis analyzers that was inconsistent with applicable standards; failing to train DOCCS employees on applicable standards for using the Indiko Plus urinalysis

analyzers; and testifying at disciplinary hearings that the results generated by Indiko Plus urinalysis analyzers could be relied on for discipline, when Defendants knew that the results were a preliminary screen only.

111.    Defendants knew that DOCCS was relying on test results from the Indiko Plus urinalysis analyzers to discipline individuals in its custody, and it was reasonably foreseeable to Defendants that their failure to ensure accurate and reliable test results and that the Indiko Plus urinalysis analyzers were used in a manner consistent with applicable standards would result in unjust discipline of those individuals and the naturally foreseeable adverse consequences of such discipline.

112.    As a result of Defendants' negligent failure to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable results and were used in accordance with applicable standards, Plaintiff and Class members were subjected to serious discipline, including, but not limited to, solitary confinement, keeplock, being held beyond their scheduled release date, and loss of privileges.

113.    Because of Defendants' unlawful conduct, Plaintiff and Class members have suffered pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

## PRAYER FOR RELEIF

WHEREFORE, Plaintiff Nadezda Steele-Warrick and Class members respectfully request that the Court enter a class-wide judgment:

A. Certifying this suit as a class action;

B. Awarding reasonable and just compensatory and punitive damages to Plaintiff and the Class for the injuries they suffered;

C. Awarding attorneys' fees and costs.

D. Ordering other and further relief as this Court deems just, proper and equitable.

Dated: New York, New York
March 5, 2020

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: /s/ Matthew D. Brinckerhoff
Matthew D. Brinckerhoff
Andrew G. Celli
Alanna Kaufman

600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

PRISONERS LEGAL SERVICES OF
NEW YORK

By: /s/ Karen L. Murtagh
Karen L. Murtagh
Michael Cassidy
David Bentivegna
Betsy Hutchings
Nicole Jolicoeur

41 State Street, Suite M112
Albany, NY 12207
(518) 445-6050

*Attorneys for Plaintiff and the Putative Class*