UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NADEZDA STEELE-WARRICK, individually
and on behalf of all others similarly situated,

    Plaintiff,

  *-against-*

MICROGENICS CORPORATION and
THERMO FISHER SCIENTIFIC, INC.,

    Defendants.

Case No. 19 Civ. 6558 (VMS)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' PARTIAL MOTION TO DISMISS**

# TABLE OF CONTENTS

PAGE NO.

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT ........................................................................................................................5

I.     DEFENDANTS HAVE SUFFICIENTLY ALLEGED A CLAIM UNDER NEW YORK GENERAL BUSINESS LAW SECTION 349..................................................5

     A.    Defendants Engaged in Consumer-Oriented Conduct. .....................................6

     B.    Plaintiff's Injury Resulted from Defendants' Pattern of Deceptive Behavior. .....................................................................................................7

II.    DEFENDANTS VIOLATED PLAINTIFF'S AND OTHER INCARCERATED INDIVIDUALS' RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS .........................................................................................9

     A.    Defendants Acted Under Color of State Law. ...................................................9

          1.  Public Function ...........................................................................................9

          2.  Close Nexus ...............................................................................................11

     B.    Defendants Maintained a Policy or Custom Over Years That Subjected People in DOCCS Custody to Discipline Based on Unreliable Drug Tests. ...............................................................................................................14

     C.    Plaintiff Has Sufficiently Alleged an Eighth Amendment Claim....................15

          1.  Defendants' acts and omissions were sufficiently serious........................15

          2.  Defendants consciously disregarded Plaintiff's health and safety, demonstrating deliberate indifference.........................................................18

     D.    Plaintiff Has Sufficiently Alleged a Substantive Due Process Claim..............20

i

# TABLE OF AUTHORITIES

**PAGE NO.**

## CASES

*Ackridge v. Aramark Corr. Food Servs.*,
No. 16-CV-6301 (KMK), 2018 WL 1626175 (S.D.N.Y. Mar. 30, 2018) ................. 11, 12, 13

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)...................................................................................... 9, 12, 15

*Amig v. Cnty. of Juniata*,
432 F. Supp. 3d 481 (M.D. Pa. 2020) ........................................................... 10, 11

*Baez v. JetBlue Airways*,
745 F. Supp. 2d 214 (E.D.N.Y. 2010) ................................................................. 14

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014)................................................................................... 12

*Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.*,
344 F.3d 211 (2d Cir. 2003)................................................................................... 8

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) ............................................................................................ 10

*Chapman v. United States*,
500 U.S. 453 (1991) ............................................................................................ 23

*Chodkowski v. City of New York*,
No. 06 CV 7120 (LBS), 2007 WL 2717872 (S.D.N.Y. Sept. 11, 2007) ............... 14

*City of New York v. Smokes-Spirits.Com, Inc.*,
12 N.Y.3d 616 (2009) ....................................................................................... 6, 7

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ............................................................................................ 24

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
318 F.3d 105 (2d Cir. 2003)................................................................................. 13

*Crawford v. Cuomo*,
796 F.3d 252 (2d Cir. 2015)........................................................................... 16, 17

*Farmer v. Brennan*,
511 U.S. 825 (1994)........................................................................... 16, 17, 19, 21

*Foucha v. Louisiana*,
504 U.S. 71 (1992).............................................................................................. 23

*Gaidon v. Guardian Life Ins. Co. of Am.*,
94 N.Y.2d 330 (1999) ........................................................................................... 8

*Gantt v. Ferrara*,
No. 15-CV-7661 (KMK), 2017 WL 1192889 (S.D.N.Y. Mar. 29, 2017) ............... 26

*Hayes v. Dahlke*,
   976 F.3d 259 (2d Cir. 2020)......................................................................... 17

*Hernandez v. Keane*,
   341 F.3d 137 (2d Cir. 2003)......................................................................... 19

*Hogan v. Fischer*,
   738 F.3d 509 (2d Cir. 2013)......................................................................... 16

*Hurd v. Fredenburgh*,
   984 F.3d 1075 (2d Cir. 2021)................................................................ 22, 24

*Jones v. Smith*,
   120 Misc. 2d 445 (Sup. Ct. 1983)................................................................. 7

*KS Trade LLC v. Int'l Gemological Inst., Inc.*,
   190 A.D.3d 556 (2021) .................................................................................. 6

*Lewis v. Siwicki*,
   944 F.3d 427 (2d Cir. 2019).................................................................. 16, 25

*McCray v. Lee*,
   963 F.3d 110 (2d Cir. 2020)......................................................................... 17

*McCullum v. City of Phila.*,
   No. 98-CV-5858, 1999 WL 493696 (E.D. Pa. July 13, 1999)..................... 11

*Monell v. Dep't of Social Serv. of the City of New York*,
   436 U.S. 658 (1978) ..................................................................................... 15

*New York Univ. v. Cont'l Ins. Co.*,
   87 N.Y.2d 308 (1995) .................................................................................... 8

*New York v. Feldman*,
   210 F. Supp. 2d 294 (S.D.N.Y. 2002).......................................................... 6

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
   875 F.3d 107 (2d Cir. 2017)...................................................................... 6, 7

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ..................................................................................... 22

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2d Cir. 2015).......................................................................... 8

*Pagan v. Westchester Cnty.*,
   No. 12 CIV. 7669 (PAE) (JCF), 2014 WL 982876 (S.D.N.Y. Mar. 12, 2014) ............... 11, 12

*Pelman ex rel. Pelman v. McDonald's Corp.*,
   396 F.3d 508 (2d Cir. 2005) .......................................................................... 8

*Pena v. DePrisco*,
   432 F.3d 98 (2d Cir. 2005)..................................................................... 25, 26

*People by Schneiderman v. Credit Suisse Sec. (USA) LLC*,
   31 N.Y.3d 622 (2018) .................................................................................... 8

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002)................................................................. 16

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ............................................................... 19

*Rendell–Baker v. Kohn*,
    457 U.S. 830 (1982)........................................................................... 10

*Rhodes v. Chapman*,
    452 U.S. 337 (1981)...................................................................... 17, 19

*Rivera v. Rhode Island*,
    402 F.3d 27 (1st Cir. 2005)................................................................. 25

*Rodriguez v. Plymouth Ambulance Serv.*,
    577 F.3d 816 (7th Cir. 2009) ............................................................... 12

*Rojas v. Alexander's Dep't Store, Inc.*,
    924 F.2d 406 (2d Cir. 1990)................................................................ 15

*Sacramento v. Lewis*,
    523 U.S. 833 (1998)........................................................................... 22

*Sandin v. Conner*,
    515 U.S. 472 (1995)...................................................................... 22, 23

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995).................................................................. 6, 7

*Smego v. Aramark Food Servs. Corp.*,
    No. 10-3334, 2013 WL 1987262 (C.D. Ill. May 13, 2013) ................................ 11

*Southerland v. City of New York*,
    680 F.3d 127 (2d Cir. 2012)........................................................ 22, 23, 24

*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
    546 F.3d 255 (2d Cir. 2008)................................................................. 9

*Torres v. Aramark Food*,
    No. 14-CV-7498 (KMK), 2015 WL 9077472 (S.D.N.Y. Dec. 16, 2015) .............. 11, 12

*United States v. Walsh*,
    194 F.3d 37 (2d Cir. 1999).............................................................. 17, 23

*Vega v. Semple*,
    963 F.3d 259 (2d Cir. 2020)................................................................ 19

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)........................................................................... 23

*West v. Atkins*,
    487 U.S. 42 (1988)................................................................... 10, 11, 13

## STATUTES

42 U.S.C. § 1983 ................................................................................................................. 15

N.Y. Gen. Bus. Law § 349 ......................................................................................... 2, 6, 7, 8

**PRELIMINARY STATEMENT**

This case is about two corporations that, acting with the power of the State, pursued profit at the expense of human welfare. Microgenics Corporation and Thermo Fisher Scientific, Inc. (collectively, "Defendants") intentionally misrepresented the reliability of the Indiko Plus and its assays, in order to induce the New York Department of Corrections and Community Supervision ("DOCCS") to use their urine drug testing system to identify individuals in DOCCS custody for discipline without legitimate justification. As a result of Defendants' misrepresentations to DOCCS, and Defendants' active involvement in the disciplinary process, Plaintiff Nadezda Steele-Warrick and numerous other incarcerated people were subjected to arbitrary punishment based on an unreliable drug test—which Defendants *knew* was unreliable. By putting profit over their duties to incarcerated people, Defendants violated Plaintiff's and other incarcerated people's constitutional rights and their rights under state law.

Defendants told DOCCS that the Indiko Plus and its assays were "just like" the system DOCCS had been using previously, had no substantive issues with cross-reactivity, and that Defendants were confident in the system's reliability. None of this was true. Between 2016 and the end of 2019, Defendants responded to DOCCS's requests for scientific data with incomplete information about their testing system. They failed to ensure that DOCCS used gas chromatography and mass spectrometry testing to confirm test results from Defendants' system; they failed to identify known scientific uncertainties in their test results, including about cross-reactivity with over-the-counter medications; and they limited themselves to providing DOCCS a "story" that deceptively appeared to support the reliability of their tests.

Once they had won DOCCS's contract, Defendants instructed their employees to give stock responses to any incarcerated person's specific questions regarding the reliability of the system, simply stating that the products are "highly accurate" and "qualified" for drug testing

use.[1] Defendants also informed DOCCS and its officials and employees that incarcerated people should not be allowed to ask detailed questions about the reliability of the system, nor should they be given access to extra manuals or package inserts which provided information about medications that could cross-react on the system.

Defendants' contract with DOCCS made them the exclusive provider of drug testing services in all DOCCS facilities. Their employees revised a DOCCS directive that had the force of law to justify discipline without outside confirmatory testing, despite Defendants knowing such confirmatory testing was essential. Thus, with the force and power of the State, Defendants' policy and practice placed all incarcerated people in every DOCCS facility at heightened and substantial risk of being subjected to arbitrary, unwarranted, and unproven discipline, all of which had no legitimate penological purpose, all based on a drug test Defendants knew was unreliable. Defendants' deliberate indifference to Plaintiff and all other incarcerated individuals violated their rights under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. Their conduct also violated New York General Business Law § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business . . . ."

## BACKGROUND

Defendants began marketing their urine drug testing system and related services to DOCCS in late 2015. Second Am. Compl. ¶ 142, ECF No. 69. At the time, Siemens provided drug testing services for DOCCS. *Id.* ¶ 131. Brenda Collum joined Defendants in November 2015 after leaving Siemens, where she had served as a direct liaison between DOCCS and Siemens with respect to that contract and services. *Id.* ¶ 140. Now employed by Defendants, she began efforts to convince, induce, and push DOCCS to switch its contract from Siemens to Defendants. *Id.* ¶ 142. Defendants were offering a different system than the one Siemens

---

[1] Plaintiff has also alleged that Defendants' products and services did not serve as accurate screening tests, let alone as the final arbiters of an incarcerated person's liberty. Second Am. Compl. ¶ 42.

provided, which DOCCS had used for thirty years. *Id.* ¶ 134. Collum's efforts were endorsed, amplified, and expanded upon by her supervisors and other high-ranking employees within Defendants, including the National Sales Manager. *Id.* ¶¶ 150–51.

Defendants withheld disclosure of known scientific uncertainty about their tests and details regarding cross-reactivity to other substances, such as over-the-counter medications, and they willfully failed to ensure that DOCCS would use gas chromatography and mass spectrometry to confirm test results, even though they knew the importance of such confirmatory testing. *Id.* ¶¶ 160–170, 208. One of Defendants' primary selling points to DOCCS was that Defendants would send employees to testify at individual incarcerated people's disciplinary hearings as to the reliability of their tests—a service Collum and Defendants knew DOCCS wanted from Collum's time at Siemens. *Id.* ¶¶ 141–42, 149–51. Collum emailed a DOCCS official, stating: "You know my abilities to help you with your drug testing program. Now, I have the backing to help you make better choices to meet all your needs including Admin. Hearings . . . ." *Id.* ¶ 149. Defendants offered these services despite internal knowledge that their testing system was not sufficiently accurate to justify discipline and that no confirmatory testing would be implemented. Defendants claimed their testing system was used by the federal government and several states to identify drug users; they did not acknowledge that these institutions used confirmatory testing in addition to Defendants' screening test, and that *none* of them required Defendants' employees to testify at hearings. *Id.* ¶¶ 148, 158–59, 164.

Defendants repeated their omissions and misrepresentations throughout DOCCS's formal contract bid processes in 2017 and 2018. An employee of Defendants wrote to colleagues in July 2017 that she planned to "draft a 'story' that supports the validity of our technologies" as compared to the technology DOCCS previously used. *Id.* ¶ 173. Another employee wrote that they should not circulate to DOCCS scientific articles regarding the reliability of their testing

system or its equivalence with Siemens because "anything negative about our tests" could be used by "defense counsel . . . to invalidate our test[.]" *Id.*

Based on their willful and deceitful misrepresentations, Defendants were awarded the contract[2] to provide drug testing services throughout all DOCCS facilities. Collum was invited to and did edit DOCCS Directive #4937, which carries the force of law and governs and is used in disciplinary hearings to justify discipline.[3] *Id.* ¶¶ 184, 187. She approved of DOCCS's plan, under the Directive, to merely run Defendants' screening tests twice without the confirmatory testing she and her colleagues knew (and had discussed) was vital. *Id.* ¶ 199. Her edits stated that other penal institutions used Defendants' drug testing services but failed to acknowledge—thus again concealing—that these other jurisdictions and institutions use confirmatory testing. *Id.* ¶ 185. Instead, Defendants established a protocol for employees to provide testimony at disciplinary hearings that included providing a stock, incomplete, and misleading answer for any probing questions an incarcerated person might have about inaccuracies or confirmatory testing: If asked, "how many false positives?", "the response should be 'Our products are highly accurate and have qualified to be used for testing in your facility.[']" *Id.* ¶ 189.

DOCCS staff started noticing issues with Defendants' testing system almost as soon as it was installed in 2019, and they specifically expressed concerns that incarcerated individuals facing discipline might not have the information they needed to respond to charges based on urinalysis testing. *Id.* ¶ 190. Among other things, DOCCS requested extra manuals and package inserts to make available to incarcerated individuals facing disciplinary action for review; but Defendants protested that it was "completely unacceptable" for inmates to have access to extra

---

[2] Defendants were awarded the contract first in 2017, but that contract was cancelled when Siemens objected to the bidding process. *Id.* ¶ 178. They re-bid in 2018 and were awarded a substantially identical contract. *Id.* ¶ 180.
[3] Defendants reference this directive as part of their argument that "DOCCS alone" was responsible for the drug testing and disciplinary process. Defs.' Mem. at 14 n.2. They conveniently omit the fact that Defendants revised the Directive and all of Defendants' edits were accepted by DOCCS. Second Am. Compl. ¶ 187.

manuals and that "inmates are not to have package inserts," even though those inserts were often the only mechanism by which incarcerated individuals could identify whether any medications they took could cause cross-reactivity with Defendants' assays. *Id.* ¶¶ 190–91, 200. Defendants also repeatedly testified during individuals' hearings that medications taken by incarcerated individuals would not cross-react, even though Defendants had never tested the effect of some of those medications on testing with the Indiko Plus machine or as to certain assays; and they continued to testify and maintain that outside confirmatory testing was not required to accurately identify inaccurate or unreliable results, despite knowledge to the contrary. *Id.* ¶¶ 201, 208.

Defendants (a) provided the physical testing system used to identify individuals who may have consumed prohibited substances, (b) warranted that that system was "substantially . . . error-free," (c) revised the directive that governed how DOCCS officers conducted disciplinary hearings, (d) instructed DOCCS to not provide accused individuals with basic documentation on the tests, (e) testified at hearings that there was no basis to challenge test results, and (f) did so while knowing that their test results were the sole determinant of whether an incarcerated individual would be disciplined and that that discipline would involve substantial deprivation of liberty. They acted as state actors and violated the constitutional rights and rights under New York law of Plaintiff and the putative class.

## ARGUMENT

### I. DEFENDANTS HAVE SUFFICIENTLY ALLEGED A CLAIM UNDER NEW YORK GENERAL BUSINESS LAW SECTION 349

New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]" N.Y. Gen. Bus. Law § 349(a). To state a claim under Section 349, a plaintiff need only "allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New*

*York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (2009) (cleaned up); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (quoting standard).

Defendants do not dispute at this stage that their conduct was deceptive or that Plaintiff suffered an injury. Rather, they argue that Defendants' conduct was neither consumer-oriented nor the cause of Plaintiff's harm. They are wrong on both counts.

### A.     Defendants Engaged in Consumer-Oriented Conduct.

"The critical question [under Section 349] is whether the matter affects the public interest[,] . . . not whether the suit is brought by a consumer or a competitor." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995); *see also KS Trade LLC v. Int'l Gemological Inst., Inc.*, 190 A.D.3d 556, 557 (2021) ("Indeed, the gravamen of the amended complaint is harm to the public interest. Plaintiff has standing to bring a claim despite not being a consumer . . . so long as there has been harm done to the public at large." (cleaned up)). Accordingly, courts have construed "consumer-oriented" activity liberally to include actions that cause consumer injury *or* "*harm to the public interest.*" *Id.* (emphasis added); *see also New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002). Thus, Section 349 may apply even where a transaction involves only "sophisticated" parties so long as there is injury to the public. *See, e.g.*, *Nick's Garage*, 875 F.3d at 125 (finding that an insurer that underpaid on claims pursuant to its contract with a repair shop affected the public generally and thus satisfied the "consumer-oriented" element of Section 349); *see also Schnabolk*, 65 F.3d at 264 (holding that although a private commercial dispute between two lock equipment manufacturers was not "aimed at the public" it was nonetheless consumer-oriented because the public was "incidentally affected" by it).

Defendants' deceptive behavior unquestionably caused harm to the public interest. By inducing DOCCS to use an unreliable drug test as a basis for prison discipline, Defendants' actions affected thousands of incarcerated New Yorkers, who are members of the public. *See*

*Jones v. Smith*, 120 Misc. 2d 445, 447 (Sup. Ct. 1983) (holding that incarcerated individuals are members of the general public under the New York Constitution and Executive Law Section 102, where prisoners challenged a correctional facility's implementation of new disciplinary procedures under Article 78). In addition, the public at large has an important interest in ensuring that prisons treat incarcerated individuals equitably. Random, unjustified punishments such as the one imposed on Plaintiff undermine public confidence in the fairness and rehabilitative potential of our justice system and can in fact reduce prisoners' incentives to remain drug free.

Defendants contend that the "DOCCS-Microgenics contract" is not consumer-oriented because it concerns a contract which was a "specialized, one-off" contract between two "highly sophisticated" parties with equal bargaining power. Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 19–20. This argument is fundamentally flawed and misleading. The test is not whether Defendants entered a consumer-oriented *contract* but whether they engaged in consumer-oriented *conduct*. *See Smokes-Spirits.Com*, 12 N.Y.3d at 621. The existence of a contract does not preclude third party claims under Section 349 based on Defendants' conduct.

The contract between Defendants and DOCCS was not a private contract—it was a contract between the State and a corporation to assist DOCCS in fulfilling its responsibilities with respect to individuals in its custody. The scope of harm caused by Defendants' conduct extends far beyond a mere contract dispute, reaching the public at large. Because Plaintiff has alleged conduct by Defendants that "ha[s] a broad impact on consumers at large[,]" that conduct was "deceptive in a material way[,] and that plaintiff has been injured by it[,]" Plaintiff has stated a claim under Section 349. *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 320 (1995).

### B. Plaintiff's Injury Resulted from Defendants' Pattern of Deceptive Behavior.

To state a Section 349 claim, a plaintiff must show that she suffered an injury as a result of defendant's misleading conduct. Citing no controlling precedent, Defendants assert that to prove causation under Section 349 Plaintiff must show "personal knowledge of or reliance upon

the alleged misrepresentations[.]" Defs.' Mem. at 21. Not true. In *Pelman ex rel. Pelman v. McDonald's Corp.*, the Second Circuit explained that, under New York Court of Appeals precedent, "because § 349 extends well beyond common-law fraud to cover a broad range of deceptive practices . . . a private action under § 349 does not require proof of the same essential elements . . . as common-law fraud," such as reliance or personal knowledge. 396 F.3d 508, 511 (2d Cir. 2005) (citing *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 348 (1999)); *People by Schneiderman v. Credit Suisse Sec. (USA) LLC*, 31 N.Y.3d 622, 633 (2018) ("the term 'deceptive practices' has been interpreted broadly to encompass wrongful conduct not previously actionable on a common law fraud theory"); *Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.,* 344 F.3d 211, 219 (2d Cir. 2003) ("Section 349 does not require all elements of a traditional common law tort[.]"). Thus, to satisfy the causation element of Section 349, Plaintiff need only show that her injury stemmed from Defendants' misrepresentations and omissions. *See Orlander v. Staples, Inc.*, 802 F.3d 289, 301 (2d Cir. 2015).

The facts alleged establish causation. Over a multiyear period, Defendants engaged in a campaign of deception by concealing and misstating facts concerning the accuracy and reliability of their drug test. Second Am. Compl. ¶¶ 140–214. Defendants' campaign successfully induced DOCCS into using Defendants' testing system as authorized and endorsed by Defendants even though they knew it was inherently flawed and unreliable. *Id.* ¶¶ 177, 182. Defendants falsely testified at disciplinary hearings that their system was accurate and reliable. *Id.* ¶¶ 200, 201, 208, 212. And relying on Defendants' flawed testing system and inaccurate testimony in hearings, DOCCS administrators levied sanctions on individuals arbitrarily accused of drug use. *Id.* ¶¶ 66–92, 208. Without Defendants' false and misleading testimonies, DOCCS would have lacked

sufficient grounds to discipline Plaintiff and other class members.[4] These facts plausibly allege a direct causal link between Defendants' consumer-oriented conduct and Plaintiff's injury.

## II. DEFENDANTS VIOLATED PLAINTIFF'S AND OTHER INCARCERATED INDIVIDUALS' RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS

### A. Defendants Acted Under Color of State Law.

To assert a constitutional claim under Section 1983, a "plaintiff must allege that the state was involved with the activity that caused the injury giving rise to the action." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257–58 (2d Cir. 2008) (cleaned up). Private actors act under color of state law for purposes of Section 1983 when they are "jointly engaged with state officials in the prohibited action[.]" *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970). Whether a private entity qualifies as a state actor is a "necessarily fact-bound inquiry[.]" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001). The criteria for determining whether a private entity is a state actor "lack rigid simplicity." *Id.* at 295.

Defendants are liable under Section 1983 because (1) their provision of drug testing services, which formed the basis for disciplinary action, is a public function; and (2) there is a close nexus between Defendants' and DOCCS's challenged actions.

#### 1. Public Function

Testing and disciplining incarcerated individuals for drugs is "traditionally the exclusive prerogative of the State[,]" and thus Defendants are state actors under the "public function" test. *Rendell–Baker v. Kohn*, 457 U.S. 830, 842 (1982). The Supreme Court has held, in analogous circumstances, that the provision of medical services related to the incarceration of people constitutes the performance of a public function, even where such services are provided by a

---

[4] Defendants have previously argued that Plaintiff does not have standing to raise Defendants' participation in disciplinary hearings because Defendants did not testify at *her* hearing. That is illogical. Defendants' employees *regularly* testified to the accuracy and reliability of their tests and DOCCS relied on those representations in imposing discipline. Whether Defendants' employees testified in any one case is neither here nor there.

private individual or entity. *See West v. Atkins*, 487 U.S. 42, 55 (1988) ("North Carolina employs physicians . . . and defers to their professional judgment[] in order to fulfill [its] obligation" to provide medical care to incarcerated people. The physician defendant therefore "is authorized and obliged to treat prison inmates" and "does so 'clothed with the authority of state law.'" (cleaned up)). Here too, DOCCS relied on Defendants' expertise and professional judgment as to the accuracy, reliability, and propriety of their tests for disciplining incarcerated individuals and, in fact, called for expert testimony from Defendants during disciplinary hearings on exactly these points.

The only court to examine this precise question held that "drug-testing in a prison may be considered a traditional state function." *Amig v. Cnty. of Juniata*, 432 F. Supp. 3d 481, 487 (M.D. Pa. 2020). The *Amig* court held that prisons are obligated to "provid[e] a safe environment in which inmates may serve their periods of incarceration[,]" which "include[s] maintaining a drug-free setting to the greatest extent possible." *Id.* Prisons therefore "have a duty to monitor their prison population for illicit drug use[,]" and they "cannot [] delegate the duty to monitor drug use [to] a private party and absolve inmates of constitutional rights by doing so." *Id.*

The district court's reasoning in *Amig* directly applies to Defendants' conduct: DOCCS delegated the functions of drug-testing and related services to Defendants, who had not only induced DOCCS to confer such functions but who assumed such role and functions. Defendants are therefore responsible for constitutional violations that arise and result from such functions and their drug-testing services. *See Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301 (KMK), 2018 WL 1626175, at *7 (S.D.N.Y. Mar. 30, 2018) ("'[p]roviding food service . . . to . . . incarcerated people is one part of the government function of incarceration,' thus rendering food service providers state actors for purpose of § 1983 analysis" (quoting *McCullum v. City of Phila.*, No. 98-CV-5858, 1999 WL 493696, at *3 (E.D. Pa. July 13, 1999)); *Torres v. Aramark Food*, No. 14-CV-7498 (KMK), 2015 WL 9077472, at *6 (S.D.N.Y. Dec. 16, 2015) ("providing

food to inmates is a public function, and . . . Plaintiff's Amended Complaint relates to the meals that Aramark, acting as the state's culinary surrogate, provided to the prisoners"); *Smego v. Aramark Food Servs. Corp.*, No. 10-3334, 2013 WL 1987262, at *6 (C.D. Ill. May 13, 2013) ("Aramark Defendants are state actors because they have voluntarily assumed the obligation to fulfill an essential state function: feeding detainees in a state facility.").

Defendants' contract with DOCCS to provide drug testing and related testimonial services also supports a finding that they are state actors under the public function test. *See West*, 487 U.S. at 56 ("The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract."); *Pagan v. Westchester Cnty.*, No. 12 CIV. 7669 (PAE) (JCF), 2014 WL 982876, at *24 (S.D.N.Y. Mar. 12, 2014), *on reconsideration*, No. 12 CIV. 7669 (PAE) (SN), 2015 WL 337403 (S.D.N.Y. Jan. 26, 2015)) ("The County has contracted with Aramark to perform this governmental function. Thus, Aramark is serving a public function in providing daily meals to inmates."); *cf. Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009) (contrasting a private person or entity that voluntarily contracts to provide services in prisons with a private person or entity that has "an incidental and transitory relationship with the state's penal system").

Defendants not only willingly contracted with DOCCS to provide drug testing and testimonial services—they spent years misrepresenting their services and concealing data to woo DOCCS away from its former provider of drug testing services, Siemens, in order to gain such a contract. Second Am. Compl. ¶ 183. Defendants are state actors under the public function test.

### 2. **Close Nexus**

Defendants were "willful participant[s] in joint activity with the State or its agents," and that "is enough" for them to qualify as a state actor. *Adickes*, 398 U.S. at 152. "Courts have found such a nexus where a private organization performs services that 'flow[ ] directly from the

obligations of the government entity and [are] performed under its supervision.'" *Ackridge*, 2018 WL 1626175, at *7 (quoting *Pagan*, 2014 WL 982876, at *25). For example, "a number of courts have found that, where Aramark[, a private corporation,] contracts with a prison to provide food to inmates, a sufficiently close nexus exists." *Torres*, 2015 WL 9077472, at *5–6 (collecting cases).

Contrary to Defendants' assertion that Plaintiff must allege that Defendants shared a common goal with the State to violate Plaintiff's rights to hold Defendants liable under Section 1983, Defs.' Mem. at 7, *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014), does not require plaintiffs to show a common goal between the state actor and private entity where the state entity employs the private actor to provide its services or fulfill its obligations. Here, DOCCS employed and relied upon Defendants to fulfill its obligation to provide drug testing services and discipline incarcerated people based on such testing services.

Defendants contracted to "provide, install, maintain, and train DOCCS employees on urinalysis analyzers[.]" Second Am. Compl. ¶¶ 2, 11. Furthermore, the contract "required Defendants' employees to testify at disciplinary hearings for incarcerated individuals who received positive drug test results from the Indiko Plus machines." *Id.* ¶ 28. Defendants willfully participated in the activity of testing and disciplining incarcerated people using an unreliable drug testing process and, like Aramark, are state actors who contracted with the state to provide such services. *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003) (A "private actor [who] operates as a willful participant in joint activity with the State or its agents" may be considered a state actor under Section 1983 (cleaned up)). Defendants contracted and functioned in the DOCCS prison system as the entity which identified and substantiated the bases for alleged drug-related disciplinary action. *See Ackridge*, 2018 WL 1626175, at *8 (finding private corporation a state actor under close nexus test where, "acting pursuant to a contract, [it] prepared the kosher and non-kosher meals for the WCDOC"); *West*, 487 U.S. at 43 (holding that

a private physician who contracted with a state prison to attend to the inmates' medical needs was a state actor due to his "function within the [] system"). Just as the only medical care the plaintiff in *West* could receive was that provided by the private physician, the only drug testing that Plaintiff here had access to and was subjected to that would form or refute the basis of her alleged wrongful drug use and disciplinary charge was that provided and afforded by Defendants.

Defendants also jointly participated in the state activity of testing and disciplining incarcerated people by making false and misleading statements and representations over the course of years with the purpose of inducing DOCCS to rely on their tests to impose such discipline. *See Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 221 (E.D.N.Y. 2010) ("A longstanding pattern of repeated lies and false accusations made for the purpose of procuring an arrest may constitute state action." (citing *Chodkowski v. City of New York*, No. 06 CV 7120 (LBS), 2007 WL 2717872, at *8–9 (S.D.N.Y. Sept. 11, 2007)). Defendants spent years obscuring the fact that their system needs confirmatory testing as they pressed DOCCS to purchase it through deceptive means, knowing that unjustified discipline would result. They made repeated false statements to DOCCS that their testing process was accurate and reliable without the requisite confirmatory testing over those years, deleted references to scientific uncertainty or the need for confirmatory testing in a script used by staff in connection with participation during disciplinary hearings, and continued to hide the need for confirmatory testing when individuals who were facing discipline sought information about the testing in order to attempt to defend themselves against the charges and unreliable drug tests.

Defendants sold DOCCS—and helped administer—a system which they knew was unreliable and deliberately withheld internal guidelines for confirmatory testing which would have made the tests reliable. They actively and repeatedly misrepresented and concealed this information from DOCCS and from incarcerated individuals despite knowing that the unreliable

13

test results would then be used to discipline incarcerated people, and despite providing testimony in support of such testing and resulting disciplinary actions. They also deliberately concealed information about the risks of cross-reactivity and calibration, and they even revised a DOCCS directive which carries the force of state law to mislead DOCCS and incarcerated individuals subjected to and facing discipline as to the reliability of their testing system. And they doubled down by testifying as to the reliability of their testing system *without* the requisite confirmatory testing during individuals' disciplinary hearings. They thus jointly participated in the state activity and therefore acted under color of state law under 42 U.S.C. § 1983.

**B.    Defendants Maintained a Policy or Custom Over Years That Subjected People in DOCCS Custody to Discipline Based on Unreliable Drug Tests.**

Private employers are liable under Section 1983 for the constitutional torts of their employees where "action pursuant to official . . . *policy* of some nature caused a constitutional tort." *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (quoting *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658, 691 (1978)) (emphasis in the original). A plaintiff may satisfy the "policy or custom" requirement by alleging, *inter alia*, "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware." *Ackridge*, 2018 WL 1626175, at *11 (cleaned up).

Defendants mischaracterize Plaintiff's claim as one alleging that, rather than a policy causing her injury, it was an employee's "noncompliance or non-implementation [of Defendants' policy that] caused her injury." Defs.' Mem. at 11. But the allegations in Plaintiff's Second Amended Complaint make clear that she is not claiming that some rogue employee made a mistake or failed to follow policy. Rather, Plaintiff alleges that Defendants *developed* and nurtured a policy or custom with respect to DOCCS, which was implemented and endorsed by individuals with supervisory and policy-making authority employed by Defendants. Defendants'

practice and custom was cemented over years and reinforced through Defendants' own materials, training programs, and practice of hiding evidence of scientific uncertainty and promoting reliance on their tests for the imposition of discipline on incarcerated people. Plaintiff has thus met the standard for alleging that her injuries are the result of Defendants' policy or custom.

### C.   Plaintiff Has Sufficiently Alleged an Eighth Amendment Claim.

It is well-established that the Eighth Amendment prohibits not only "physically barbarous" punishments, but also punishments that totally lack "penological justification." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). To state a valid Eighth Amendment claim, a plaintiff need only allege two elements. First, she must allege that the defendant's misconduct was objectively "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). Second, she must allege that the defendant acted with "deliberate indifference" to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834; *see also Lewis v. Siwicki*, 944 F.3d 427, 430–31 (2d Cir. 2019).

Plaintiff satisfies both requirements by alleging that (1) Defendants' misrepresentations and omissions concerning the accuracy of their testing system were sufficiently serious, and (2) Defendants, by *repeatedly* misrepresenting and omitting material information about their system (which they knew was unreliable), acted with deliberate indifference to her health and safety, and to the health and safety of the putative class.

### 1.   Defendants' acts and omissions were sufficiently serious.

The test to determine whether the alleged misconduct was "sufficiently serious" is objective and "context specific." *Crawford*, 796 F.3d at 256; *see also Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013). In cases where plaintiffs challenge the conduct of a prison official—as opposed to, say, the material conditions of confinement—the "principal inquiry" is whether the conduct served a penological purpose. *Compare Crawford*, 796 F.3d at 257–58 (stating that where an inmate alleges that a prison official's frisk violated the Eighth Amendment, the

"principal inquiry is whether the contact [was] incidental to legitimate official duties"), *with Farmer*, 511 U.S. at 834 (explaining that in "prison-conditions" cases, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm"). If the conduct serves no penological purpose, it is "sufficiently serious." *See United States v. Walsh*, 194 F.3d 37, 49 (2d Cir. 1999) ("[T]he Eighth Amendment prohibits behavior that . . . has no legitimate penological purpose." (internal quotations omitted)); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'").

Even single incidents of misconduct that do not result in serious injury can constitute an Eighth Amendment injury. *See McCray v. Lee*, 963 F.3d 110, 118 (2d Cir. 2020) (holding that a prison's denial of plaintiffs' right to a "meaningful opportunity for physical exercise" was a cognizable harm under the Eighth Amendment because the prison's refusal to clear an outdoor space of ice and snow during the winter season lacked "penological reason"); *Hayes v. Dahlke*, 976 F.3d 259, 275 (2d Cir. 2020) (reversing summary judgment on Eighth Amendment claim because fact issues existed as to whether the defendant prison official's over-the-clothing pat frisk of the plaintiff was "incidental to legitimate official duties" or "undertaken to arouse or gratify the officer or humiliate the inmate"); *Crawford*, 796 F.3d at 257 (stating that "a corrections officer's intentional contact with an inmate's genitalia" violates the Eighth Amendment if it "serves no penological purpose[,]" regardless of whether "there was penetration, physical injury, or direct contact").

Defendants' conduct was sufficiently serious. Defendants engaged in a multiyear disinformation campaign to ensure that DOCCS purchased and used their unreliable testing system. Second Am. Compl. ¶¶ 140–214. They concealed information that would have allowed DOCCS to properly assess the efficacy of their testing system, including known flaws with their assays and data on the scientific uncertainty and unreliability of their system. *Id.* ¶¶ 163–66, 173,

208. They deliberately and willfully downplayed the requirement that test results be confirmed by gas chromatography and mass spectrometry, telling incarcerated individuals and DOCCS officers that such testing was not needed. *Id.* ¶ 186. Defendants flagrantly misrepresented the accuracy and proper operation of their testing regime on multiple occasions. *Id.* ¶¶ 143, 173, 196–98, 201, 208. Defendants always knew their testing system was inherently unreliable when used as DOCCS intended and as Defendants encouraged and endorsed. *Id.* ¶ 190. Yet, as late as December 2019, even after the Acting Commissioner of DOCCS ordered DOCCS not to discipline incarcerated individuals for drug use without first having an outside vendor confirm the accuracy and reliability of Defendants' results, Defendants continued to testify at disciplinary hearings that their system was accurate and reliable. *Id.* ¶ 212.

Defendants' repeated misrepresentations and omissions were unnecessary, avoidable, and totally unrelated to any penological interest in protecting the health, safety, and security of incarcerated individuals or DOCCS facilities. Indeed, Defendants' conduct undermined any such legitimate interests. Defendants' intentionally misled DOCCS concerning cross-reactivity issues, the need for confirmatory testing by gas chromatography and mass spectrometry, and other data related to the unreliability of their test. This deception, coupled with Defendants' insistence in disciplinary hearings that their test was reliable, served no purpose other than to advance Defendants' financial interests. Furthermore, Defendants jeopardized the health and safety of incarcerated individuals in DOCCS's custody by implementing an unreliable drug testing regime and by wantonly inflicting injury on individuals who were subjected to such regime and faced and suffered disciplinary sanction despite there being no reliable evidence at all of any wrongdoing. Such entirely "unnecessary and wanton" infliction of pain and harm is precisely the kind of punishment proscribed by the Eighth Amendment. *Rhodes*, 452 U.S. at 346.

2.      **Defendants consciously disregarded Plaintiff's health and safety, demonstrating deliberate indifference.**

To show deliberate indifference under the Eighth Amendment, a plaintiff must show that the defendant acted with criminal recklessness, or "a conscious disregard of a substantial risk of serious harm." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). The defendant "must [] be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must [] draw the inference." *Farmer*, 511 U.S. at 837. "Evidence that a risk [is] obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (cleaned up).

Although courts may infer deliberate indifference where the punishment lacks justification, *Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019), this court does not need to make any inferences here. The facts are clear and direct: Defendants knew that that their testing system was flawed when used as DOCCS intended and Defendants endorsed, and that DOCCS would exclusively rely upon it to impose guilt and a range of sanctions and punishments upon incarcerated individuals. Defendants' testimony endorsing and approving the tests and results during disciplinary hearings, alone, demonstrates a conscious disregard of a substantial risk of serious harm directly and solely attributable to their misconduct. But Defendants' knowledge that they were placing incarcerated people at substantial risk of both wrongful accusation of drug use and punishment based on unreliable tests extends all the way back through their contract negotiation processes with DOCCS, during which they repeatedly provided DOCCS with incomplete and inaccurate cherry-picked data creating a false impression that their tests were reliable, even as Defendants committed to testifying at individuals' disciplinary hearings.

Defendants argue that Plaintiff cannot show "deliberate indifference" because Defendants buried in an attachment to their bid—not in the bid itself, much less in the final contract—that

DOCCS needed to verify positive test results with confirmatory testing. Defs.' Mem. at 15–16. However, this Court already addressed any argument that DOCCS was aware of the need for confirmatory testing in the Court's opinion on Defendants' first motion to dismiss. The Court reasoned that even if DOCCS knew that confirmatory testing was advisable, Plaintiff "plausibly alleges that during the bid process and contract negotiation with DOCCS, Defendants warrantied a uniquely accurate urinalysis system." Order on Mot. to Dismiss at 25–26, ECF No. 64. Thus, a fact issue existed as to whether Defendants were negligent in failing to disclose to DOCCS that their system—no matter how accurate—required confirmatory testing. *Id.* at 26. Correspondingly, there exists a fact issue as to whether Defendants acted with deliberate indifference when they repeatedly misrepresented and concealed material facts about their system.

Defendants also argue that Plaintiff cannot prove "deliberate indifference" because "the drug screen and disciplinary process was conducted by DOCCS alone" with "no role in the process for Microgenics." Defs.' Mem. at 14. This is patently false and provably so. Defendants played an active role in the drug screen and disciplinary process both at the systemic level and at specific individuals' disciplinary charges and hearings. They sold their drug testing system to DOCCS based in part on a promise to provide testimonial services at disciplinary hearings. They went so far as to revise a DOCCS directive that carried the force of law, governed the drug-related testing and disciplinary process, and was used to justify and impose discipline so that it enhanced trust in their drug testing system. They systematically and uniformly denied relevant information to incarcerated people that could have helped them defend against disciplinary charges based solely upon Defendants' unreliable test results. They evaded charged individuals' inquiries about the reliability of the testing process and results. And they directed DOCCS officials to not permit incarcerated individuals to ask specific questions about the drug test or to

be permitted access to written manuals and package inserts. Plaintiff has thereby not only sufficiently alleged but clearly demonstrated Defendants' deliberate indifference.

In any event, state actors may be liable for injuries suffered by an incarcerated individual at the hands of another individual or source. *See, e.g.*, *Farmer*, 511 U.S. at 838 (stating that prison officials may violate the Eighth when they knowingly or recklessly *subject* an incarcerated person to violence at the hands of other individuals). Thus, to state an Eighth Amendment claim, Plaintiff need not show that Defendants *actually* imposed the punishment or conducted the drug test. She can meet her burden by merely alleging that Defendants, acting with deliberate indifference, *made it possible* for the drug test and punishment to occur in the first place. *See id.* at 843. Plaintiff has met her burden by showing that Defendants' misrepresentations and omissions misled DOCCS into purchasing Defendants' testing system and into imposing sanctions on individuals based on botched and unreliable test results.

Defendants knew that their actions would result in a substantial risk of random punishment of faultless individuals. Yet, they continued to misrepresent and conceal facts related to the reliability of their drug testing system. Their actions were deliberately indifferent, reckless, and sufficiently serious to violate the Eighth Amendment.

### D.    Plaintiff Has Sufficiently Alleged a Substantive Due Process Claim

Plaintiff has a fundamental substantive due process right under the Fourteenth Amendment to be free from arbitrary punishment that has no justification whatsoever. Defendants, by knowingly and deliberately causing Plaintiff and other incarcerated individuals to be exposed to an unreliable drug testing regime, unsupported drug-related disciplinary charges, and an array of disciplinary sanctions and other adverse consequences based on unreliable drug tests, violated Plaintiff's and others' substantive due process rights. That Defendants repeatedly urged DOCCS to rely on their tests, and their tests alone, to levy punishment on the incarcerated population; systematically withheld information about the tests' unreliability; repeatedly and

deliberately denied both DOCCS's and incarcerated individuals' requests for more information about the tests; and testified at individuals' disciplinary hearings that their tests were reliable enough to justify discipline, shocks the conscience.

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (cleaned up). Incarcerated individuals therefore "are entitled to substantive due process protection against egregious and arbitrary government interference" in fundamental rights. *Hurd v. Fredenburgh*, 984 F.3d 1075, 1088, 1089 (2d Cir. 2021) (finding that a "[prisoner] had a [substantive due process] liberty interest in freedom from detention upon his conditional release date, as guaranteed by New York law").[5]

"[S]ome liberties are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental[.]'" *Obergefell v. Hodges*, 576 U.S. 644, 694–95 (2015) (internal citation and quotation marks omitted). Such rights are "objectively, deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal quotation marks omitted). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

The right to be free from arbitrary punishment or discipline which has no "reasonable justification in the service of a legitimate governmental objective," *Southerland*, 680 F.3d at 151,

---

[5] Defendants suggest that *Sandin v. Conner*, 515 U.S. 472 (1995) is relevant here. It is not. *Sandin* unmistakably and expressly concerns *procedural* due process. As the Second Circuit recently made clear in holding that a prisoner had a fundamental right to mandatory release, without reference to *Sandin*, "[t]he Fourteenth Amendment guarantees 'more than fair process'; it 'cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Hurd*, 984 F.3d at 1087 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). *Sandin* and its progeny thus have no bearing whatsoever on the *substantive* due process rights of incarcerated people.

is implicit in the concept of ordered liberty. This right is built into the fabric of the criminal justice system: "Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees." *Chapman v. United States*, 500 U.S. 453, 465 (1991). Once a person is duly convicted, a "court may impose[] whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." *Id.* (cleaned up). Once in State custody, an incarcerated person has an Eighth Amendment right not to be subjected to treatment that "has no legitimate penological purpose." *Walsh*, 194 F.3d at 49.[6] Without a reliable expectation that the State will only punish individuals when there is a reason for doing so, neither liberty nor justice can persist.

Indeed, Defendants' drug testing system—when used by DOCCS as Defendants authorized, endorsed, and implemented—is materially indistinguishable from a lottery system using a random number generator to arbitrarily select individual persons in DOCCS custody for disciplinary charges and the substantial punishment that inevitably flows from those charges. No defendant could plausibly argue that a system that randomly selected imprisoned persons to charge and discipline would be consistent with the right to due process guaranteed by the Fourteenth Amendment. But that is the argument Defendants make here. The prohibition and prevention of random and arbitrary punishment untethered to any conduct of the accused is at the

---

[6] Here again it is evident that *Sandin* is inapposite. The Supreme Court noted that prisons may impose sanctions on incarcerated people in order to "effectuate[] prison management and prisoner rehabilitative goals," and "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485. *Sandin* therefore does not speak to the status of discipline that is imposed where there is *no reliable evidence of misconduct at all*. Arbitrary punishment is not within the expected parameters of any court sentence.

very core of the due process guarantee. Defendants' attempt to dismiss Plaintiff's due process claim should be denied.

Defendants' actions in denying Plaintiff and others this fundamental right were "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *Hurd*, 984 F.3d at 1087 (quoting *Southerland*, 680 F.3d at 151–52 (internal quotation marks and citation omitted)). No amount of process could justify the imposition of discipline based on a drug test that Defendants knew to be unreliable, and a fact which Defendants concealed, and defended even in the face of individual prisoners who faced punishment for something they knew they could not have done. *See id.* ("The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.").

"While the measure of what is conscience shocking is no calibrated yard stick," the Supreme Court has stated that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). Additionally, "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" *Pena v. DePrisco*, 432 F.3d 98, 113 (2d Cir. 2005) (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005)) (internal quotation marks omitted). "[I]n the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis*, 523 U.S. at 851.

Defendants worked for years to implement a drug-testing system at DOCCS that would subject incarcerated people to arbitrary punishment. In their earliest conversations with DOCCS, Defendants deliberately concealed information about the scientific uncertainty of their tests and the need for confirmatory testing in order to win DOCCS's confidence in the reliability of their

tests and induce DOCCS to adopt and implement their testing. Second Am. Compl. ¶¶ 160–70, 173, 208. Simultaneously, and as further inducement, Defendants promised that they would provide testimonial services at individual prisoners' disciplinary hearings to shore up and endorse DOCCS's reliance on the tests. *Id.* ¶¶ 141–42, 149–51. Defendants carefully cultivated and cherry-picked data to share with DOCCS to obscure scientific uncertainty, and they revised a DOCCS directive used in disciplinary hearings to justify discipline. *Id.* ¶¶ 184, 185, 187, 189–91, 199–200. In response to prisoners' requests for more information about the tests for purposes of defending themselves against discipline based on these tests, Defendants coldly and systematically refused. *Id.* ¶¶ 190–92. Even in the face of multiple positive tests demonstrated to be false, Defendants doubled down and persisted in their insistence that their tests were reliable bases for imposition of discipline. *Id.* ¶¶ 192–99. As late as *December 2019*, well after the State of New York had started to shut down use of Defendants' tests, key employees continued their active campaign to hide scientific uncertainty from incarcerated people and worked to shore up disciplinary findings they knew were worthless. *Id.* ¶ 212.

Defendants' callous and wonton indifference to the welfare of the incarcerated people whom they worked with DOCCS to discipline is egregious and shocks the conscience. Their behavior over years, motivated by avarice, put incarcerated individuals at risk for arbitrary and widely ranging[7] punishment. *See Gantt v. Ferrara*, No. 15-CV-7661 (KMK), 2017 WL 1192889, at *12 (S.D.N.Y. Mar. 29, 2017) (defendants' behavior shocks the conscience where "the alleged

---

[7] The Defendants' knowledge of the range of potential discipline and resultant consequences contributes to the egregiousness of their conduct. They advocated for discipline based on their unreliable system regardless of the consequences for any particular prisoner. For example, Defendants' employees "discussed an instance in which an incarcerated individual who was being treated for HIV tested positive for AB-Pinaca (a synthetic cannabinoid) and had asked Defendants to testify at his disciplinary hearing. Collum wrote that 'of course we have not [*sic*] idea' about cross-reactivity 'because that is a cocktail of drugs.' However, on information and belief, Defendants took no steps to intervene and prevent this individual from being disciplined." Second Am. Compl. ¶ 206. Defendants had no regard for the welfare of an inmate whose medication regime was threatened by their unreliable testing system.

behavior of . . . defendants [took place] over an extended period of time and in the face of action that presented an obvious risk of severe consequences" (quoting *Pena*, 432 F.3d at 114)).

Defendants' deliberate indifference towards, and indeed willful and wanton disregard for, the rights of Plaintiff and other incarcerated people to be free from arbitrary and unjustifiable punishment which has no legitimate penological purpose violated Plaintiff's and others' substantive due process rights.

## CONCLUSION

Defendants engaged in a years-long campaign of withholding and misrepresenting information about the reliability of their urine drug tests in order to secure and maintain a lucrative contract with DOCCS. As a result of their callous behavior, Plaintiff and numerous other incarcerated individuals were subjected to unjustified punishment based on unreliable drug tests. Plaintiff has sufficiently alleged that Defendants' conduct violated her rights under the Eighth Amendment and the substantive due process guarantees of the Fourteenth Amendment, and that it violated New York General Business Law Section 349. The Court should therefore deny Defendants' partial motion to dismiss.

Dated:     New York, New York
           July 23, 2021

                              EMERY CELLI BRINCKERHOFF
                              ABADY WARD & MAAZEL LLP

                    By:  _____/s/_____
                              Matthew D. Brinckerhoff
                              Ananda V. Burra
                              Noel R. León

                         600 Fifth Avenue, 10th Floor
                         New York, NY 10020
                         (212) 763-5000

                         PRISONERS LEGAL SERVICES OF
                         NEW YORK

                              Karen L. Murtagh
                              Michael Cassidy
                              David Bentivegna
                              Nicole Jolicoeur
                              Marie-Ann Sennett

                         41 State Street, Suite M112
                         Albany, NY 12207
                         (518) 445-6050

                         *Attorneys for Plaintiff and the Putative
                         Class*