UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NADEZDA STEELE-WARRICK, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　Plaintiff<br>　vs.<br><br>MICROGENICS CORPORATION AND THERMO FISHER SCIENTIFIC INC.,<br><br>　　　　　　　　Defendants | Hon. Vera M. Scanlon<br><br>CASE 1:19-cv-06558-VMS |

**REPLY MEMORANDUM OF DEFENDANT MICROGENICS CORPORATION IN FURTHER SUPPORT OF PARTIAL MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT**

To read Plaintiff's brief, one comes away with the impression that the Department of Corrections and Community Supervision (DOCCS) is an impotent front for a villainous scheme to brutalize its inmates. As Plaintiff describes it, DOCCS plays almost no role in how its facilities are run or its inmates disciplined; incredibly, Plaintiff goes so far as to state that Microgenics is the "final arbiter[ ] of an incarcerated person's liberty." Pl.'s Opp'n Mem. (Opp'n) 2 n.1. There is rhetorical hyperbole, and then there is bald absurdity; Plaintiff's gross mischaracterization of Microgenics' role pursuant to its contract with DOCCS falls squarely within the latter.

According to Plaintiff, Microgenics used the mighty cudgel of state authority to pursue "profit at the expense of human welfare." Opp'n 1. The mundane reality is this: Microgenics supplied drug-testing equipment to DOCCS under a private contract. It is undisputed that Microgenics provided written warnings to DOCCS—both in the contract and via product packaging—that false-positive results could occur through cross-reactivity and therefore positive results must be confirmed via chromatographic procedures. However, DOCCS—and DOCCS alone—elected not to perform confirmatory testing on positive samples. In fact, DOCCS has *long* declined to perform confirmatory testing on inmate drug screens, despite judicial admonition that it should give "serious consideration to whether, as a matter of policy and prudence, confirmatory testing should be performed ***at least in those circumstances where there is reason to believe that a misbehavior report will impact severely on an inmate***." *Peranzo v. Coughlin*, 608 F. Supp. 1504, 1515 (S.D.N.Y. 1985) (emphasis added). Plaintiff's attempt to scapegoat Microgenics for a policy that has been in place for more than 30 years is unavailing; DOCCS knew that confirmatory testing was recommended and simply chose—as it has *always* chosen—not to perform it.

Despite the bombast, Plaintiff's brief does not rectify the fatal flaws in her constitutional and consumer-protection claims, and those claims should be dismissed, *with prejudice.*

**Law and Argument**

I.  **Plaintiff has not adequately alleged a claim under GBL § 349.**

    A.  **Microgenics did not engage in consumer-oriented conduct.**

The bulk of Plaintiff's GBL § 349 analysis attempts to frame Microgenics' conduct in supplying drug-screen equipment to DOCCS (pursuant to a private, one-off commercial contract) as "consumer-oriented."[1] Relying heavily on *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995), Plaintiff argues that conduct is "consumer-oriented" if it "'affects the public interest.'" Opp'n 6 (quoting *Securitron*, 65 F.3d at 264). According to Plaintiff, Microgenics' sale of urinalysis analyzer machines to DOCCS "affects the public interest" because prisoners are "members of the public" and "the public at large has an important interest in ensuring that prisons treat incarcerated individuals equitably." Opp'n 6–7. But this application of *Securitron* is both misguided and overbroad. *Securitron* was decided shortly after—but apparently without the benefit of—the New York Court of Appeals' decision in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, where the court clarified that GBL § 349 "is directed at wrongs against the *consuming* public" and thus established the "consumer-oriented" transaction requirement. 647 N.E.2d 741, 744 (N.Y. 1995) (emphasis added). *Securitron* never mentions *Oswego*, nor does it reckon with the consumer-oriented requirement that *Oswego* introduced. Moreover, the narrow issue in *Securitron* was whether a business competitor has standing to bring suit under GBL § 349, which is not at issue here. Simply put, *Securitron* is inapposite.

---

[1] Plaintiff contends that Microgenics' GBL § 349 analysis improperly conflates the Microgenics–DOCCS *contract* with Microgenics' *conduct* thereunder, arguing that performance of an ostensibly private contract may incidentally impact the consuming public. Opp'n 7. However, there is no meaningful distinction in this case, as Microgenics' only "conduct" under the contract was to sell equipment to DOCCS and provide limited support services to DOCCS personnel. In other words, both the contract *and* its performance were entirely private and did not affect the consuming public at large.

Numerous cases decided after *Securitron* make clear that a plaintiff invoking GBL § 349 must plead conduct that is consumer-oriented in the sense that it "potentially affect[s] similarly situated consumers." *Oswego*, 647 N.E.2d at 745; *accord Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 259 (2d Cir. 2021) (finding no liability under GBL § 349 because the misconduct alleged "was not consumer-oriented in the sense that it potentially affects similarly situated *consumers*" (internal quotation marks omitted) (emphasis added)). That requirement categorically is not met where, as here, a plaintiff alleges that a private company entered into a "[t]ailored" commercial supply agreement, Compl. [ECF. 69] 26, with a state entity. *See EUA Cogenex Corp. v. N. Rockland Cent. Sch. Dist.*, 124 F. Supp. 2d 861, 875 (S.D.N.Y. 2000) (ruling that an equipment-supply contract with a school district was not "consumer oriented"); *see also Barroso v. Polymer Research Corp. of Am.*, 80 F. Supp. 2d 39, 43 (E.D.N.Y. 1999) (finding no consumer orientation where the contract was "tailored to the plaintiff's specific wishes and requirements"). Such idiosyncratic commercial transactions have no potential to affect *similarly situated consumers*—in fact, no similarly situated consumers exist—and thus are not consumer-oriented.

*Vitolo v. Mentor H/S, Inc.*, 213 F. App'x 16 (2d Cir. 2007), is particularly instructive. In that case, a physician sued a manufacturer of breast implants for allegedly misrepresenting the implants' "deflation rate." The Second Circuit affirmed summary judgment for the manufacturer:

> We agree . . . that Vitolo failed to raise an issue of material fact with respect to whether [the manufacturer's] alleged misrepresentation to Vitolo of the deflation rate of the implants in question was "consumer-oriented." The misrepresentation, if it did occur, had no "broader impact on consumers at large" than it did on Vitolo, and it did not have the potential to "affect similarly situated consumers" because the alleged misrepresentations regarding the [implant] deflation rate were made to Vitolo in person, **and Vitolo failed to produce evidence that the [manufacturer's] personnel made such representations to other doctors or to end users.** Only Vitolo and the limited group of his patients who were implanted with these particular products—**not members of the public at large**—were affected.

*Vitolo*, 213 F. App'x at 17–18 (internal citations omitted) (emphases added).

3

Here, too, the alleged misrepresentations regarding confirmatory testing were made to DOCCS *alone*, pursuant to a private transaction between Microgenics and the State of New York. *See also Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004) (holding that "allegedly deceptive acts that occur between relatively sophisticated entities with equal bargaining power do not give rise to § 349 liability"). And like the patients who received allegedly defective implants in *Vitolo*, the group of individuals purportedly impacted in this case is discrete—*i.e.*, certain inmates at DOCCS facilities. In short, neither Microgenics' contract with DOCCS—nor its performance thereunder—impacted the "consuming public" as required to state a claim under GBL § 349.

As Plaintiff's amorphous "public interest" theory is not sufficient to bring Microgenics' conduct within the ambit of GBL § 349, her consumer-protection claim should be dismissed.

**B. Plaintiff has not adequately alleged causation under GBL § 349.**

Plaintiff next contends that her consumer-protection claim is cognizable under GBL § 349 despite the fact that she was not personally privy to any of the alleged misrepresentations. In support, Plaintiff mis-cites *Orlander v. Staples, Inc.*, 802 F.3d 289, 301 (2d Cir. 2015), for the proposition that causation is established under GBL § 349 simply by showing that a plaintiff's injury "stemmed from" the defendant's alleged misrepresentations. Opp'n 8.

While a consumer-protection claim does not entail a showing of reliance, courts routinely require that a plaintiff plead more in regard to causation than the attenuated theory Plaintiff advances. *See, e.g.*, *Oden v. Boston Sci. Corp.*, 330 F. Supp. 3d 877, 902 (E.D.N.Y. 2018) ("[T]o properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased." (citation omitted)); *Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 739 (W.D.N.Y. 2020) ("[A] plaintiff must have been personally misled or deceived.") (citation omitted); *Abraham v. Am.*

*Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 234 (E.D.N.Y. 2013) ("[E]ach Plaintiff must individually plead the disclosures he or she *received* were inadequate, misleading, or false, and that she was injured as a result … ." (emphasis added)). Plaintiff wasn't exposed to any allegedly deceptive marketing statements from Microgenics and certainly was not deceived by any such statements. On the facts alleged, Plaintiff's consumer-protection claim fails for lack of causation.

**II. Microgenics did not engage in state action and therefore cannot be liable for Plaintiff's alleged constitutional harms under Section 1983.**

Plaintiff's opposition to Microgenics' motion continues to advance the demonstrably false claim that Microgenics "test[ed]" and "disciplin[ed] incarcerated individuals for drugs," Opp'n 9, at various DOCCS facilities and thus assumed a traditional public function and/or established a "close nexus" between its contract-related activities and DOCCS policy. These claims are ludicrous; Microgenics neither "tested" nor "disciplined" Plaintiff and is not a state actor.

**A. Microgenics' sales to DOCCS do not satisfy the "public function" test.**

In a highly dubious citation to *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982), Plaintiff states: "Testing and disciplining incarcerated individuals for drugs is 'traditionally the exclusive prerogative of the State,' and thus Defendants are state actors under the 'public function' test." Opp'n 9 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)). This ungrammatical attribution is as misleading as it is unavailing. *Rendell-Baker* addressed the constitutionality of terminating teachers from a private high school based on expressions of allegedly protected speech; the holding there does nothing to advance Plaintiff's contention that drug testing is a public function.

Plaintiff's main support for her public-function theory, however, lies in inapt analogies to *West v. Atkins*, 487 U.S. 42 (1988), a case involving contractor-provided prison medical services, and three cases against Aramark, a provider of prison cafeteria services (*e.g.*, *Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301 (KMK), 2018 WL 126175 (S.D.N.Y. Mar. 30, 2018)).

5

According to Plaintiff, these cases indicate that Microgenics' supply of drug-testing equipment and training services to DOCCS was the assumption of a traditional government function. However, each of Plaintiff's cited cases involved a private contractor maintaining a *permanent, physical presence* inside state-run facilities and taking over public functions—literally rendering medical care to inmates and preparing meals for inmates. Microgenics, by contrast, did not engage in any comparable involvement with DOCCS operations or inmates and was rarely on site.

Moreover, Plaintiff's citation to *Amig v. Cnty. of Juniata*, 432 F. Supp. 3d 481, 487 (M.D. Pa. 2020), Opp'n 10–11, is neither binding nor persuasive, as the overwhelming majority of public-function cases affirm the extreme narrowness of the exception, even when contractors sell products and training to prison personnel. *See, e.g.*, *O'Boyle v. Bradshaw*, 952 F. Supp. 2d 1310, 1315 (S.D. Fla. 2013) (supplying municipalities with breathalyzer machines and training did not satisfy the exception); *Neal-Lomax v. Las Vegas Metro Police Dep't*, No. 2:05-CV-1464-PMP-PAL, 2006 WL 2022989, at *7 (D. Nev. July 18, 2006) (same as to tasers). Regardless, as it was DOCCS personnel, not Microgenics employees, who administered the tests, Microgenics cannot be said to have "assumed" any state duty to perform inmate drug testing.

**B. There is no "close nexus" between Microgenics' contractual performance and the discipline Plaintiff received from DOCCS sufficient to find "state action."**

Ignoring the plain language of *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014), and instead citing several unpublished district court opinions, Plaintiff argues that the "close nexus" test for state action is satisfied where a private actor performs services that "flow" from government obligations and are conducted under government supervision. Untrue. The Second Circuit has unequivocally held that "[a] private actor can only be 'a willful participant in joint activity with the State or its agents' if the two share some *common goal* to violate the plaintiff's rights." *Betts*, 751 F.3d at 85 (citation omitted) (emphasis added). This comports with the Supreme Court's

observation that joint state action requires a quasi-contractual "meeting of the minds" between the government and private actor to deprive the plaintiff of a constitutional right. *See Adickes v. Kress & Co.*, 398 U.S. 144, 158 (1970). Here, because Plaintiff's opposition continues to posture DOCCS as a victim of Microgenics' alleged deception, her "close nexus" theory of joint state action fails.

### III. Plaintiff has not plausibly alleged the existence of a policy to "subject[t] people in DOCCS custody to discipline based on unreliable drug tests." Opp'n 14.

In light of Microgenics' repeated, written recommendation that DOCCS perform confirmatory testing on positive drug screens, Plaintiff cannot sustain her facially implausible theory that Microgenics "*developed* and nurtured a policy or custom with respect to DOCCS" that caused DOCCS to inflict constitutional torts upon inmates. Opp'n 14 (emphasis in original). As "bald allegations that such a [policy] existed" do not suffice to establish Section 1983 liability against a private corporation, Plaintiff's constitutional claims cannot be sustained against Microgenics and are due to be dismissed. *Bess v. City of New York*, No. 11 CIV. 7604 TPG, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013).

### IV. Plaintiff fails to state an Eighth Amendment claim.

Citing no authority to suggest that her 11-day confinement in disciplinary keeplock and deprivation of certain privileges (*e.g.*, telephone; commissary) constitutes a "harm of magnitude" sufficient to trigger Eighth Amendment liability,[2] Plaintiff nevertheless contends that her punishment was "cruel and unusual" and that Microgenics acted with "criminal recklessness" regarding its provision of drug-screen equipment to DOCCS. Under all prevailing standards of

---

[2] Presumably, because the overwhelming majority of courts to consider the question have consistently held that it does not. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 381 (S.D.N.Y. 2011) (ninety-day confinement to a special housing unit with loss of "visitation, phone, and commissary privileges"); *Thompson v. United States*, No. 09-CV-0964M, 2010 WL 1910293, at *4–6 (W.D.N.Y. May 7, 2010) (eighteen days in SHU (four days longer than the disciplinary action required)); *Jackson v. Johnson*, 15 F. Supp. 2d 341, 363 (S.D.N.Y. 1998) ("mere placement in keeplock for 99 days").

7

law, however, Plaintiff's allegations fall far short of the sufficiently serious harm and "sufficiently culpable state of [defendant's] mind" required to support an Eighth Amendment claim. *Hurd v. Fredenburgh*, 984 F.3d 1075, 1084 (2d Cir. 2021). Indeed, she does not cite a single case in which discipline of the nature and duration she alleges was found to state a plausible claim for relief.

Plaintiff's insistence that she has a plausible claim because her discipline supposedly lacked a penological purpose is unfounded. Her case is not comparable to those cited in her brief, Opp'n 15–17, where prison officials acted arbitrarily by, for example, beating prisoners or depriving prisoners of exercise out of malevolence or apathy (*e.g.*, as by refusing to clear snow and ice from outdoor recreation spaces). The penological purpose of drug screening is to combat rampant drug abuse in DOCCS facilities, and courts in this jurisdiction authorized DOCCS to pursue that end through immunoassay testing despite the fact that such testing invariably produces false-positive results. *See Peranzo v. Coughlin*, 850 F.2d 125, 126 (2d Cir. 1988) (approving immunoassay testing while noting that the EMIT testing system produced false positives 2% of the time (at least) and "the risk of false positives has not been entirely eliminated").

Moreover, because Microgenics' actions in supplying purportedly substandard urinalysis products and services did not inflict punishment—not deliberately, recklessly, or otherwise—the Complaint also fails to satisfy the scienter element of her Eighth Amendment claim.

## V. Plaintiff fails to state a claim for violation of substantive due process.

### A. Plaintiff does not allege a right protected by the Fourteenth Amendment.

Citing cases as far afield as *Obergefell v. Hodges*, 576 U.S. 644 (2015), Plaintiff seeks to identify a constitutional right through abstractions about ordered liberty. Opp'n 21–22. But she relegates to footnotes the controlling case law that imperils her claim. *Id.* at 21 n.5, 22 n.6.

The Supreme Court has explained that, as to prisoners, the "Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed."

*Sandin v. Conner*, 515 U.S. 472, 480 (1995) (internal quotation marks & citation omitted). While state prison regulations may "under certain circumstances create liberty interests," they do so only to the extent of creating interests in freedom from restraints that "impos[e] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 483–84 (citation omitted). Under this framework, courts have repeatedly ruled that inmates do not have a liberty interest in avoiding the type of discipline Plaintiff alleges here—eleven days in keeplock. *E.g.*, *Zaire v. Mitchell*, 131 F.3d 132, 1997 WL 791519, *1 (2d Cir. 1997) (Table Opinion) (finding no deprivation of a liberty interest from twelve days in keeplock); Microgenics' Opening Mem. 17 (collecting cases).

Plaintiff's response to this binding precedent is a bald assertion in a footnote that *Sandin* "is inapposite." Opp'n 22 n.6. In Plaintiff's view (and hers alone, it seems), because *Sandin* involved a procedural due process claim, "*Sandin* and its progeny [ ] have no bearing whatsoever on the *substantive* due process rights of incarcerated people."[3] Opp'n 21 n.5. But *Sandin* nowhere states or even suggests that its liberty-interest analysis is confined to the battlefield of procedural due process. To the contrary, the Court advised there that, absent a valid liberty interest under *Sandin*, inmates would need to look to "the First and Eighth Amendments and the Equal Protection Clause" for redress of purported constitutional harms. *Sandin*, 515 U.S. at 487 n.11. And indeed, appellate courts across the country consistently apply the *Sandin* framework to dismiss prisoners' *substantive* due process claims. *See, e.g.*, *Dennison v. Ryan*, 522 F. App'x 414, 417 (9th Cir. 2013)

---

[3] Plaintiff is incorrect in arguing that *Hurd v. Fredenburgh*, 984 F.3d 1075 (2d Cir. 2021), proves that *Sandin* does not apply to substantive due process claims. The reason *Sandin* did not apply in *Hurd* is that the government there held the plaintiff in custody beyond a mandatory early-release date. While incarcerated persons do not have a liberty interest in avoiding short stays in keeplock, they may have a liberty interest in a mandatory early-release date. *E.g., Swarthout v. Cooke*, 562 U.S. 216, 219–20 (2011). Thus, it is *Hurd*, not *Sandin*, that is inapposite.

(applying *Sandin* to reject procedural *and* substantive due process claims); *Smith v. Deemer*, 641 F. App'x 865, 868 (11th Cir. 2016) (same); *Levi v. Thomas*, 429 F. App'x 611, 613 (7th Cir. 2011) (applying *Sandin* to substantive due process claim); *Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) (holding that substantive due process claim failed because seven months' disciplinary confinement does not violate a liberty interest); *Bandy-Bey v. Crist*, 578 F.3d 763, 767 (8th Cir. 2009) (same as to 25 days' segregation).

Finally, Plaintiff's resort to a general right against arbitrary action is also unavailing. As noted, DOCCS's use of immunoassay testing served a penological purpose. *See supra* § IV.

### B. Plaintiff has not plausibly alleged the culpability element of her due process claim.

Stripped of empty rhetoric, Plaintiff's liability theory is that Microgenics sold an immunoassay drug-screen system susceptible to producing false-positive results through cross-reactivity. But Plaintiff cannot plausibly deny that Microgenics advised DOCCS through its IFUs *and in the parties' contract* that false-positive test results could occur through cross-reactivity and therefore positive screens must be confirmed via more specific methods. Contract No. CC161458, App'x H, Attach. B at Bates No. DOCCS 00255 (Ex. 1 to Marcusen Decl.); Package Insert for CEDIA Buprenorphine II Assay at 1 (Ex. 2 to Marcusen Decl.). Given that Microgenics conveyed such warnings, Plaintiff cannot plausibly allege that Microgenics intended its products and services to somehow deprive Plaintiff of a liberty interest. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (explaining that intent to injure is the paradigmatic level of culpability). Plaintiff thus has not and cannot plead the culpability required to state a substantive due process claim.

### Conclusion

Plaintiff's consumer-protection and constitutional claims fail as a matter of law, and Counts II, III, and IV of her Complaint should be dismissed, *with prejudice*.

Respectfully submitted,

Dated: August 10, 2021

<u>s/Nathan J. Marcusen</u>
Chris R. Carton (ID # CC0408)
Erica Mekles (ID # EM1020)
BOWMAN AND BROOKE LLP
317 George Street, Suite 320
New Brunswick, NJ 08901
Telephone: (201) 577-5175
chris.carton@bowmanandbrooke.com
erica.mekles@bowmanandbrooke.com

Nathan J. Marcusen (*admitted PHV*)
BOWMAN AND BROOKE LLP
150 South Fifth Street, Suite 3000
Minneapolis, MN 55402
Telephone: (612) 339-8682
nathan.marcusen@bowmanandbrooke.com

***Attorneys for Defendant Microgenics Corporation***