UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NADEZDA STEELE-WARRICK and DARRYL SCHULTZ, individually and on behalf of all others similarly situated, | No. 19 Civ. 6558 (VMS) |
| Plaintiffs, | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| -*against*- | **JURY TRIAL DEMANDED** |
| MICROGENICS CORPORATION, THERMO FISHER SCIENTIFIC, INC., ANTHONY ANNUCCI, JAMES O'GORMAN, CHARLES KELLY, RICHARD FINNEGAN, DONALD VENETTOZZI, ANTHONY RODRIGUEZ, COREY BEDARD, and JENNIFER BOOTH | |
| Defendants. | |

Nadezda Steele-Warrick and Darryl Schultz ("Plaintiffs"), on behalf of themselves and all others similarly situated, and by and through their attorneys, Prisoners Legal Services (PLS) and Emery Celli Brinckerhoff Abady Ward & Maazel LLP, allege as follows:

## PRELIMINARY STATEMENT

1.      This is a class action on behalf of thousands of currently and formerly incarcerated New Yorkers who were unjustly punished for false positive drug test results in 2019.

2.      Defendant Microgenics Corporation ("Microgenics"), doing business as Thermo Fisher Scientific, is the company with which the New York Department of Corrections and Community Supervision (DOCCS) contracted to provide, install, maintain, and train DOCCS employees on urinalysis analyzers used to conduct drug testing at all DOCCS facilities.

3.      Microgenics was required to ensure that the urinalysis analyzers were used in accordance with applicable standards and produced accurate results.  Due to its negligent failure

1

to fulfill this basic responsibility, thousands of individuals incarcerated in New York State prisons received positive drug test results in 2019 even though they did not ingest any illicit substance.

4.      When it entered into the contract with DOCCS, Microgenics knew that DOCCS would use positive drug tests to discipline individuals in DOCCS's custody, and that is what DOCCS did.  Relying on false positive results generated by Microgenics's urinalysis machines, DOCCS charged and severely punished thousands of individuals for drug use.

5.      The punishments DOCCS levied for false positive results were devastating to Class members, who had done nothing wrong and were bewildered by the false accusations.

6.      These punishments included, but were not limited to, weeks or months in solitary confinement or keeplock, lost privileges, denial of visitation, and rescission of open parole or conditional release dates.  In some cases, individuals were held in prison months far beyond their release dates as a direct result of false positive drug tests.

7.      Microgenics and Thermo Fisher Scientific (collectively, the "Microgenics Defendants") are liable to the individuals currently and formerly incarcerated in New York State prisons who received false positive test results due to their negligent failure to ensure that their drug testing devices and assays were used in accordance with applicable standards and produced reliable test results.

8.      In this Third Amended Complaint, Plaintiffs further allege that Defendants Anthony Annucci, James O'Gorman, Charles Kelly, Richard Finnegan, Donald Venettozzi, Anthony Rodriguez, Corey Bedard, and Jennifer Booth (collectively, the "DOCCS Defendants," who are all sued in their personal capacities) are also liable to the individuals who received false positive test results while incarcerated in New York State prisons, based on their deliberate

indifference towards those individuals' rights under the United States Constitution's Eighth Amendment and the Fourteenth Amendment's Due Process Clause.  These DOCCS Defendants knew or should have known that their drug testing directive was constitutionally infirm, especially in the context of the testing system provided by the Microgenics Defendants.  They failed to conduct basic due diligence into the Indiko Plus urinalysis analyzers and its suitability for use in the prison system; failed to create procedures and protocols to ensure accurate drug testing; and failed to implement safeguards to prevent individuals from being punished based on patently unreliable drug test results.  To compound their failures, the DOCCS Defendants learned of numerous instances of inaccurate test results and resulting harm to incarcerated individuals throughout 2019, but did not act to stop the repeated and ongoing harm in a timely fashion.  As a result, thousands of incarcerated individuals, including Plaintiffs and the putative class, suffered harm ranging from loss of recreation privileges to the loss of parole dates and early release.

## PARTIES

9.      Plaintiff Nadezda Steele-Warrick is a 38-year-old woman who resides in Queens County, New York.  From 2014 to 2019, Ms. Steele-Warrick was in the custody of DOCCS.

10.     Plaintiff Darryl Schultz is a 66-year-old man who resides in Orleans County, New York.  From 1989 to 2019, Mr. Schultz was in the custody of DOCCS.

11.     Defendant Microgenics Corporation is a Delaware company that is based in Fremont, California, and which specializes in the development, manufacture, marketing, and sale of products relating to clinical diagnostics.  Microgenics Corporation is a wholly owned corporate subsidiary of Defendant Thermo Fisher Scientific, Inc.  In 2018, Microgenics

Corporation contracted with DOCCS to provide Indiko Plus urinalysis analyzers at 52 DOCCS facilities, and to install, maintain, and train DOCCS employees on those machines.

12.     Defendant Thermo Fisher Scientific, Inc. is a Delaware company that is based in Waltham, Massachusetts.  Thermo Fisher Scientific, Inc. is the corporate parent company of Microgenics Corporation.  Thermo Fisher Scientific markets itself as the manufacturer of the Indiko Plus urinalysis analyzers, as well as the owner of the assays used to conduct drug testing on those machines.  Thermo Fisher Scientific is responsible for all FDA submissions made regarding the Indiko Plus urinalysis analyzers and assays used to conduct drug testing on those machines.  For purposes of the contract with DOCCS, Microgenics is identified as doing business as Thermo Fisher Scientific.

13.     Defendant Anthony Annucci was named the Acting Commissioner of the New York State Department of Corrections and Community Supervision effective May 1, 2013.  As such, he had overall responsibility for all DOCCS policies, practices, and procedures during the relevant time periods, including the policies around drug testing and discipline.  He was informed of significant problems with the urinalysis system DOCCS used in 2019 and yet did not take effective action to prevent or abate the harm to incarcerated individuals in DOCCS custody.  He also specifically and directly supervised the work of *inter alia* Defendants James O'Gorman and Charles Kelly.  He is sued in his personal capacity.

14.     Defendant James O'Gorman was Deputy Commissioner for Correctional Facilities at DOCCS during the relevant time periods and, on information and belief, was responsible for drug testing and discipline at DOCCS correctional facilities.  He signed and approved DOCCS directives on drug testing and was the direct supervisor for Defendants Richard Finnegan and Donald Venettozzi.  He too received notice of serious problems in

4

DOCCS's drug testing procedures but failed to act to prevent harm to incarcerated individuals. He is sued in his personal capacity.

15.     Defendant Charles Kelly was initially Assistant Commissioner of Special Housing/Inmate Disciplinary Programs, charged with administering DOCCS's drug testing policies and procedures, and thereby supervised Defendant Corey Bedard during the process of comparing the Indiko Plus to previous testing systems employed by DOCCS. Defendant Kelly was subsequently appointed Associate Commissioner and Executive Assistant to Defendant Acting Commissioner Annucci, tasked with special projects and investigating irregularities in the DOCCS drug testing program in 2019. He was on notice that the Microgenics Defendants' urinalysis tests were inaccurate, but failed to stop continued discipline of incarcerated individuals. He is sued in his personal capacity.

16.     Defendant Richard Finnegan, on information and belief, became Assistant Commissioner of Special Housing/Inmate Disciplinary Programs, charged with administering DOCCS's drug testing policies and procedures, after Defendant Kelly became Associate Commissioner. Defendant Finnegan supervised Defendants Donald E. Venettozzi and Anthony Rodriguez, approved the installation of the Indiko Plus at DOCCS facilities, and was involved in investigating and insufficiently responding to serious concerns about the accuracy and reliability of DOCCS's drug testing procedures. He specifically prevented Defendants Venettozzi, Rodriguez, and Jennifer Booth from raising their concerns with Defendant O'Gorman. He is sued in his personal capacity.

17.     Defendant Donald Venettozzi was Director of Special Housing and Inmate Discipline during the relevant time periods and was charged with overseeing the prison disciplinary system in 2019, including responding to allegations of defective urinalysis testing

and unjustifiable discipline.  Defendant Venettozzi directly supervised Defendants Rodriguez, Bedard and Booth, who coordinated the relationship between DOCCS and the Microgenics Defendants.  He was involved in investigating and insufficiently responding to serious concerns about the accuracy and reliability of DOCCS's drug testing procedures.  He is sued in his personal capacity.

18.     Defendant Anthony Rodriguez was Assistant Director of Special Housing and Incarcerated Individual Disciplinary Programs during the relevant time periods and directly oversaw the incarcerated individual discipline program.  He received and processed disciplinary appeals from incarcerated individuals and worked closely with Defendants Bedard and Booth on the integrity of the DOCCS urinalysis testing program.  He is sued in his personal capacity.

19.     Defendant Corey Bedard was a DOCCS Correction Lieutenant and Captain during the relevant time periods and was the primary contact between the Microgenics Defendants and DOCCS between 2015 and 2019, at which point he was replaced by Defendant Booth.  Defendant Bedard orchestrated the contract between the Microgenics Defendants and DOCCS, colluded with the Microgenics Defendants in crafting DOCCS disciplinary procedures, and was finally brought in to assist in the investigation into the Microgenics Defendants' faulty and unreliable testing systems.  He is sued in his personal capacity.

20.     Defendant Jennifer Booth was a Correctional Facility Operations Specialist in Special Housing/Inmate Disciplinary Programs at DOCCS during the relevant time periods. Defendant Booth took over day-to-day correspondence with the Microgenics Defendants regarding the Indiko Plus from Defendant Bedard.  She received complaints regarding the inaccuracy and unreliability of the Microgenics Defendants' urinalysis system, served as the liaison between correctional officers and the Microgenics Defendants, and was involved in

investigating and insufficiently responding to serious concerns about the accuracy and reliability of DOCCS's drug testing procedures.  She is sued in her personal capacity.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).  This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Venue in this case is based upon 28 U.S.C. § 1391(b)(3).  The Eastern District of New York is the proper venue because it is the judicial district where Plaintiff Steele-Warrick currently resides and where Defendants are subject to the Court's personal jurisdiction.

## STATEMENT OF FACTS

### *Microgenics Defendants Contracted with DOCCS to Provide Urinalysis Analyzers*

23.     In May 2018, DOCCS issued IFB 2018-06 seeking "reagent rentals of bench top urinalysis analyzer services to be used in its 52 correctional facilities for inmates," with a contract term of September 1, 2018 to August 31, 2023.

24.     Microgenics Defendants submitted a bid in response to the Invitation for Bids on behalf of "Microgenics Corporation Part of Thermo Fisher Scientific."

25.     Microgenics is a wholly owned subsidiary of Thermo Fisher Scientific.

26.     Microgenics Defendants' bid was submitted on Thermo Scientific letterhead.

27.     The web address identified by Microgenics on the bid was www.thermoscientific.com/diagnostics.

28.     The two individuals identified by Microgenics as "authorized to negotiate on its behalf regarding all matters pertaining to this bid" were sales representatives with email addresses ending with "@thermofisher.com."

29.     In attachments A and C to its bid, Microgenics submitted marketing materials for Thermo Fisher Scientific relating to its urinalysis systems.

30.     In attachment B to its bid, Microgenics submitted literature regarding "ThermoFisher Microgenics Reagant information."

31.     In the bid signature page, Microgenics Defendants identified "Microgenics Corporation" as the "Legal Business Name of Company Bidding" and stated that Microgenics was "D/B/A – Doing Business As" "Thermo Fisher Scientific."

32.     In September 2018, DOCCS entered into a five-year contract, #CC161458, with Microgenics Defendants (the "Contract") to provide Indiko Plus urinalysis analyzers and related services for 52 correctional facilities in New York.

33.     The Indiko Plus urinalysis analyzer is an automated benchtop chemistry system that is marketed as a device to conduct urinalysis drug testing.

34.     Thermo Fisher Scientific is the manufacturer of the Indiko Plus urinalysis analyzer and the assays used in connection with that machine.  It is responsible for the FDA submissions relating to both the machine and assays.

35.     The Indiko Plus urinalysis analyzer is sold and distributed by medical distributors across the country, including Microgenics.

36.     The Contract required Microgenics Defendants to conduct onsite training at all 52 DOCCS facilities and to conduct a mandatory master trainer class so that DOCCS could train and certify new testers.  Microgenics Defendants conducted such trainings and certified that DOCCS employees were proficient to operate Microgenics Defendants' machines.

37.     The Contract required Microgenics Defendants to provide support and maintenance for their urinalysis services, including unlimited 24/7 telephone support;

preventative maintenance visits; 24-hour response time; repair, replacement, and maintenance of machines; helpdesk operations; user feedback procedures; and warranties, returns, and exchanges.

38.     The Contract required Microgenics Defendants' employees to testify at disciplinary hearings for incarcerated individuals who received positive drug test results from the Indiko Plus machines.

39.     Microgenics Defendants testified about the professed reliability of their testing at numerous disciplinary hearings in 2019—even when the tests had actually produced false positive results.  DOCCS relied on the test results and Microgenics Defendants' supporting testimony when disciplining incarcerated persons for positive drug tests.

40.     The Contract required that Microgenics Defendants' products be "substantially uninterrupted or error-free in operation."  It further required that Microgenics Defendants warrant and represent that products delivered under the contract conform to the manufacturer's specifications, performance standards, and documentation.

41.     Both Microgenics and Thermo Fisher Scientific were responsible for providing services under the Contract, and both entities negligently provided such services, breaching their duty of care to Ms. Steele-Warrick and putative class members and causing them foreseeable harm.

***Microgenics Defendants Failed to Comply with Applicable Standards and Their Test Results Were Unreliable***

42.     DOCCS began to use the Indiko Plus urinalysis analyzers provided by Microgenics at DOCCS's facilities in late 2018 or early 2019.

43.     As the entities responsible for providing drug testing services in DOCCS' facilities (including machines, assays, services, training, installation, and maintenance),

Microgenics Defendants owed incarcerated persons in those facilities a duty to abide by applicable drug testing standards and to ensure that the testing was accurate and reliable. Microgenics Defendants breached those duties.

44.     Microgenics Defendants' standards for the Indiko Plus urinalysis analyzers state that the machines should be used as an initial screen only, and confirmatory testing is required to verify any positive result.

45.     Despite these standards, Microgenics Defendants negligently provided products and services to DOCCS knowing that the results generated by the Indiko Plus urinalysis analyzers would be used to discipline inmates without any confirmatory testing.

46.     Microgenics Defendants negligently failed to inform DOCCS of the applicable standards for the Indiko Plus urinalysis analyzers when negotiating the Contract and providing its contracted products and services.

47.     Microgenics Defendants negligently failed to train DOCCS employees on the applicable standards for the Indiko Plus urinalysis analyzers.

48.     Microgenics Defendants negligently testified at disciplinary hearings that the results from the Indiko Plus urinalysis analyzers could be relied on as a basis for disciplining incarcerated individuals, even though Microgenics Defendants knew that the results were only preliminary screens.

49.     Microgenics Defendants negligently failed to ensure that their products and services were used in accordance with applicable standards even though they had full control over the nature of the use.

50.     Microgenics Defendants knew that positive drug screen results from the Indiko Plus urinalysis analyzers would be used to discipline individuals in DOCCS' custody—without

verification by an outside laboratory using gas chromatography or any other verification method—and they did nothing to stop such discipline from being imposed.   On the contrary, Microgenics Defendants' employees supported and endorsed such use.

51.     Nothing in the Contract required DOCCS to verify Microgenics Defendants' drug test results through an outside laboratory using gas chromatography or any other method prior to disciplining incarcerated persons.

52.     Not only did Microgenics Defendants negligently fail to abide by applicable standards, they were also negligent in failing to ensure that the Indiko Plus urinalysis analyzers produced accurate preliminary drug test screens.

53.      Contrary to Microgenics Defendants' representations that their services would be error-free, they failed to ensure that their machines and assays functioned properly, resulting in widespread cross-reactivity issues that caused thousands of false positive results for Suboxone/buprenorphine, AB Pinaca, opiates, and THC.

54.     The cross-reactivity issues that ensued were the direct result of Microgenics Defendants' negligence in their installation, training, and maintenance of the machines.

55.     Further, Microgenics Defendants continued to testify at disciplinary hearings that their test results were reliable even though they should have known that there were serious reliability concerns—especially given the sheer number of incarcerated persons reporting false results.

56.     Ultimately, DOCCS determined that the positive results generated by Indiko Plus urinalysis analyzers were so unreliable that it reversed the disciplinary decisions for every positive result for Suboxone/buprenorphine, AB Pinaca, Opiates, and THC generated by the machines in 2019.

57.     DOCCS's decision to overturn every positive result for these substances indicates the magnitude of the issue.  The problem with Microgenics Defendants' testing was so widespread that not a single positive finding was reliable enough to discipline putative class members.

58.     In January 2020, DOCCS terminated its contract with Microgenics Defendants for cause, based on Defendants' failure to comply with the terms and conditions of the Contract.

59.     DOCCS officials and the New York State Inspector General are both investigating Microgenics Defendants given the rampant and voluminous unreliable and false positive test results.

60.     On February 28, 2020, DOCCS sued Microgenics Defendants in New York State Supreme Court, County of Albany, alleging that Microgenics Defendants' equipment, products, procedures, and services were inadequate and deficient, failed to operate according to their intended use, and produced false positive test results.

61.     The natural and foreseeable consequence of Microgenics Defendants' negligent failure to ensure that its products and services complied with applicable standards and produced accurate results was that thousands of incarcerated persons were punished for false and unreliable positive drug tests.

62.     The punishments DOCCS imposed on putative class members included, but were not limited to, weeks or months in solitary confinement; weeks or months in keeplock (where the wrongfully accused individuals were not permitted to leave their cell or dorm area); loss of privileges like recreation, commissary, mail, packages, and phone calls; loss of  visitation; loss of good time credit; loss of merit time; loss of an open conditional release date; loss of a parole open date; loss of a preferred work assignment; denial of parole release; denial of conditional

release; denial of participation in the Family Reunion Program; removal from a necessary or desired program, such as an education or treatment program; and transfer from a preferred facility or hub.  In some cases, individuals who lost good time credit or who had open parole or conditional release dates rescinded were held in prison months beyond their release dates as a direct consequence of the faulty test results.

### Plaintiff Nadezda Steele-Warrick Tested Positive for Suboxone/buprenorphine Despite Not Using It

63.     Plaintiff Nadezda Steele-Warrick was incarcerated at Albion Correctional Facility ("Albion"), a DOCCS facility, from June 2015 to May 2019.

64.     Ms. Steele-Warrick was a model prisoner, with a pristine and unblemished record of good behavior.  While incarcerated, she participated in numerous prison programs, obtained her GED, and was employed as a teacher's assistant.  She also taught cardiovascular and mash-up exercise classes at the Albion gym.

65.     As soon as she was eligible, after six months at Albion, Ms. Steele-Warrick applied for and received preferred housing on the basis of her exemplary behavior.

66.     Preferred housing offers many advantages over general-population housing.  In preferred housing, Ms. Steele-Warrick lived with a smaller group of women, making for quieter and calmer surroundings, and she had better access to stoves, showers, and toilets.  She obtained a private room, where she had a night stand, closet, radio, safe keeping for her personal belongings, and an overall much greater measure of privacy and quiet.

67.     At the same time, when she became eligible after six months at Albion, Ms. Steele-Warrick applied to the Family Reunification Program (FRP), a DOCCS program that allows incarcerated individuals to meet privately and spend overnights with family members. She was admitted to the FRP after approximately seven months on the waiting list.

68.     Through the FRP, Ms. Steele-Warrick saw her husband and young son for overnight visits every four weeks.  Her husband and son would arrive on Friday mornings and spend two days with Ms. Steele-Warrick in a private setting where they could cook, eat, sleep, and be alone together as a family unit.  Her husband and son would depart on Sunday morning.

69.     DOCCS protocol requires, as Ms. Steele-Warrick was well-aware, that all individuals participating in the FRP provide a urine sample for drug testing at the following times: (1) between two to ten days prior to an FRP visit; (2) immediately prior to an FRP visit; and (3) immediately following an FRP visit.

70.     Pursuant to that protocol, Ms. Steele-Warrick provided a urine sample at approximately 8:30 a.m. on April 14, 2019, following an FRP visit.

71.     That same day, at approximately 10:53 a.m., DOCCS officials processed the urine sample on the Indiko Plus urinalysis analyzer using the DRI + CEDIA Drug Testing System.

72.     The results came back with a false positive for Suboxone/buprenorphine, even though Ms. Steele-Warrick had not taken that substance, any substance known to trigger a positive result, or any other illicit substance.

73.     At approximately 11:20 a.m., as per protocol, DOCCS staff re-tested the urine sample again on the Indiko Plus urinalysis analyzer using the DRI + CEDIA Drug Testing System.

74.     Again, the test results indicated a positive result for Suboxone/buprenorphine. Prior to this incident, Ms. Steele-Warrick had never tested positive for any illegal substance, nor had she ever incurred any prison misconduct charges, for drugs or otherwise, during her entire period of incarceration.

75.     As DOCCS confirmed months later, Ms. Steele-Warrick's test results were a faulty false positive.

***Ms. Steele-Warrick Was Unjustly Charged and Sentenced***

76.     On Thursday, April 18, 2019, a DOCCS correction officer and sergeant came to Ms. Steele-Warrick's room and advised her she was being charged with drug use.

77.     When the sergeant and correction officer informed her of the charge, Ms. Steele-Warrick thought at first they were joking, as she knew it was not possible for her to have a true positive result.  She quickly learned they were serious when they handcuffed her, walked her out of her housing unit, and confined her in a disciplinary keeplock cell where she remained for 11 days.

78.     Individuals assigned to keeplock have limited access to their property, packages, telephones, correspondence, and visitors, and their commissary privileges are suspended, pending a disciplinary determination.

79.     Ms. Steele-Warrick felt tremendous shame and humiliation as she was marched away in handcuffs past her peers and friends.

80.     Unlike her private room, which had a door she could self-close and open, Ms. Steele-Warrick's keeplock cell was behind locked and secured steel bars.  The room had only a locker, sink, and toilet.  It did not have the night stand, radio, or closet that Ms. Steele-Warrick had in her private room.  Her meals were delivered through a "feed-up slot" in the bars.

81.      Ms. Steele-Warrick did not have access to any of her belongings in her keeplock cell.  Her first day there, she could not access her toothbrush, shampoo, or soap.  Although she eventually obtained those items, she did not have any of her other personal belongings, including her books or magazines.

82.     While Ms. Steele-Warrick was confined in keeplock, correction officers emptied out her private room, searching and cataloguing all of her personal belongings and putting most of it in storage.

83.     A package of food from Ms. Steele-Warrick's husband arrived while she was in keeplock, and correction officers confiscated all the fresh vegetables and produce, later leaving Ms. Steele-Warrick with only a couple of canned items.

84.     Ms. Steele-Warrick was traumatized by her time in the keeplock cell.  She was shocked that she had received what she knew had to be a faulty and false positive drug test result and that she had been summarily confined and was facing serious disciplinary charges.  She was petrified of the possible punishment she faced and the black mark on her previous unmarred record of behavior.  She cried every day, and people around her began to express concerns about her mental health.

85.     She even confided in a mental-health counselor that she was feeling depressed due to the false positive result.

86.     Ms. Steele-Warrick faced a formal disciplinary hearing for her charge of alleged drug use.  The hearing took place over three separate days while DOCCS continued to hold Ms. Steele-Warrick in a keeplock cell.

87.     Ms. Steele-Warrick pleaded not guilty to the charge.  She testified at the hearing that she did not ingest any substances containing Suboxone/buprenorphine.  Her husband testified that he had not delivered any illegal substances to Ms. Steele-Warrick in the DOCCS facility, and she submitted medical documents from her husband's doctor explaining that the false positive result may have been triggered by a medication he had been prescribed.

88.     Despite her testimony, the testimony of her husband, and her husband's medical records, the DOCCS hearing officer found Ms. Steele-Warrick guilty of drug use, relying on the fact that the "test result forms were found to be credible and truthful."

89.     Ms. Steele-Warrick was sentenced to 11 days in keeplock (which was equivalent to her time served therein) and thirty days loss of recreation, packages, and commissary privileges.  She lost the coveted preferred housing she had previously earned and enjoyed, and was moved back to general population dorm housing.

90.     As a result of her sentence, Ms. Steel-Warrick lost her eligibility for the FRP program.

91.     Originally, Ms. Steele-Warrick was told that the thirty-day loss of privilege portion of her disciplinary sanctions included her eleven days in keeplock.  But when she was given her final paperwork, it stated that the thirty days did not begin to run until the time that she was released from keeplock status.  Because Ms. Steele-Warrick's maximum expiration date was May 22, 2019, she was released from DOCCS custody before her disciplinary sanctions were fully satisfied.

92.     The disciplinary disposition, sanctions, and other resulting consequences were devastating for Ms. Steele-Warrick.  She felt much less safe and secure in general population housing, where she lived in a large, crowded, open dormitory-style room with about sixty other women.  Compared to her private room in preferred housing, it was much noisier, more dangerous, and difficult to access simple amenities like toilets, showers, and the kitchen.  She had no privacy, little real personal space, and had trouble sleeping.  Some of her personal items were stolen by other individuals.

93.     Due to her loss of recreation privileges, Ms. Steele-Warrick was no longer able to go to the gym or serve as a gym class instructor.  She was restricted to her dormitory and the mess hall, except for a limited time when she was permitted to go outdoors.

94.     Worst of all, Ms. Steele-Warrick was denied her last FRP visit with her husband and son, which was scheduled to occur in May before her release.  Because of ongoing immigration proceedings in which she faced possible removal from the United States, Ms. Steele-Warrick did not know what would happen to her when she was released from DOCCS custody.  She feared that she would be detained by Immigration and Customs Enforcement (ICE) or even deported.  The previously scheduled and much anticipated and desired May 2019 FRP visit was the last time she knew for certain that she would see and spend personal and private time with her husband and son.  When the FRP visit was cancelled as part of and because of her wrongful disciplinary sanction, Ms. Steele-Warrick feared that she may never see and spend real time with her family again.

95.     Ms. Steele-Warrick also worried about the possible adverse effects of her drug charge on the course and outcome of her immigration proceedings.  To enhance her chances of being permitted to remain with her family in the United States, she needed to demonstrate that she was not a dangerous person or a flight risk.  The false drug charge posed a reasonable threat to those efforts and potential outcome.

96.     The mental and emotional adverse effects of Ms. Steele-Warrick's disciplinary disposition and sanctions cannot be understated.  She had worked tirelessly and successfully to become and remain a model prisoner and get her life back on track, and it felt like her world was crashing down due to incomprehensible and unfair circumstances outside her control.  She kept thinking, "why is this happening to me?" and she cried to God for answers.

97.     On May 22, 2019, Ms. Steele-Warrick was released from DOCCS custody to post-release supervision.

98.     In September 2019, Ms. Steele-Warrick's disciplinary hearing result was overturned because of the false positive Suboxone/buprenorphine result.

99.     DOCCS informed Ms. Steele-Warrick and other putative class members that the false positives were the result of a "cross reactivity" issue relating to the Indiko Plus urinalysis analyzers.

100.    Even before Ms. Steele-Warrick tested positive for Suboxone/buprenorphine, she heard about other prisoners in the FRP program receiving false positive results.

101.    For example, Ms. Steele-Warrick's friend received a false positive result and was handcuffed in front of her family during an FRP visit and sentenced to sixty days in solitary confinement.  She also heard of another elderly woman in another housing unit who tested positive, even though everyone believed the result was likely false.

102.    Even before Ms. Steele-Warrick had a false positive result, correction officers told her that they believed something was wrong with the machines.

***Plaintiff Darryl Schultz Was Wrongfully Disciplined After Testing Positive for AB-Pinaca***

103.    Plaintiff Darryl Schultz was incarcerated in DOCCS custody from January 1989 until his release in December 2019.  Throughout 2019, he was housed at Orleans Correctional Facility ("Orleans"), a DOCCS facility.  He was housed in the honor block, a privilege it had taken him several years to achieve.

104.    Mr. Schultz is a cancer survivor, suffers from high blood pressure and diabetes, and has suffered a heart attack and had a triple bypass.  Taking illegal drugs would be extraordinarily dangerous to his health.

19

105.    In 2019, Mr. Schultz was eligible to be considered for parole.  He paid an attorney to put together his parole application and was preparing to go before the parole board.

106.    On February 11, 2019, at approximately 8:20 p.m., Mr. Schultz provided a urine sample for drug testing.

107.    The next afternoon, DOCCS officials processed this urine sample through the Indiko Plus urinalysis analyzer.

108.    The sample tested positive for AB-Pinaca, a synthetic cannabinoid.

109.    A DOCCS officer re-tested the same sample on the Indiko Plus.  It again tested positive for AB-Pinaca.

110.    Mr. Schultz was immediately removed from his housing unit in the honor block and was placed in solitary confinement.

111.    Far from having taken AB-Pinaca, Mr. Schultz had never even heard of such a substance.  He was due to go before the parole board, and a positive drug test would have doomed his parole application and his chance at freedom after thirty years.

112.    A misbehavior report was written, charging Mr. Schultz with drug use, and a Tier 3 disciplinary hearing began on February 20, 2019.  DOCCS had no reason, other than the drug test, to charge Mr. Schultz.  Indeed, his disciplinary record before the DOCCS hearing officer included no prior discipline for positive drug tests or drug use.  Mr. Schultz had given numerous urine samples over many years as part of the family reunification program and had always tested negative.

113.    Mr. Schultz pleaded not guilty to the charge at the hearing.  He did not understand why or how he could have tested positive for illegal substances when he was on the cusp of release, after a thirty-year incarceration.

114.    Mr. Schultz sought testimony from a facility doctor and nurse because he thought one of his many medications may have caused the positive test result.

115.    In his desperation, Mr. Schultz asked the disciplinary officer whether an adrenaline rush due to stress could have caused his positive result.

116.    Relying on the list of cross-reactive drugs provided by Defendants, the hearing officer concluded that none of Mr. Schultz's medications could have caused the positive result.

117.    Based on the supposed reliability of the Indiko Plus urinalysis analyzer, Mr. Schultz was found guilty on February 27.  Directive #4937 on drug testing procedures and discipline, which was drafted by DOCCS in collaboration with Defendants, was attached to Mr. Schultz's hearing disposition.

118.    Mr. Schultz was sentenced to 30 days of keeplock, as well as 30 days of loss of recreation, packages, commissary, and phone calls.  This was in addition to the time he spent in solitary confinement.

119.    Mr. Schultz appealed his hearing disposition to the Director of Special Housing/Inmate Discipline on March 12, 2019.

120.    Mr. Schultz tried to stop taking his prescribed medications to avoid future positive test results.  His blood pressure increased to unsafe levels and his diabetes became unregulated as a result, and he had to restart his medications.

121.    On March 13, while he was still not taking his prescribed medications, Mr. Schultz tested negative for any prohibited substances on a urine test.

122.    Mr. Schultz's discipline for his February 11 test was affirmed.

123.    On May 24, Mr. Schultz's attorney sought reconsideration of his discipline from the Special Housing/Inmate Discipline appeals division.  This was denied on June 12.

124.     On June 27, 2019, the Director of Special Housing/Inmate Discipline administratively reversed the guilty disposition and discipline imposed on February 27 because, according to DOCCS, circumstances raised concerns about Mr. Schultz's culpability.

125.     Mr. Schultz had been placed into the DOCCS Substance Abuse Treatment Continuing Recovery Plan, known as ASAT, because of his February 2019 test.  He was administratively released from the ASAT program on July 9, 2019, but was not placed back into honor block.

126.     On July 27, 2019, at approximately 7:52 a.m., Mr. Schultz provided another urine sample for testing on the Indiko Plus.  He was taking his prescribed medications at this time.

127.     This sample tested positive for AB-Pinaca on August 1, 2019.  The sample was retested on the Indiko Plus and again tested positive.

128.     Mr. Schultz was placed in solitary confinement once again.

129.     Mr. Schultz had a parole hearing scheduled for August 6.  He would not have been granted parole with an outstanding drug-related disciplinary charge.  His attorney had to seek a postponement of his parole hearing, and the hearing was postponed for three months.

130.     Mr. Schultz was charged with use of illegal drugs based on the August 1 test results, and a disciplinary hearing was held from August 8 to August 22.

131.     He provided the hearing officer with a list of his medications.

132.     On information and belief, DOCCS sent Mr. Schultz's list of medications to Microgenics Defendants.

133.     At the hearing, Mr. Schultz asked that a representative from Microgenics Defendants give testimony regarding the reliability of the Indiko Plus testing system and about potential cross-reactivity issues.

22

134.    A representative from Microgenics Defendants testified at Mr. Schultz's disciplinary hearing on August 19 and 22, 2019.

135.    The representative testified that many of Mr. Schultz's medications had been tested and found not to cross-react on the AB-Pinaca assay.

136.    The representative also testified that, even though some of Mr. Schultz's medications had not been tested for cross-reactivity, none of those medications would cause a false positive test result.  Nor, he testified, would Mr. Schultz's food or drink cause a false positive test result.

137.    The representative affirmatively stated to the hearing officer and Mr. Schultz that there was no chance Mr. Schultz's test result was a false positive.  Specifically, the representative stated that the "cutoff" level for AB-Pinaca metabolites, above which the Indiko Plus would show a positive result, was set high enough that other forms of chemical interference would not show up as positive results.  Unlike other urinalysis testing systems, the Indiko Plus system provided to DOCCS did not display the amount of the substance in the sample and only displayed a positive or negative result.

138.    Mr. Schultz asked the representative whether there had been reports of false positive results in New York prisons.  The representative falsely testified that there had been no significant reports of faulty test results in New York.  In reality, DOCCS had already told Microgenics Defendants that there were serious issues with reliability with the Indiko Plus.

139.    On the basis of the positive test results on the Indiko Plus and the testimony as to its reliability by Microgenics Defendants' representative, Mr. Schultz was found guilty of using AB-Pinaca.  He was sentenced to 60 days of keeplock and loss of privileges.

140.    On September 13, 2019, Mr. Schultz's attorney wrote to DOCCS's Special Housing Unit Appeals Division, seeking its intervention in Mr. Schultz's repeated discipline and loss of parole dates.  On the same day, Mr. Schultz's attorney wrote to Microgenics Defendants to raise concerns about Mr. Schultz's repeated false positive rest results.

141.    By the end of September, DOCCS stopped using the Indiko Plus BUP II assays and began to reverse discipline imposed due to those tests.  No such blanket reversals were made for AB-Pinaca-related discipline.

142.    On October 2, 2019, the Acting Director of Special Housing/Inmate Discipline affirmed Mr. Schultz's guilty disposition and discipline from the August 22 hearing.

143.    Mr. Schultz's August 22, 2019 hearing disposition was administratively reversed on October 11, 2019, again because, according to DOCCS, circumstances raised concerns about Mr. Schultz's culpability.

144.    Mr. Schultz was finally able to go before the parole board after his discipline was reversed.  The board immediately granted him parole.  He was released in December 2019.

145.    Mr. Schultz's ordeal scarred and traumatized him.  After decades behind bars, with the chance of freedom tantalizingly close, Mr. Schultz suddenly found himself falsely accused and disciplined on charges that snatched that freedom away from him.  Not only had he not taken illegal substances, Mr. Schultz had been accused (and disciplined) for taking a substance he had never even heard of.  He was placed in solitary confinement, abused, and denied basic services.  He spent hundreds of dollars on legal assistance to overturn these blatantly inaccurate test results and to reschedule his parole dates.  This wrongful discipline started to make Mr. Schultz lose hope.

146.    Even more profoundly, the inaccurate test results led directly to Mr. Schultz remaining incarcerated for *months* longer than he should have been.  Mr. Schultz could and should have been a free man in August of 2019.  Instead, as a direct result of DOCCS and Microgenics Defendants' conduct, he remained incarcerated until December.  Those were precious months that he lost, months that he could have spent with his family and loved ones.

## CLASS ACTION ALLEGATIONS

147.    Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class of all persons similarly situated.

148.    Plaintiffs are just two of thousands of individuals wrongly and unjustly punished as a result of Microgenics Defendants' negligent failure to ensure that its tests were used in accordance with applicable standards and produced reliable results, and as a result of DOCCS's failures to afford such individuals their basic constitutional rights.

149.    Plaintiffs seek to represent a class consisting of all persons subjected to the Microgenics Defendants' unreliable testing devices and services provided under the contract and who received positive drug test results generated by Indiko Plus urinalysis analyzers while in DOCCS custody in 2019.

150.    The members of the Class are too numerous to be joined in one action, and their joinder is impracticable.  Upon information and belief, the class is comprised of thousands of individuals.

151.    Common questions of law and fact exist as to all Class members and predominate over questions that affect only the individual members. These common questions of fact and law include, but are not limited to: (1) whether Microgenics Defendants were negligent in providing Indiko Plus machines that generated false positive results to DOCCS' facilities; (2) whether Microgenics Defendants were negligent in failing to ensure that its products and services were

used in accordance with applicable standards; (2) whether Microgenics Defendants negligently trained DOCCS corrections officers regarding the applicable standards for using their machines; (3) whether Microgenics Defendants negligently testified that its machines were reliable for purposes of issuing discipline, when they knew that they should be used as a preliminary screen only; (4) what precautions Microgenics Defendants took to ensure that Indiko machines were running in accordance with applicable standards; (5) whether Microgenics Defendants persuaded DOCCS to use its machines and products by deceptive means in violation of N.Y. GBL § 349; (6) whether all the Defendants are responsible for violating the due process rights of Class members that were disciplined based on unreliable tests and testing protocols; (7) whether all the Defendants are responsible for violating the Eighth Amendment rights of Class members that were disciplined based on unreliable tests and testing protocols; (8) what disciplinary actions DOCCS took against Class members after Class members received false positive drug testing results; and (9) what damages should be awarded to redress the harms suffered by Class members.

152.    Defendants' actions and the claims alleged in this Complaint are common to all members of the Class.

153.    Plaintiffs' claims are typical of those of the Class.  Plaintiff Steele-Warrick received a false positive drug test result for Suboxone/buprenorphine in 2019 on the Indiko Plus testing apparatus while she was in DOCCS custody, and she was subjected to disciplinary sanctions and various other direct adverse consequences as a result.  Plaintiff Schultz received false positive drug test results for AB-Pinaca in 2019 on the Indiko Plus testing apparatus while he was in DOCCS custody, and he was subjected to disciplinary sanctions and various other direct adverse consequences as a result.

154.     The legal theories on which Plaintiffs rely are the same or similar to those on which all Class members would rely, and the harms suffered by them are typical of those suffered by all the other Class members.

155.     Plaintiffs will fairly and adequately protect the interests of the Class.  The interests of the Class representatives are consistent with those of the Class members.  In addition, Plaintiffs' counsel are experienced in class action, civil rights, and prison-related litigation.

156.     Plaintiffs' counsel know of no conflicts of interest among Class members or between the attorneys and Class members that would affect this litigation.

157.     Use of the class action mechanism here is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

158.     This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.  The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt individual redress for damages.

159.     There will be no extraordinary difficulty in the management of this case as a class action.

### ADDITIONAL FACTUAL ALLEGATIONS FROM DISCOVERY IN SUPPORT OF NEW CAUSES OF ACTION IN THE SECOND AMENDED COMPLAINT

***Drug-of-abuse Testing Procedures***

160.     DOCCS has carried out urinalysis testing on individuals incarcerated at its facilities for decades, using different forms of testing services.

161.    DOCCS's policies and procedures regarding testing of urine for drugs of abuse have changed over the years in response to the different products and services provided by third-party providers of urinalysis testing services.

162.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has tailored its testing regulations pursuant to the representations it has received from the third-party providers of testing services as to the accuracy and reliability of those testing services.

163.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has chosen so-called immunoassay testing services on the basis of the belief that those testing services do not require any specialized knowledge, expertise, or verification, and can be carried out by correctional officers without advanced technical supervision.

164.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on employees from the providers of testing services to install and maintain testing systems, and to provide all fixed and consumable materials required for such testing.

165.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on employees from the providers of testing services to evaluate any unexpected or unexplained results from those systems, to diagnose any concerns or failures with the systems, and to remediate all such issues.

166.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on employees from the providers of testing services to respond to customer service questions regarding the operation, maintenance, and

reliability of the supplied testing services.

167.    "If [a DOCCS] facility has [a] urinalysis testing apparatus . . . [t]he individual performing the urinalysis testing shall have been appropriately trained in the use of the testing apparatus and shall precisely follow procedures recommended by the manufacturer for the operation of the testing apparatus."  N.Y. Comp. Codes R. & Regs. tit. 7 § 1020.4(f)(1)(iii).

168.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on trainers from the providers of testing services to train its staff on the mechanical task of collecting and testing urine to insert into immunoassay machines, as well as on the mechanical tasks of storing and using the reagents and assays used in these testing services.

169.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on trainers from the providers of testing services to train its staff on reading the results from the testing systems in order to determine whether or not an individual had consumed a drug of abuse.

170.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on trainers from the providers of testing services to train its staff to identify when a positive test result requires a second test on the same machine and assay.

171.    In the years urinalysis has been used in New York State correctional facilities, DOCCS has been aware that individuals who take certain medications, consume certain foods, or use certain toiletries may test positive for drugs of abuse when tested on urinalysis systems.

172.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on trainers from the providers of testing services

to train its staff to identify when a positive test result may not be accurate, even after a second test.

173.    Prior to imposing discipline upon an inmate for drug use based on test results, DOCCS holds a disciplinary hearing.  *See* N.Y. Comp. Codes R. & Regs. tit. 7 § 253.6.  At such a hearing, DOCCS may use an inmate's positive urinalysis result as evidence of the inmate's illicit use of the drug indicated by presenting, *inter alia*, "any printed documents produced by the urinalysis testing apparatus" and the appropriate Statement of Scientific Principles and Validity of the Testing Apparatus "if the facility has urinalysis testing apparatus."  N.Y. Comp. Codes R. & Regs. tit. 7 § 1020.5(a)(1).

174.    If any incarcerated individual receives a positive urine drug screen and reports taking medication at the time the sample was obtained, DOCCS must conduct an "inquiry . . . to medical personnel as to what medications the inmate has received in the past month which may lead to a positive result."  N.Y. Comp. Codes R. & Regs. tit. 7 § 1020.4(d)(2).

175.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on trainers from the providers of testing services to train its staff on when and how disciplinary officers must contact medical providers to identify the medications tested individuals have been using.

176.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on the providers of testing services to provide pharmacists, doctors, nurses, hearing officers, and other individuals involved in the care and supervision of incarcerated individuals with comprehensive and complete lists of substances that may "cross-react" and thereby cause positive test results ("Lists").  These Lists are sometimes included in product inserts.

177.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has relied on the providers of testing services to provide Lists that accurately and completely describe cross-reactivity concerns, including by identifying any areas of scientific uncertainty.

178.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, DOCCS has not independently evaluated whether the Lists are accurate, up-to-date, or comprehensive.

179.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, providers of testing services have been put on notice that DOCCS will not independently evaluate whether the Lists are accurate, up-to-date, or comprehensive, and that DOCCS relies on the providers to provide current and complete information regarding any areas of scientific uncertainty in how the testing services perform.

180.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, providers of testing services have known that individuals who receive two positive screening results are subject to discipline, including, *inter alia*, loss of privileges, restrictive confinement, removal from programs, loss of good time, and denial of or otherwise interference with parole and eligibility for earned early release from incarceration.

181.    On information and belief, in the years urinalysis has been used in New York State correctional facilities, providers of testing services have known that two positive screening results, in practice, are in almost every case sufficient evidentiary basis for the imposition of discipline, unless providers identify specific substances that cross-react or identify areas of scientific uncertainty or disclose failures in the testing system.

182.    On information and belief, in the years urinalysis has been used in New York

State correctional facilities, providers of testing services have known that testimony from incarcerated individuals that they had not, in fact, ingested drugs of abuse does not, in almost any case, result in being found not guilty in such disciplinary proceedings, even if DOCCS staff might otherwise have doubts as to the guilt or innocence of the tested individuals.

183.     On information and belief, in the years urinalysis has been used in New York State correctional facilities, providers of testing services have known that testimony from medical professionals about concerns that non-controlled substances ingested by incarcerated individuals and their loved ones may have caused inaccurate or unreliable results are almost never sufficient basis to prevent imposition of discipline, unless the relevant substances are listed on the Lists.

184.     Microgenics Defendants were aware of the facts alleged in paragraphs 162–185 at the time they sought to secure testing services contracts from New York State and during the pendency of the contract they did secure.

***Testing Services Prior to 2016***

185.     For several years prior to 2016, DOCCS secured testing services from Siemens AG or one of its medical-focused subsidiaries ("Siemens").

186.     By 2016, DOCCS did not have a formal long-term contract with Siemens, but rather engaged in month-to-month ordering of products.

187.     Siemens provided DOCCS with its Syva and Viva branded testing services, which use an Enzyme-Multiplied Immunoassay Technique (EMIT) to detect drugs of abuse.

188.     On information and belief, EMIT testing had been used at DOCCS facilities for at least thirty years.

189.     On information and belief, Siemens worked with DOCCS to update and craft policies and procedures regarding testing in light of the EMIT testing services it provided,

32

recognizing and communicating concerns regarding cross-reactivity and unreliability.

190.    At some point prior to 2016, DOCCS officials approached Siemens to ask that Siemens provide representatives who would testify as to the functioning and reliability of testing services during disciplinary hearings.

191.    Siemens, for a period, made its employees available for providing such testimony.

192.    Siemens, however, determined that it could not continue to provide such testimony regarding the reliability or accuracy of testing results at disciplinary hearings and informed DOCCS of that decision.

193.    For several years, the key client contact between DOCCS and Siemens was Brenda Collum, who was employed by Siemens.  On information and belief, Collum had developed close working relationships with several employees of DOCCS due to their long-standing interactions in the provision of drug testing services.

***Defendants Approach DOCCS to Change Providers in Late 2015***

194.    In November 2015, Brenda Collum left Siemens and obtained employment with Defendants.  On information and belief, she did not sign a non-compete or non-disclosure agreement with Siemens.

195.    As the key client contact at Siemens, Collum was aware of DOCCS's interest and desire in obtaining testimonial services and was aware of the prices Siemens charged DOCCS and the services it was willing and unwilling to provide.

196.    As soon as she started her new job, Collum emailed Lt. Corey Bedard at DOCCS from her new email address @thermofisher.com and suggested that DOCCS consider abandoning the Siemens EMIT test and use Defendants' Cloned Enzyme Donor Immunoassay (CEDIA) services instead.

197.    CEDIA and EMIT tests are similar in that they are they are both immunoassays;

but they are manufactured in different ways, have different chemical compositions, have different technical specifications, have different output options, and can provide different results.

198.    On information and belief, DOCCS had never before used CEDIA tests to test for drugs of abuse.

199.    CEDIA tests, even if they provide positive results, require confirmation by gas chromatography and mass spectrometry.

200.    On information and belief, prior to 2016, there had been no peer-reviewed scientific studies that approved of using CEDIA testing systems, without confirmatory testing, to impose discipline on incarcerated individuals.

201.    On information and belief, prior to 2016, no correctional or penal institution in the United States, whether federal, state, or local, used CEDIA testing systems to impose discipline for drug of abuse charges without first requiring confirmation from a more accurate and reliable testing system.

202.    Collum represented to Bedard that Microgenics Defendants' testing systems are "just like EMIT," but the "[d]ifference here is, these Microgenics reagents are the reagent [*sic*] used by the Federal Courts!"  "Also, AK AND Alabama state prison systems (to name 2 of the largest)."

203.    Collum told Bedard: "You know my abilities to help you with your drug testing program.  Now, I have the backing to help you make better choices to meet all your needs including Admin. Hearings as well as a much better financial option."

204.    During late 2015 and early 2016, Collum was supervised by, *inter alia*, Larry Wilkie ("Eastern US Regional Sales Manager") and Brett Richards ("National Sales Manager"); and she collaborated with Kim Mulcahy ("Marketing Product Manager"), who provided Collum

with scientific and operational data on the CEDIA tests.

205.    On information and belief, each of these individuals was aware of Collum's approach to DOCCS, her prior knowledge of DOCCS's contract with Siemens and the Siemens limitations on providing testimony at disciplinary proceedings, and approved of her efforts to convince DOCCS to switch to using Defendants' testing systems and services.

206.    Richards and Wilkie, in particular, were each aware of Collum's approach to DOCCS and were involved in the day-to-day negotiations over how Defendants would persuade DOCCS to abandon the Siemens relationship and retain the services of Defendants.

207.    On information and belief, Richards, as the direct supervisor of Wilkie and Collum, was involved in communicating details of these negotiations to his superiors and other officials at Microgenics Defendants.

208.    Between December 2015 and March 2016, Wilkie and/or Collum travelled to New York on more than one occasion to meet with Bedard in person.  Richards offered to accompany them because getting DOCCS's business was "so important" and "[t]here are so many eyes on it."

***Defendants Develop a Tailored Proposal for DOCCS***

209.    In January 2016, Bedard wrote to Collum and Wilkie asking for a quote from Microgenics Defendants for their services.

210.    Multiple staff members who worked at Microgenics Defendants, including some individuals who have publicly identified themselves as employed by Defendant Thermo Fisher Scientific Inc., provided input into the proposal in early 2016.  In particular, they discussed methods by which they could reduce the cost of providing services to DOCCS and discussed resource concerns regarding providing administrative hearing testimony.

211.    Notably, when Microgenics Defendants sought to bid for this contract in late

35

2017, these February 2016 discussions were circulated among John Vernasco, Vice President, Commercial Operations; Bill Pyron, legal counsel; and David Hissong, who is publicly identified as the Vice President and Deputy General Counsel of Defendant Thermo Fisher Scientific Inc.

212.   While Defendants were preparing their quote for DOCCS, DOCCS asked Collum about Defendants' ability to provide expert witnesses for court proceedings and Microgenics Defendants' experience in doing administrative hearings previously.  On March 6, 2016, Wilkie expressed concern about Microgenics Defendants providing experts to testify as to the reliability of the tests at trial, and about the nature of administrative hearings.  He understood that DOCCS "just need for us to go on record for our Package inserts and our claims."  He confirmed that none of the correctional facilities in other jurisdictions that Microgenics Defendants supplied "requires such administrative hearings on our products."  An employee of Microgenics Defendants would testify to the Inspector General in 2020 that "hearing-based testimony was unique to New York State DOCCS."

213.   Collum tried to assuage Wilkie's concerns by explaining that experts would only be needed on rare occasions and that she had "a great deal of experience on" administrative hearings and could assist.  Collum is not a scientist and knew at this point that Siemens had refused to provide administrative hearing testimony to DOCCS.  Later, DOCCS officials would testify that "one of the reasons for changing providers was because [Defendants would] provide testimony and the previous vendor would not."

214.   Microgenics Defendants provided DOCCS with a proposal in March 2016.  On information and belief, at least Richards, Wilkie, Collum, Mulcahy, Humaira Saya, Michael Schwartz, Triffany Chung, Gino Gonnelli, Douglas Berg, and Angela Miller provided input into the content of this proposal.  Wilkie and Collum sought to meet with Bedard in person to discuss

it.

215.     Microgenics Defendants' proposal repeated Collum's representation that Microgenics Defendants' testing system was used in many correctional systems, met stringent accuracy standards from such facilities, and that Microgenics Defendants would provide administrative hearing support.  Microgenics Defendants submitted this proposal and made such representations even though they were aware that DOCCS would not carry out confirmatory testing using more accurate methods, despite the proposal itself noting the importance of such confirmatory testing.

216.     In April 2016, Microgenics Defendants wrote to DOCCS with proposals to include assays for testing synthetic cannabinoids, even though research scientists at Microgenics Defendants were still evaluating such assays.  In an attempt to bolster Bedard's ability to advocate for Microgenics Defendants' products with Bedard's superiors at DOCCS, Collum asked her colleagues, including Mulcahy, Richards, and Lakshmi Anne, to provide preliminary analyses and summaries, including on issues of cross-reactivity and the professed superiority of Microgenics Defendants' product over Siemens's.

217.     In May 2016, Bedard asked Collum to comment on the "efficacy" of Microgenics Defendants' system and how it compared to gas chromatography and mass spectrometry.  In follow up emails, he sought confirmation from Collum on the equivalence of the EMIT and CEDIA tests.  DOCCS thus relied on the data on efficacy provided by Microgenics Defendants. Collum provided summaries but did not identify any scientific uncertainty, any details regarding cross-reactivity, or any disclaimers regarding the need to carry out gas chromatography and mass spectrometry.

218.     Instead of providing full transparency on the scientific uncertainty and limitations

of their tests, in July 2016, Microgenics Defendants provided DOCCS with references in several other correctional jurisdictions and facilities, without disclosing whether or not those facilities used gas chromatography and mass spectrometry testing as well.

219.    In August 2016, Mulcahy and Anne produced a draft document comparing EMIT and CEDIA testing systems to be sent to DOCCS.  Richards provided feedback regarding whether the presentation to DOCCS was to be "a selling piece or informational piece primarily." Mulcahy stated that she had deleted references to articles "about how to use immunoassays in general for screening" because they were not relevant to the comparison between EMIT and CEDIA systems.

220.    Internally, in November 2016, scientists at Microgenics Defendants informed Collum and Wilkie that they did not, in fact, know the efficacy of at least one assay in comparison to EMIT assays.  On information and belief, Collum did not inform DOCCS of this limitation and caveat.  Instead, she told her colleagues that DOCCS repeated all positive results and that using the experimental assay at DOCCS would give Microgenics Defendants data on how well their assays functioned.

221.    In a meeting on December 1, 2016, several employees of Microgenics Defendants discussed the pros and cons of proceeding with the DOCCS opportunity.  They identified it as "potentially worth $5M over several years."  They acknowledged that DOCCS would "[s]end nothing out for confirmation but rather run assay twice (to ensure not operator error)."  In other words, Microgenics Defendants knew that there would be no backstop to checking the accuracy of their own testing system's scientific reliability before DOCCS's initiation of disciplinary charges and proceedings against and imposition of disciplinary sanction upon incarcerated individuals, but decided to go ahead based on the financial size and value of the contract.

222.    On December 5, Mulcahy wrote to Wilkie, comparing Microgenics Defendants' and Siemens's buprenorphine tests.

223.    Microgenics Defendants installed a test machine at a DOCCS facility shortly thereafter, to test side-by-side with the existing Siemens system.  Collum told her colleagues that Microgenics Defendants intended to "make this a blow out over" Siemens' system.

224.    Microgenics Defendants trained several DOCCS staff on the operation of their testing system.  On information and belief, Siemens was unaware of this comparison being carried out.

225.    Starting in January 2017, DOCCS raised concerns with Microgenics Defendants that it was getting incongruous results from Microgenics Defendants' system.  Some samples tested positive on the Siemens, but negative on Defendants' system.  Others tested positive on Microgenics Defendants' system but negative on Siemens, apparently due to cross-reactivity issues.  Microgenics Defendants investigated the issue and reported it was due to their supplying a form of Buprenorphine assay (BUP I) that had a heightened risk of false positives.  To correct this issue, Microgenics Defendants offered to provide an updated version of the assay that would not cause these issues.  That updated assay, known as BUP II, generated a false positive test for Plaintiff Steele-Warrick in 2019.

***Defendants Seek a DOCCS Contract in 2017***

226.    On February l7, 2017, DOCCS issued a Request for Information, seeking information on new technology for urinalysis in order to develop an Invitation for Bids.  On information and belief, Siemens had not been aware that DOCCS was seeking new technology or was dissatisfied with its testing services.

227.    In July 2017, Mulcahy wrote to her colleagues that Microgenics Defendants had collected "12 references and summary notes that support our technology, how DRI is the same as

EMIT, and performance comparisons of CEDIA and DRI to EMIT."  She stated that, "[f]rom

these notes, I will draft a 'story' that supports the validity of our technologies."  In an internal

agenda, Wilkie specifically told Mulcahy, Preziotti, Gonnelli, and Richards that they should not

circulate to DOCCS scientific articles regarding the reliability of their testing system or its

equivalence with Siemens because "anything negative about our tests" could be used by "defense

counsel . . . to invalidate our test," and that Defendants should insist on "25+" years of

unchallenged testing in pitching their test to DOCCS.  Microgenics Defendants' "Sales/talking

points" would also be that this test would be "[a]ssume[d] to be accurate since it is like the EMIT

technology" and that it was FDA cleared.  Wilkie did not mention the regulatory and scientific

requirement that any positive tests on CEDIA tests had to be confirmed with more accurate

methods.

228.    Three vendors responded to the February 2017 RFI, including Microgenics

Defendants.  Bedard forwarded Collum informational emails he had received about the

forthcoming bidding process.

229.    DOCCS issued IFB 2017-14 on October 31, 2017, based in part on the

information received from Microgenics Defendants.  Siemens, Defendants, and Alere submitted

bids.

230.    Microgenics Defendants' bid was more than 30% less than their competitors.

DOCCS wrote to Larry Wilkie to ask how Microgenics Defendants could underbid their

competitors by such a large margin.  Wilkie responded that "Thermo Fisher Scientific Inc. is the

world leader in serving science" and that the company's global reach "allows our company

certain economies of scale others don't have."  Wilkie further represented that since Thermo

Fisher Scientific Inc. "also manufacturing [*sic*] our own instruments, unlike other vendors who

are selling instruments made by companies they do not own," it could "deliver a unique value proposition for our customers."  Microgenics Defendants thus "responded to the bid with full understanding of what is required" and Microgenics Defendants "have full company support in meeting your needs for the full term."

231.    Microgenics Defendants were tentatively awarded the contract pursuant to their 2017 bid.

232.    In January 2018, Siemens challenged the bidding process and the award of the bid to Microgenics Defendants.  The Office of the State Comptroller investigated the bidding process and found that, due to "flaws," the IFB and Microgenics Defendants' tentative award would have to be cancelled.  It was subsequently cancelled.

***Microgenics Defendants Submit a Materially Identical Bid in 2018 and Amend DOCCS Policies on Urinalysis Testing***

233.    As alleged in paragraph 23 above, in May 2018, DOCCS issued IFB 2018-06, which was a re-bid of IFB 2017-14, with minimal differences.

234.    Microgenics Defendants submitted a bid in response to this IFB that was in relevant part identical to their bid in 2017, albeit with different pricing proposals.

235.    In August 2018, Collum wrote to DOCCS to ask for updates on Microgenics Defendants' bid because she was feeling "a lot of pressure coming down from the top on this bid."

236.    In September 2018, DOCCS entered into Contract #CC161458 (the Contract). On information and belief, DOCCS's decision to enter into this Contract with Microgenics Defendants was identical to their decision to tentatively award Defendants a contract in 2017.

237.    As part of the Contract, Microgenics Defendants agreed to indemnify DOCCS for any claims it may face resulting from faulty testing services.

238.     In late October 2018, Bedard shared an editable draft of DOCCS Directive #4937 regarding urinalysis testing with Collum, soliciting her edits to the Directive so that it could be conformed to the technical specifications of the Indiko Plus.

239.     Collum suggested edits to the Directive to equate EMIT tests to CEDIA tests. She proposed adding to the Directive that "DRI and CEDIA reagents are currently used by the largest reference lab in the country; by the Federal Probation and Parole; Department of Defense; as well as numerous other state prisons; hospitals; drug courts and treatment programs."  This edit to the Directive did not acknowledge that, on information and belief, all of these other jurisdictions and institutions use confirmatory testing in addition to CEDIA screening testing.

240.     Collum also provided to DOCCS snippets from scientific journals regarding CEDIA testing systems, without noting that Microgenics Defendants' own standards and uniform federal and scientific requirements mandated a gas chromatography and mass spectrometry confirmatory test before discipline can be imposed.  These snippets were identical to those provided to DOCCS in 2016 to induce a perception that the EMIT and CEDIA tests are the same.  On information and belief, neither Collum nor anyone else at Microgenics Defendants provided DOCCS with the underlying scientific papers or data from which the excerpts were drawn, or any other data that would acknowledge the scientific uncertainty of the reliability of Microgenics Defendants' testing system.  In fact, as noted above, in July 2017 numerous employees of Microgenics Defendants had specifically discussed not providing comprehensive lists of references on the grounds that such studies may be used by incarcerated individuals to challenge the propriety of the discipline charges and sanctions imposed on them.

241.     All of Collum's edits to the DOCCS Directive, which carries the force of law and is used in disciplinary hearings to justify discipline, were accepted by Bedard into the final

Directive.  Bedard informed Collum and Wilkie in November 2018 that "the changes to the

Directive do not require Department of State intervention" to become law and that he would

place them before the Deputy Commissioner of DOCCS for approval.  On information and

belief, nobody at DOCCS verified the accuracy of the information underlying Collum's additions

and edits to the Directive, and Defendants were aware that there would be no further verification

of the accuracy or appropriateness of Collum's amendments to the Directive.

242.    Incarcerated individuals in DOCCS custody were disciplined in accordance with,

on the basis of, and under the terms of Directive #4937, as amended by Defendants.

***Microgenics Defendants Downplay Reports of Unreliable Testing and Dismiss Concerns
Raised by Incarcerated Individuals***

243.    Microgenics Defendants began training DOCCS staff and installing equipment at

all facilities in early 2019.  In January, Collum informed employees who would provide

testimony at disciplinary hearings that incarcerated individuals "should not be allowed to ask"

"'how many false positives?'" in a disciplinary hearing.  "[I]f they did, the response should be

'Our products are highly accurate and have qualified to be used for testing in your facility.[']"

244.    In March 2019, almost as soon as the new system was installed, Collum was

informed by DOCCS staff that they were concerned the Indiko Plus only displayed results as

positive and negative, without an indication of the concentration of the drug of abuse, as the

Siemens testing system had done.  Jennifer Booth, who had taken over as the main DOCCS

contact for urinalysis testing, confirmed that DOCCS had "always provided the inmate with a

cutoff number and their neg and pos results" because "[t]here needs to be something to backup

the results."  Collum informed Booth that it was not likely practicable with the Indiko Plus to

provide incarcerated individuals with raw data on the level of drugs detected in their samples, in

addition to a positive or negative result.

245.    Later that same month, a DOCCS officer wrote to Collum seeking extra manuals for the Indiko Plus in order to provide them to incarcerated individuals facing charges for drug use on the basis of urinalyses for their review.  Collum objected and emailed Booth to say it was "completely unacceptable" for incarcerated individuals to have access to extra manuals in the prison library.  That same month, the first incarcerated individuals started to flag unreliable test results.

246.    By April 2019, several incarcerated individuals, including Plaintiffs, were reporting that their positive test results were inaccurate and had to have been inaccurate. DOCCS officials wrote to Booth to ask her help in having Microgenics Defendants come and visit facilities to "inspect our procedures and verify installation and function of the machine" in order "to address the inmate populations [*sic*] concern re: false positives."  In one case, an individual who had not received any disciplinary reports since December 2010 was found positive and, on information and belief, had his parole hearing jeopardized.  However, because "[t]he vendor checked the machine results and calibration and found no deficiencies," the discipline imposed was upheld on appeal.

247.    Booth was informed by DOCCS officials in May 2019 that they had been made to understand, on information and belief by Microgenics Defendants, that the Indiko Plus was a "better technology," that it "screen[ed] for more" drugs of abuse, and "so the amount of positives will rise," but that the people testing positive included those who were participating in the family reunification program—like Plaintiff—and thus, by implication, were highly unlikely to be taking illicit substances.

248.    Booth wrote to Collum and Wilkie to raise a concern that Attica Correctional Facility had seen a number of anomalous results and that DOCCS officers were "requesting

someone revisit their facility and check the machine parameters and give an overview to staff on testing procedures to ensure they are being conducted properly." Booth mentioned that Microgenics Defendants' system was giving positive results for synthetic cannabinoids for "[o]lder men with no history of drug use" and that similar concerns were raised at Sing Sing. Booth also raised the concern that, for some assays, Microgenics Defendants had not provided complete lists for verifying cross-reactivity.

249. Microgenics Defendants sent an employee to Attica to verify that DOCCS officials were using the testing system properly. After a review of the machine and the officers using the machine, the employee wrote to DOCCS officials and stated there is "no reason to question those results." His "professional opinion" was that the DOCCS was "performing the drug testing in a manner consistent with our recommendations and that the results generated can be trusted as accurate."

250. Collum followed up by writing to Booth and assuring her that the positive tests— no matter how anomalous—could not be due to any failures or scientific uncertainty in the testing system. Rather, the anomalous tests were likely because certain drugs had never been tested before and because the new Buprenorphine test "is better [and] more sensitive" than the earlier Siemens machines.

251. Also in May 2019, DOCCS officials informed Microgenics Defendants that DOCCS needed a statement from the company that calibrating the Indiko Plus only weekly was sufficient to ensure reliability. Siemens, when its testing system was used at DOCCS, had warranted that weekly calibration on its machines was sufficient. When Microgenics Defendants installed their testing system at DOCCS facilities, they trained DOCCS officials that weekly calibration of the Indiko Plus was also sufficient. However, Microgenics Defendants' own

internal technical specifications recommended *daily* calibration in order to maintain reliability.

252.    In internal emails, several employees of Microgenics Defendants balked at providing written guidance that weekly calibration was sufficient, asking instead that, if DOCCS absolutely required such guidance, it should only be communicated orally.  Despite the fact that their internal scientific standards called for daily calibration, key employees of Microgenics Defendants involved in the DOCCS contract like Karl Beiser and Vladimira Kuftinec pressured their colleagues to rely on an outdated scientific standard on file to justify weekly calibration. Microgenics Defendants then provided DOCCS with written material sufficient to justify only weekly calibrations, because the "[c]ustomer disciplinary hearing is dependent" on providing such a statement.  New York law requires DOCCS officials to "precisely follow procedures recommended by the manufacturer for the operation of the testing apparatus," N.Y. Comp. Codes R. & Regs. tit. 7 § 1020.4(f)(1)(iii), and Microgenics Defendants knowingly manipulated their guidance and recommendations to DOCCS on the proper procedure for the operation of their testing system despite knowing that their guidance was not supported by their internal standards.

253.    In June 2019, in response to further concerns about unreliable tests from a DOCCS official, Collum reiterated that "the basic principles for testing within NYS DOC for >17 years has been …emit x2 only."  She affirmed that the same procedure had to be followed with the Indiko Plus and that officers were not permitted to deviate from it because that procedure had been put into place in Directive #4937, which Collum had helped draft and finalize.

254.    Collum also directed that "[i]nmates are not to have package inserts," even though those inserts were often the only means for incarcerated individuals to identify whether any

medications they took could cause cross-reactivity with Microgenics Defendants' assays.  Upon receiving pushback from an officer that incarcerated individuals—or at least pharmacists—must have access to Indiko Plus inserts in order to identify cross-reactivity, Collum stated that "the pharmacist should only see the XR [cross-reactivity] section where is [*sic*] says could show up positive."  Moreover, Collum represented that "our package insert doesn't have anything that cross-reacts at clinically significate [*sic*] levels."  She assured the DOCCS officer that she understood that "inmates and all their friends try to find out everything they can on this," but that the inserts, which included information about the need for confirmatory gas chromatography and mass spectrometry testing, was not to be shared with incarcerated individuals.  In the same month, Microgenics Defendants' employees testified at disciplinary hearings that the Indiko Plus was "highly accurate."

255.    DOCCS continued to express serious concerns about inaccurate and unreliable testing in July 2019.  In particular, on information and belief, DOCCS had found that many individuals were testing positive for Buprenorphine who would otherwise not be suspected or expected of abusing that drug, including but not limited to individuals at Eastern Correctional Facility.  DOCCS officials called Microgenics Defendants' technical support line to get assistance on interpreting test results.  Finally, in response to these concerns, Microgenics Defendants agreed to re-review the list of medications being taken by incarcerated individuals who had tested positive for Buprenorphine.  At the same time, however, Microgenics Defendants' employees testified at disciplinary hearings that medications taken by incarcerated individuals would not cross-react, even though Microgenics Defendants had never tested the effect of those medications on the Indiko Plus or as to certain assays.

256.    By late July 2019, DOCCS prohibited Microgenics Defendants from installing

47

any further assays on the testing system and directed Microgenics Defendants to start sending some samples for further testing using more accurate methods.  DOCCS told Microgenics Defendants that the Buprenorphine assay appeared to be particularly unreliable and was at least too sensitive.  Booth put Microgenics Defendants on specific notice that "inmate[s] are losing programs and time because of these positive results."  Senior officials at DOCCS began to discuss whether there were systemic issues with Defendants' testing system.

257.    By late August, Microgenics Defendants had still not provided DOCCS with a reliable solution to the unreliable testing results of which they were on notice.  In fact, as they testified to the Inspector General later, Microgenics Defendants had become aware of at least three additional compounds that would likely cause cross-reactivity but made no effort to update their documentation or inform DOCCS.  On information and belief, incarcerated individuals were still subject to discipline during this period.

258.    On August 22, 2019, Wilkie provided DOCCS with a list of medications prescribed to incarcerated individuals that could interfere with the Buprenorphine assay.  The list was divided into three tabs, showing those drugs that had been tested and were known not to react, those drugs that had not been tested but were thought to "have a higher probability of interference," and those drugs that had not been tested but "run a lower probability of interference."  Wilkie conceded that the Buprenorphine assay provided to Microgenics Defendants in 2019 "presumptively appears to be sensitive to medications being prescribed to inmates" and suggested shifting back to BUP I, the assay first offered in 2016–17, which had been found to generate a false positive then.  If DOCCS retained the system Microgenics Defendants had warranted as being "error free," Wilkie "recommend[ed] additional training to your pharmacist and key stake holders on cross reactivity."

48

259.    At no point did Microgenics Defendants acknowledge that incarcerated individuals had been disciplined on the basis of this unreliable test, and they did not propose any remediation for the wrongful discipline that had been imposed.  Instead, they reiterated the misleading statement that "[m]any in department of corrections industry, for example United States Federal Probation System, Department of Defense, hundreds of local state and county facilities," used Microgenics Defendants' systems.

260.    In a separate PowerPoint presentation during the same period, Microgenics Defendants represented to DOCCS that "there are no established cutoffs for synthetic cannabinoids . . . and there are no established regulatory limits."  Yet, Microgenics Defendants continued to propose DOCCS discipline incarcerated individuals when they tested positive for such drugs on Microgenics Defendants' testing system.  Internally, at the very same time, Collum and her colleagues discussed an instance in which an incarcerated individual who was being treated for HIV tested positive for AB-Pinaca (a synthetic cannabinoid) and had asked Microgenics Defendants to testify at his disciplinary hearing.  Collum wrote that "of course we have not [*sic*] idea" about cross-reactivity "because that is a cocktail of drugs."  However, on information and belief, Microgenics Defendants took no steps to intervene and prevent this individual from being disciplined.

261.    On information and belief, this was the first time Microgenics Defendants had provided DOCCS with such detailed information, which confirmed the significant scientific uncertainty in Microgenics Defendants' testing system.  DOCCS required Microgenics Defendants to send samples to outside laboratories to confirm suspicious cases and installed the alternative Buprenorphine assay now recommended by Microgenics Defendants.  Some of those samples were found to incorrectly have been marked as positive on the Indiko Plus.

262.    In the months leading up to these admissions, Microgenics Defendants'
employees had testified at disciplinary hearings that no over-the-counter medications would
cause a false positive, and they testified in some cases that confirmatory testing was only
required to identify how much of a drug of abuse was present in a sample, not to determine
whether the sample was in fact positive for the drug of abuse.  Such knowingly false testimony,
combined with the original deception that positive results from the Indiko Plus were reliable
without confirmatory gas chromatography and mass spectrometry testing, led directly to the
initiation of disciplinary proceedings and imposition of disciplinary sanctions upon incarcerated
individuals, resulting in a variety of adverse consequences and harms.

263.    DOCCS officials had a conference call with Microgenics Defendants on
September 4, 2019, "to discuss product performance."  DOCCS officials made clear to
Microgenics Defendants that they did not wish to speak to sales personnel, who had carried out
the majority of the relationship, but rather to technical experts.

264.    By September 11, DOCCS officials began to reverse prison disciplinary
dispositions due to a cross reactivity issue with the BUP II assay.  When Microgenics Defendants
learned of this, Collum wrote to Vladimira Kuftinec that "this hurts our reputation" and that
DOCCS "need[s] to be reassured."

265.    In November 2019, the New York State Inspector General started to review and
investigate the use of Microgenics Defendants' Buprenorphine testing system in state facilities
due to concerns about unreliability.  The Acting Commissioner of DOCCS ordered that Directive
#4937, which had been drafted in part by Defendants, be amended so that "[a]ll urine samples
that test positive following application of our current Thermo Fisher immunoassay tests must be
sent for confirmatory testing by an outside, independent, vendor and no incarcerated individual

may be disciplined, nor any other adverse action taken against such individual, for a positive drug test before a positive confirmatory test has been received and the disciplinary hearing concluded."

266.    Microgenics Defendants had known such confirmatory testing was necessary in 2016, when they first began their efforts to supplant Siemens in its contractual relationship with DOCCS.  Yet, as late as December 2019, Microgenics Defendants' employees continued to testify at disciplinary hearings that no confirmatory testing was necessary.  In December, Gilbert O'Young, a Technical Service Representative of Microgenics Defendants who participated in numerous disciplinary hearings, sent Collum a draft script for technical support representatives to use when called to testify during disciplinary hearings.  Collum responded that "Non customers," those "not running the instrument"—i.e., the incarcerated individuals being charged on the basis of positive tests—"should have limited info."  She told O'Young to delete all acknowledgments of scientific uncertainty from the script, including removal of any reference to the fact that not all medications are tested for cross-reactivity.  Specifically, she directed that the following sentence be deleted from the script: "Confirmation using other methods such as Thermo Fisher's to be released Gold Standard Cascadian technology may increase the accuracy rate and add further confidence to your positive results and potentially detect unlikely false-positive results."

267.    Also in December 2019, the Inspector General, as a result of its investigation, advised DOCCS to consider releasing anyone who was in SHU or keeplock on the basis of a positive test for synthetic cannabinoids.  DOCCS ordered confirmatory testing on several samples that had tested positive on the Indiko Plus for such drugs and found that not a single one contained these drugs.

268.    A few weeks later, DOCCS cancelled its contract with Microgenics Defendants and reversed all discipline imposed on incarcerated individuals resulting from and related to Defendants' testing services.

**The Microgenics Defendants Acted Under Color of Law**

269.    As set forth above, and without limitation, Microgenics Defendants worked with DOCCS in installing and implementing Microgenics Defendants' Indiko Plus urinalysis testing system.  That work included training and, in some cases, supervising DOCCS's personnel using the system, testifying at disciplinary hearings, and providing guidance and input on drafting and implementing the DOCCS's testing directive to be used in disciplining prisoners.

270.    Thus, Microgenics Defendants, at all relevant times, acted under color of law because their actions in instituting and operating a regime of prisoner discipline constitutes a public function and/or because Microgenics Defendants acted in concert with DOCCS in jointly instituting and operating a regime of prisoner discipline based solely on an unreliable Indiko Plus testing system without confirmatory gas chromatography and mass spectroscopy testing.

## ADDITIONAL FACTUAL ALLEGATIONS IN SUPPORT OF CAUSES OF ACTION AGAINST DOCCS DEFENDANTS IN THE THIRD AMENDED COMPLAINT

271.    The New York State Inspector General completed its investigation and published a report titled 'Investigation of New York State Department of Corrections and Community Supervision: Incarcerated Individual Drug Testing Program' ("IG Report") on January 4, 2022.

272.    The IG Report paints a scathing picture of misconduct by both the Microgenics Defendants and by various senior staff members at DOCCS, including the DOCCS Defendants now being sued in this Third Amended Complaint.  Its specific findings, based on dozens of interviews and extensive document review, identify most of the following significant failures by DOCCS Defendants.

***DOCCS Defendants Ignored State Law, the Due Process Rights of Incarcerated Individuals, and Basic Precautions in Deciding to Use the Indiko Plus***

273.    Defendant Corey Bedard was charged with overseeing the DOCCS drug testing program for incarcerated individuals from 2011 until 2019.

274.    On information and belief, he lacked scientific training in drug testing, urinalysis, medicine, pharmacology, chemistry, or laboratory techniques.  On information and belief, he had no relevant training in law, constitutional due process requirements, or State procurement policies.  He had never worked at a urinalysis testing company or any other manufacturer or provider of medical or analytical devices.  In short, his supervisors at DOCCS had no business entrusting the oversight of a drug testing program that tested tens of thousands of incarcerated individuals a year to him.

275.    Bedard developed a cordial relationship with Brenda Collum while she was a representative at Siemens, the longtime provider of testing services to DOCCS.  On information and belief, Collum, too, had no scientific training in urinalysis testing, constitutional due process requirements, or state law, and Bedard knew this.  Bedard nonetheless relied on Collum's representations on the scientific efficacy and reliability of urinalysis testing systems, and on their sufficiency for use in disciplining incarcerated individuals.

276.    After Collum was hired by the Microgenics Defendants, she reached out to Bedard and suggested DOCCS choose the Indiko Plus over Siemens's products.  She was not an expert in the differences between the Indiko Plus CEDIA tests and the Siemens EMIT tests.  Nor was Bedard.

277.    In May 2016, after this outreach from Collum, Bedard recommended to his supervisors that DOCCS should end its current instrument leases and should instead procure drug tests from another vendor.  On information and belief, Defendant Kelly was Bedard's

supervisor at this point.  Other DOCCS Defendants were also in the chain of command that needed to approve a new urinalysis testing system at DOCCS.

278.    On information and belief, Bedard had not seriously considered any vendors other than the one suggested by Collum.  Even had he seriously considered other vendors, neither Bedard nor, on information and belief, any of his direct supervisors or anyone he consulted on this matter had training or expertise in evaluating drug testing vendors.

279.    In July 2016, Bedard identified Microgenics Defendants as the potential new vendor and forwarded contact information for Brenda Collum to his supervisors.  Neither Bedard nor, on information and belief, any of his supervisors independently investigated the propriety of the Indiko Plus for use in DOCCS's incarcerated individual drug testing program.

280.    Between July and October 2016, Bedard created the required specifications for selecting a new drug testing vendor and circulated them to his supervisors.  On information and belief, Bedard believed the Indiko Plus met these specifications but carried out no independent analysis of whether these specifications were appropriate.  Bedard was not qualified to create such technical and contract specifications.  On information and belief, none of his supervisors intervened to appoint a qualified and independent party to create these specifications.

281.    In November 2016, Bedard asked his supervisors to approve a side-by-side comparison of the Indiko Plus and Siemens' drug tests (but not instruments from any other competitors) at a correctional facility.  On information and belief, DOCCS Defendants, including Defendant Venettozzi, were notified of this request and did not evaluate whether this comparison was appropriate, necessary, or in compliance with state contracting laws.

282.    Bedard asked Collum to coordinate the side-by-side comparison of these two instruments.

283.    In that side-by-side testing, the Indiko Plus buprenorphine assay identified one sample as positive that had not been identified as positive by Siemens's system.  That positive was caused by the incarcerated individual taking Tylenol with codeine as prescribed.

284.    Bedard did not halt consideration of the Indiko Plus upon learning of this inaccurate result.  He accepted the Microgenics Defendants' explanation that the supposedly more accurate and sensitive BUP II assay would solve any such cross-reactivity problems and would be appropriate to discipline incarcerated individuals.  Neither he nor any of his supervisors evaluated these claims for their scientific or penological accuracy, nor did they check if these assays had been approved by the FDA for their intended uses.

285.    In February 2017, Bedard and his supervisors approved a Request for Information regarding urinalysis testing systems.

286.    Between February and October 2017, Bedard forwarded Collum emails about the forthcoming bidding process.  On information and belief, he did not extend the same courtesy to all potential vendors.

287.    DOCCS issued an Invitation for Bids in October 2017 and three vendors responded.  According to the IG Report, DOCCS did not follow standard New York State procurement laws and policies in seeking such bids.  On information and belief, DOCCS Defendants approved this Invitation for Bids.

288.    The Microgenics Defendants were awarded a contract to supply DOCCS urinalysis testing services.  In January 2018, Siemens challenged the bidding process and the contract was cancelled.  On information and belief, the DOCCS Defendants were aware of the bidding process and its results.

289.    In March 2018, Defendant Bedard met with Defendants Rodriguez, Venettozzi,

Finnegan, and others to discuss a second attempt at procuring a new vendor for urinalysis testing. According to Bedard, at least these Defendants were aware of the side-by-side testing in January 2017.  On information and belief, none of these Defendants (or any other DOCCS Defendants) raised any concerns about using the Indiko Plus system despite this previous failure.

290.     DOCCS issued a new invitation for bids in May 2018 that was substantially identical to the October 2017 invitation.  DOCCS entered into the Contract with the Microgenics Defendants in September 2018.

291.     On information and belief, every DOCCS Defendant was aware of this new invitation and the new contract, and the Contract could not have been signed without express approval from senior DOCCS personnel like the DOCCS Defendants.

292.     In October and November 2018, as alleged above, Bedard worked with Collum to redraft DOCCS Directive #4937 regarding urinalysis testing.  Collum provided Bedard with excerpts from scientific journals which she indicated equated Siemens' and Microgenics Defendants' technologies.

293.     Bedard did not have this draft directive reviewed by either any scientific experts or DOCCS medical personnel.  This is especially concerning since DOCCS was now contracting to use drug assays that were unapproved for their intended use and, in some cases, were being used for detecting drugs DOCCS had never tested for before.

294.     Bedard provided the redrafted directive to his supervisors, including, on information and belief, Defendants Rodriguez, Venettozzi, and O'Gorman.  None of these Defendants made changes to the Directive, questioned the amendments, verified that the Indiko Plus was fit for its intended purpose, checked whether DOCCS's policies comported with state law or the federal constitution, or evaluated whether the procurement process had been

appropriate.

295.    The DOCCS Defendants did not seek additional training for disciplinary hearing officers, to explain the science of the Indiko Plus screening tests.  They also did not create any training or additional roles for medical staff to oversee the drug testing system.  The IG Report found that hearing officers routinely misunderstood how the Indiko Plus worked and what a positive screening test did and did not indicate.  Similarly, medical staff were not appropriately consulted during disciplinary hearings to identify cross-reactivity issues, and they were not provided with accurate scientific data to properly opine on such issues.

296.    Defendant O'Gorman signed the redrafted Directive, thus making it operative, on December 27, 2018.

297.    All of the DOCCS Defendants were aware that individuals in DOCCS custody would be immediately subject to discipline on the basis of two preliminary screening tests, knew that those positive preliminary screening tests would be deemed sufficient and in most cases determinative to a guilty disposition for using illegal substances, and knew that incarcerated individuals would thus lose substantive rights as a result of two preliminary screening tests.

298.    DOCCS Defendants were also aware that incarcerated individuals were routinely punished prior to their hearings by being placed in solitary confinement or keeplock, by being denied all benefits, special housing, and visits, and by having their parole hearings jeopardized. Yet not a single one of these DOCCS Defendants sought scientific, medical, or legal review of this change in DOCCS policy or this new contract.

***DOCCS Defendants Oversaw and Implemented a System that Systematically and Unjustifiably Destroyed the Lives of Incarcerated Individuals Who Tested Positive on the Indiko Plus***

299.    As alleged more fully above, the Indiko Plus was rolled out to all 52 DOCCS

facilities beginning in January 2019.  At the same time, Defendant Jennifer Booth took over from
Bedard.  On information and belief, Booth had been aware of the development of the Indiko Plus
contract in the months before the urinalysis system was installed in DOCCS facilities.  She
became the primary liaison between senior DOCCS Defendants, correctional officers at DOCCS
facilities, and with the Microgenics Defendants.  She had no more expertise in urinalysis,
chemistry, medicine, or law than Bedard had.

300.    As the IG Report notes, the number of "complaints lodged by incarcerated
individuals of false positive drug tests noticeably increased" immediately after the Indiko Plus
was installed, and these reports often came from individuals who had never before tested positive
for illegal drug use.

301.    Both incarcerated individuals and DOCCS officers started to report problematic
cases up the chain of command, including to Defendants Booth, Rodriguez, Venettozzi, and
Annucci.

302.    One such individual tested positive for opiates in early January 2019, despite
having been in DOCCS's ASAT drug treatment program.  He wrote to Defendant Annucci to no
avail.  In February, another incarcerated individual wrote to Defendant Annucci to report that she
had been wrongly disciplined because her urine sample had tested positive for synthetic
cannabinoids, despite an otherwise unblemished record.  On information and belief, she received
no relief or even a substantive review.

303.    Initial reports of faulty testing were referred by Annucci to DOCCS Special
Housing, supervised by Defendants Finnegan, Venettozzi, and Rodriguez.  In April, further
complaints to Annucci were referred to Defendant Kelly.  Neither Annucci nor anyone in his
chain of command ordered an investigation into these obviously problematic test results.

304.     Nor, on information and belief, did DOCCS Defendants take effective action in response to reports from DOCCS officers who were raising concerns about anomalous testing. On information and belief, it was extraordinarily rare for correctional officers to raise concerns about the possible innocence of incarcerated individuals with their superiors.

305.     Instead of pausing the drug testing program in light of the growing swell of complaints and restoring privileges to incarcerated individuals who were either awaiting hearings or had been found guilty, DOCCS continued testing and disciplining incarcerated individuals until September (for Buprenorphine) or December (for all other drugs).

306.     By May 2019, the number of questionable results at Attica Correctional Facility ("Attica") had reached such proportions that senior staff reported their concerns about the system to Defendant Booth, who passed those concerns on to Defendant Venettozzi.  Defendant Annucci had, by this point, already received over two dozen letters from incarcerated individuals, most of which had been delegated to Special Housing, overseen by Defendant Venettozzi.  This is in addition to the appeals incarcerated individuals filed from their disciplinary dispositions.

307.     Defendant Booth responded to Attica by asking Microgenics Defendants to send a technician to check the machines there.  As alleged above, the Microgenics Defendants' representative checked Attica's systems and told DOCCS that the Indiko Plus was being used correctly at that facility, despite the clearly unusual results being reported by that facility. Collum told Booth that the results were due to the heightened sensitivity of the Indiko Plus, which supposedly accurately identified drug users who would earlier have escaped detection under Siemens's system.

308.     Booth reported Collum's statement and the findings of the visiting engineer to

some of her superiors, including Defendants Venettozzi and Rodriguez. She also informed these superiors that these tests were resulting in more positives.

309. Defendants Booth and Venettozzi briefed Defendant Finnegan in May, suggesting that these issues may need to be escalated to DOCCS senior management. Finnegan told Booth and Venettozzi that they were not qualified to question the validity of the new tests. He accepted Collum's explanation that the new tests were catching incarcerated persons who were previously able to evade detection.

310. Finnegan did not approve detailed discussions about this issue with his superiors. This is despite the fact that, starting in May 2019, the DOCCS Office of Special Investigations had started to review complaints sent by prominent US Congresspeople to DOCCS regarding testing.

311. DOCCS Defendants took no action to review the scientific basis for the testing, to double-check Collum's statements, or to verify that this new testing regime—which was admittedly finding individuals positive who had not previously been disciplined for drugs—was sufficiently reliable to use as the basis for punishing incarcerated individuals without further reliable testing by an outside laboratory.

312. Defendants Venettozzi, Booth, and Rodriguez spoke with Defendant Finnegan repeatedly in June 2019, seeking to escalate the issue to more senior DOCCS officials. Finnegan refused to pass on concerns to his supervisor, Defendant O'Gorman.

313. At the same time, however, Defendant Annucci was notified by attorneys for prisoners about the spate of unusual positive results across the DOCCS system. Annucci was told that many of the individuals who were disciplined were part of programs that required regular testing. In other words, the individuals who were testing positive *knew* they were

scheduled to be tested as part of hard-won programs.  The results made no sense.  On information and belief, Defendant Annucci discussed these issues with his management group.

314.    Annucci assigned Defendant Kelly to investigate the issue.  Kelly had no training, education, or scientific or practical knowledge relevant to evaluating the accuracy and constitutionally-mandated reliability of urinalysis systems.

315.    Also in June 2019, the superintendent of Eastern Correctional Facility ("Eastern") independently contacted Defendant Kelly about problems with the drug testing system.  Kelly discussed their concerns with Venettozzi and Booth, and enlisted Defendant Bedard to help him with the investigation.  Kelly informed O'Gorman of the complaints coming in about testing from all around the DOCCS system.

316.    Kelly and Bedard began their investigation in earnest in July 2019, six months after incarcerated individuals had started to raise concerns.  The same month, Annucci received another letter from legal advocates for prisoners about the continuing unacceptable discipline of innocent people by DOCCS.  Kelly discussed these issues with Annucci.

317.    Kelly ordered Venettozzi to pause testing at Eastern in July, but nowhere else, even though the same urinalysis machines was used throughout DOCCS.

318.    Also in July, Booth spoke with representatives of the Microgenics Defendants about the ongoing concerns across DOCCS.  She provided the Microgenics Defendants with six urine samples from Eastern that had tested positive for buprenorphine, to receive confirmatory testing.  She gave Microgenics Defendants a list of medications regularly taken by incarcerated individuals.  Microgenics Defendants sent a representative to Eastern, who confirmed that the samples tested positive on the Indiko Plus.

319.    DOCCS did not pause testing while awaiting results from the Microgenics

Defendants.

320. The Microgenics Defendants learned from two outside laboratories in August 2019 that four of the six samples from Eastern were false positives. They did not inform Kelly or Booth. Neither Kelly nor Booth, nor any other DOCCS Defendants, followed up with the Microgenics Defendants on these tests. Kelly, in general, failed to take any initiative to investigate this issue, which was leading—every single day—to incarcerated individuals being disciplined.

321. Simultaneously, Defendant Annucci announced to his senior staff, including Defendant O'Gorman, that DOCCS should independently send urine samples to outside laboratories for confirmatory testing.

322. DOCCS did not pause testing while awaiting results from their own outside laboratories.

323. On information and belief, any of the DOCCS Defendants could have sought and received authorization for such confirmatory testing as early as January 2019, had they been willing to believe the reports from incarcerated individuals that the new testing system was flawed, or had they been willing to face the reality that preliminary screening test results from the Indiko Plus were inherently unreliable and thus could only be used as the catalyst to take adverse action against a prisoner if a second reliable test by an outside laboratory produced a positive result.

324. Defendant Kelly received results from DOCCS's outside laboratory in early August 2019. The laboratory informed Kelly that five out of the six samples DOCCS had sent were false positives. Kelly not only failed to immediately pause testing and reverse discipline imposed on incarcerated individuals across the board based on this abysmal finding, he failed to

intervene to stop or reverse the discipline for the five individuals he now knew had been wrongfully accused.

325.    Kelly, on information and belief, told Defendants Annucci and O'Gorman of the outside laboratory testing.  Ten days later, O'Gorman ordered facilities to stop using Microgenics Defendants' buprenorphine testing system.  On information and belief, Defendant Annucci approved of this decision.

326.    Defendant Annucci then assembled a task force consisting, *inter alia*, of Defendants O'Gorman, Kelly, Rodriguez, Finnegan, and Venettozzi to address ongoing testing issues.

327.    Despite the pause on further buprenorphine testing due to its inaccuracy, Defendant Finnegan told Defendant Venettozzi that there was no reason to reverse discipline or even release people who were confined based on tests DOCCS knew were unreliable.

328.    DOCCS Defendants did not pause testing for non-buprenorphine drugs at DOCCS facilities.  They did not send out any AB-Pinaca urine samples for outside testing.  Non-buprenorphine testing continued unabated.

329.    In September 2019, Defendants Booth, Kelly, and Annucci participated in a conference call with representatives of the Microgenics Defendants about drug testing.  On information and belief, these representatives told DOCCS that the buprenorphine test DOCCS was using might be too sensitive to rule out false positives and may not be appropriate in correctional contexts.  Incarcerated individuals, their lawyers, and their advocates had been telling DOCCS Defendants exactly this for **nine months**.

330.    It was only in September that DOCCS Defendants—led by Annucci—ordered the release of incarcerated individuals who had been placed in punitive segregation due to the

buprenorphine test.  At least 140 individuals were released.  It took another five weeks for discipline to be reversed and misbehavior reports to be expunged.  Such misbehavior reports, until they were expunged, can jeopardize parole applications and can lead to heightened discipline for subsequent infractions.

331.    On information and belief, DOCCS took no action regarding non-buprenorphine tests in September 2019, despite having been on notice for months about systemic issues with those tests as well.

332.    The Inspector General began its investigation into DOCCS in September and by November 2019 advised DOCCS, and Defendant Annucci in particular, that DOCCS had to cease all adverse action against incarcerated individuals for any positive drug test results until confirmatory testing from an independent outside laboratory was obtained.

333.    This action was filed that same month.

334.    DOCCS started to submit preliminary screening tests for outside confirmation in November 2019.  Numerous cannabinoid and synthetic cannabinoid tests were found to be false positives.

335.    It was not until December, when the Inspector General told DOCCS that it should release anyone with a positive cannabinoid test while the IG investigated these issues, that DOCCS finally took action and started to reverse all other discipline for drug tests.

336.    DOCCS could have decided to investigate the unreliable testing system they were using at any point in 2019 and could have paused testing and discipline in the interim.  It did not.

337.    The DOCCS Defendants, fundamentally, refused to believe that incarcerated individuals and their advocates were telling the truth, refused to consider the science behind testing, refused to question the Microgenics Defendants' representations, and refused to even

consider that their disciplinary system was fundamentally and unconstitutionally flawed. Thousands of incarcerated individuals suffered as a result.

### FIRST CAUSE OF ACTION
(Negligence)
(Against Microgenics Defendants)

338.    Plaintiffs incorporate by reference each and every allegation contained above as if set forth fully herein.

339.    Plaintiffs bring this claim on their own behalf and on behalf of the Class.

340.    Plaintiffs and the Class received false positive drug test results while in DOCCS' custody, resulting in serious sanctions and punishment, as well as a common and typical series of other adverse consequences, including but not limited to those denoted in paragraphs 5-6 above.

341.    Microgenics Defendants owed a duty to Plaintiffs and the Class to ensure that the Indiko Plus urinalysis analyzers were used in accordance with applicable standards and produced accurate and reliable test results.

342.    Microgenics Defendants breached their duty to Plaintiffs and the Class by failing to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable test results; entering a contract for use of the Indiko Plus urinalysis analyzers that was inconsistent with applicable standards; failing to train DOCCS employees on applicable standards for using the Indiko Plus urinalysis analyzers; and testifying at disciplinary hearings that the results generated by Indiko Plus urinalysis analyzers could be relied on for discipline, when Microgenics Defendants knew that the results were a preliminary screen only.

343.    Microgenics Defendants knew that DOCCS was relying on test results from the Indiko Plus urinalysis analyzers to discipline individuals in its custody, and it was reasonably foreseeable to Microgenics Defendants that their failure to ensure accurate and reliable test results and that the Indiko Plus urinalysis analyzers were used in a manner consistent with

applicable standards would result in unjust discipline of those individuals and the naturally foreseeable adverse consequences of such discipline.

344.    As a result of Microgenics Defendants' negligent failure to ensure that the Indiko Plus urinalysis analyzers yielded accurate and reliable results and were used in accordance with applicable standards, Plaintiffs and Class members were subjected to serious discipline, including, but not limited to, solitary confinement, keeplock, being held beyond their scheduled release date, and loss of privileges.

345.    Because of Microgenics Defendants' unlawful conduct, Plaintiffs and Class members have suffered pain and suffering, mental and emotional distress, humiliation, embarrassment, loss of liberty, and monetary damages.

### SECOND CAUSE OF ACTION
(42 U.S.C. § 1983; U.S. Const. Amds. VIII & XIV (Cruel and Unusual Punishment))
(Against Microgenics Defendants)

346.    Plaintiffs incorporate by reference each and every allegation contained above as if set forth fully herein.

347.    By their actions described hereinabove, in facilitating and enabling, and even actively and substantially encouraging, the imposition and infliction of the disciplinary sanctions and various other deprivations and adverse actions against Plaintiffs and Class members on the basis of the faulty and unreliable urinalysis testing process and results, and through their deliberate indifference to the unreasonable risk of exposure to such harms, Microgenics Defendants subjected Plaintiffs and Class members to cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

### THIRD CAUSE OF ACTION
(42 U.S.C. § 1983; U.S. Const. Amd. XIV (Substantive Due Process))
(Against Microgenics Defendants)

348.    Plaintiffs incorporate by reference each and every allegation contained above as if

set forth fully herein.

349.    By their actions described herein, in facilitating and enabling, and even actively and substantially encouraging, the imposition and infliction of the disciplinary sanctions and various other deprivations and adverse actions against Plaintiffs and Class members on the basis of the faulty and unreliable urinalysis testing process and results, Microgenics Defendants caused to be inflicted unlawful, unjustified, and unwarranted punishments and harms upon Plaintiffs and Class members, in the absence of any legitimate penological interest, in violation of the substantive due process rights and protections of the Fourteenth Amendment of the United States Constitution.

## FOURTH CAUSE OF ACTION
### (N.Y. Gen. Bus. Law § 349)
### (Against Microgenics Defendants)

350.    Plaintiffs incorporate by reference each and every allegation contained above as if set forth fully herein.

351.    New York prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."  N.Y. Gen. Bus. Law § 349(a).

352.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."  N.Y. Gen. Bus. Law § 349(h).  An award of damages may be increased "to an amount not to exceed three times the actual damages up to one thousand dollars," if Microgenics Defendants "willfully or knowingly violated this section."  *Id.*

353.     As enumerated above, Microgenics Defendants violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of their business.

354.     Microgenics Defendants' deceptive conduct had a broad impact on consumers at large.

355.     Microgenics Defendants committed the above-described acts willfully and/or knowingly.

356.     Microgenics Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiffs and Class members.

357.     Microgenics Defendants' violations include, without limitation, misleading DOCCS to believe that the Indiko Plus system could be used to discipline incarcerated persons without confirmatory gas chromatography and mass spectrometry testing through numerous means, including, without limitation, (a) deceptively touting the use of the Indiko Plus system by other corrections and/or parole departments without noting that those departments did not rely on the results of the Indiko Plus without also conducting confirmatory gas chromatography and mass spectrometry testing; (b) warranting that the Indiko Plus could be used as DOCCS intended when it knew it could not; (c) drafting, editing, and approving the DOCCS directive that provided for prisoner discipline based solely on positive screening tests from the Indiko Plus without conducting confirmatory gas chromatography and mass spectrometry testing; and (d) maintaining and sustaining Microgenics Defendants' campaign of deceit by insisting to DOCCS that it should continue to use the Indiko Plus system in order to impose harsh discipline on prisoners without equivocation up to the date that DOCCS canceled its contract with Microgenics Defendants.

358.   As a direct and proximate result of these violations of § 349 of the General

Business Law, Plaintiffs and Class members were charged with misconduct and subjected to

serious discipline, thus suffering compensable harm and entitling them to recover statutory,

actual and treble damages, costs and attorney's fees.

### FIFTH CAUSE OF ACTION
(42 U.S.C. § 1983; U.S. Const. Amds. VIII & XIV (Cruel and Unusual Punishment))
(Against DOCCS Defendants)

359.   Plaintiffs incorporate by reference each and every allegation contained above as if

set forth fully herein.

360.   By their actions described herein, in facilitating and enabling, and even actively

and substantially encouraging, the imposition and infliction of the disciplinary sanctions and

various other deprivations and adverse actions against Plaintiffs and Class members on the basis

of the faulty and unreliable urinalysis testing process and results, and through their deliberate

indifference to the unreasonable risk of exposure to such harms, DOCCS Defendants subjected

Plaintiffs and Class members to cruel and unusual punishment, in violation of the Eighth and

Fourteenth Amendments to the United States Constitution.

### SIXTH CAUSE OF ACTION
(42 U.S.C. § 1983; U.S. Const. Amd. XIV (Substantive Due Process))
(Against DOCCS Defendants)

361.   Plaintiffs incorporate by reference each and every allegation contained above as if

set forth fully herein.

362.   By their actions described herein, in facilitating and enabling, and even actively

and substantially encouraging, the imposition and infliction of the disciplinary sanctions and

various other deprivations and adverse actions against Plaintiffs and Class members on the basis

of the faulty and unreliable urinalysis testing process and results, DOCCS Defendants caused to

be inflicted unlawful, unjustified, and unwarranted punishments and harms upon Plaintiffs and

Class members, in the absence of any legitimate penological interest, in violation of the substantive due process rights and protections of the Fourteenth Amendment of the United States Constitution.

**PRAYER FOR RELEIF**

WHEREFORE, Plaintiff Nadezda Steele-Warrick, Plaintiff Darryl Schultz, and Class

members respectfully request that the Court enter a class-wide judgment:

A.      Certifying this suit as a class action;

B.      Awarding reasonable and just compensatory, statutory, treble and/or punitive

damages to Plaintiffs and the Class for the injuries they suffered;

C.      Awarding attorneys' fees and costs; and

D.      Ordering other and further relief as this Court deems just, proper and equitable.

Dated:  New York, New York      EMERY CELLI BRINCKERHOFF
       March 30, 2022         ABADY WARD & MAAZEL LLP

                    By:    /s/ Matthew D. Brinckerhoff
                             Matthew D. Brinckerhoff
                             Ananda V. Burra
                             Noel R. León
                             Emma L. Freeman

                             600 Fifth Avenue, 10th Floor
                             New York, NY 10020
                             (212) 763-5000

                             PRISONERS LEGAL SERVICES OF
                             NEW YORK

                    By:    /s/ Karen L. Murtagh
                             Karen L. Murtagh
                             David Bentivegna
                             Marie-Ann Sennett
                             Ann Ferrari
                             Andrew Stecker

                             41 State Street, Suite M112
                             Albany, NY 12207
                             (518) 445-6050

                           *Attorneys for Plaintiffs and the Putative Class*