UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
NADEZDA STEELE-WARRICK and
DARRYL SCHULTZ, individually and
on behalf of all others similarly situated,

          Plaintiffs,

    -against-

MICROGENICS CORPORATION,
THERMO FISHER SCIENTIFIC, INC.,
ANTHONY ANNUCCI, JAMES
O'GORMAN, CHARLES KELLY,
RICHARD FINNEGAN, DONALD
VENETTOZZI, ANTHONY
RODRIGUEZ, COREY BEDARD, and
JENNIFER BOOTH,

          Defendants.
-----------------------------------------------x

**OPINION**
Case No. 19-CV-6558-FB-VMS

*Appearances:*
*For the Plaintiffs:*
MATTHEW D. BRINCKERHOFF
Emery Celli Brinckerhoff Abady Ward
& Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020

KAREN L. MURTAGH
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, New York 12207

*For Defendants Annucci and
O'Gorman:*
SARANDE DEDUSHI
Assistant Attorney General
State of New York
28 Liberty Street
New York, New York 10005

*For Defendants Venettozzi, Rodriguez,
and Booth:*
ORIANA L. KILEY
Whiteman Osterman & Hanna, LLP
One Commerce Plaza
Albany, New York 12260

*For Defendant Kelly:*
JEFFREY P. MANS
Law Office of Jeffrey P. Mans
Post Office Box 11-282
Albany, New York 12211-0202

*For Defendant Finnegan:*
BENJAMIN W. HILL
Capezza Hill, LLP
30 South Pearl Street, P-110
Albany, New York 12207

*For Defendant Bedard:*
RYAN T. DONOVAN
Conway, Donovan & Manley, PLLC
50 State Street, 2nd Floor
Albany, New York 12207

**BLOCK, Senior District Judge:**

In this putative class action under 42 U.S.C. § 1983, Nadezda Steele-Warrick and Darryl Schultz (collectively, "Plaintiffs") claim that they and thousands of others under the jurisdiction of the New York State Department of Corrections and Community Supervision ("DOCCS") were subject to discipline based on false-positive results of faulty drug tests developed by Microgenics Corporation and Thermo Fisher Scientific, Inc. (collectively, "Microgenics Defendants"). In addition to the Microgenics Defendants, Plaintiffs have sued eight current and former DOCCS employees (collectively, "DOCCS Defendants"). They allege that those defendants violated their rights under the Eighth

2

Amendment and the Substantive Due Process Clause of the Fourteenth

Amendment because they failed to take corrective action after becoming aware that

the tests were unreliable.

All the DOCCS Defendants have moved, pursuant to Federal Rule of Civil

Procedure 12(b)(6), to dismiss the claims against them.  In an order dated March

31, 2023, the motions were summarily granted in part and denied in part.  As now

explained in the following opinion, the Court concluded that: (1) Plaintiffs do not

have a viable Eighth Amendment claim against any of the DOCCS Defendants, (2)

Plaintiffs have alleged a cognizable substantive due process claim against five of

the eight DOCCS Defendants, and (3) qualified immunity does not shield those

defendants from liability.

## I

The following facts are taken from the Third Amended Complaint

("Complaint") and are accepted as true for purposes of the DOCCS Defendants'

Rule 12(b)(6) motions to dismiss.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

The Court assumes the parties' familiarity with the allegations and recounts only

those pertinent to resolving the motions.  Greater detail of the allegations against

each DOCCS Defendant is provided as necessary in Part II.[1]

---

[1] For a detailed recitation of the allegations against the Microgenics

## A.  DOCCS' Testing System

DOCCS Defendant Lieutenant Corey Bedard was charged with overseeing the DOCCS drug testing program for inmates from 2011 until 2019. Prior to 2016, DOCCS secured testing services from Siemens AG and developed a close working relationship with its employee Brenda Collum, who is not a party to this suit.

Collum left Siemens to work for the Microgenics Defendants in November 2015.  She emailed Bedard to suggest that DOCCS consider using her new employer's services.  Bedard then recommended the switch from Siemens to his supervisors, including DOCCS Defendant and Assistant Commissioner of Special Housing and Inmate Disciplinary Programs Charles Kelly.

In 2017, DOCCS conducted a side-by-side comparison of Siemens's tests and the Microgenics Defendants' "Indiko Plus" tests.   The Indiko Plus test for the opioid buprenorphine identified one sample as positive that the Siemens' test did not.  The sample was provided by an inmate using codeine, a different opioid, pursuant to a prescription.  This misidentification did not cause Bedard any concern; he simply "accepted the Microgenics Defendants' explanation that the

---

Defendants, see Magistrate Judge Scanlon's memorandum and order on their motion to dismiss a prior iteration of the Complaint.  *Steele-Warrick v. Microgenics Corp.*, 2021 WL 1109052 (E.D.N.Y. Mar. 22, 2021).  The Microgenics Defendants' motion to dismiss the current Complaint is pending before the Court and is not addressed in this opinion.

supposedly more accurate and sensitive [Indiko Plus] assay would solve any such cross-reactivity problems and would be appropriate to discipline incarcerated individuals."  Complaint ¶ 284.

An initial contract between DOCCS and the Microgenics Defendants was cancelled due to flaws in the bidding process.  But in September 2018, DOCCS awarded a contract to the Microgenics Defendants to provide Indiko Plus urinalysis analyzers and related services for correctional facilities in New York.  Bedard then worked with Collum to draft a DOCCS directive to use Indiko Plus tests.  Bedard passed the directive up the chain of command to DOCCS Defendants Anthony Rodriguez, Donald E. Venettozzi and Richard Finnegan.  The Complaint alleges that all three knew that the Indiko Plus test had misidentified codeine as buprenorphine but did not question or change the directive.

DOCCS Defendant and Deputy Commissioner James O'Gorman signed the directive in December 2018.  A month later, DOCCS began using the Indiko Plus tests at all 52 of its facilities.  At the same time, DOCCS Defendant Jennifer Booth took over for Bedard as the *de facto* liaison between the Microgenics Defendants and DOCCS.

**B.     Steele-Warrick**

Steele-Warrick was an inmate at DOCCS's Albion Correctional Facility

("Albion").  As a result of good behavior, she lived in preferred housing and

participated in the Family Reunification Program ("FRP"), which allowed her to

meet privately and spend overnight visits with family members.

Steele-Warrick was subject to a urinalysis test before and after each FRP

visit.  On April 14, 2019, she submitted to an Indiko Plus test.  Prior to the test,

Steele-Warrick had heard reports of false positives from other inmates and from

DOCCS corrections officers, who told her that "they believed something was

wrong with the [testing] machines."  Complaint ¶ 102.

Steele-Warrick's April 14 sample tested positive for

Suboxone/buprenorphine.  As a result, DOCCS confined Steele-Warrick in a

disciplinary "keeplock" cell for eleven days.  Unlike her private room, the

keeplock cell was locked behind steel bars and lacked a nightstand, radio, and

closet. While in keeplock, her commissary, phone, correspondence, package and

visitor privileges were suspended.  During her first day in keeplock, she did not

even have access to soap, shampoo or a toothbrush.

In addition to punitive confinement, the positive drug test led to a formal

disciplinary charge.  After a hearing, Steele-Warrick was sentenced to "time

6

served" with an additional thirty-day suspension of package, commissary and recreation privileges.  She was returned to a general population dorm, instead of preferred housing, and lost eligibility for the FRP program.

Steele-Warrick was released to post-custody supervision in May 2019.  Her discipline was not overturned until September 2019, when her April 14th test result was determined to be a false positive.  She alleges that she was traumatized by her unjustified punishment.  She cries every day and suffers from depression due to the stress of having her otherwise spotless record of good behavior ruined.

## C.   Schultz

Schultz was an inmate at DOCCS's Orleans Correctional Facility ("Orleans").  He resided in Orleans's "honor block," a privilege he earned through several years of good behavior.

In February 2019, Schultz took an Indiko Plus test that returned a positive result for a synthetic cannabinoid.  As a result, Schultz was removed from the honor block and placed in solitary confinement.  After a disciplinary hearing, he was sentenced to thirty days of keeplock and loss of recreation, package, phone and commissary privileges.   The result of the disciplinary hearing was eventually reversed in June 2019 because, according to DOCCS, the "circumstances raised concerns about Mr. Schultz's culpability."  Complaint ¶ 124.

In July 2019, an Indiko Plus test that Schultz took returned another positive result.  Schultz was again placed in solitary confinement and subjected to another disciplinary hearing.  The consequence this time was sixty days of keeplock and loss of privileges.  The result of the second disciplinary hearing was reversed in October 2019, again because of "concerns about Mr. Schultz's culpability." Complaint ¶ 143.

In December 2019, Schultz was released on parole.  He alleges that he would have been granted parole in August 2019 but for the second positive test. He further alleges that he was traumatized by having to endure two rounds of solitary confinement and disciplinary proceedings while being so close to parole eligibility.

**D.     Problems with Indiko Plus**

In addition to alleging that their test results were false positives, Plaintiffs allege that their cases were not isolated incidents: "[T]he number of complaints lodged by incarcerated individuals of false positive drug tests noticeably increased immediately after the Indiko Plus [system] was installed."  Complaint ¶ 300. These complaints—which often came from inmates who had never before tested positive for drug use and were often seconded by DOCCS corrections officers— were reported to Booth, Rodriguez and Venettozzi.

Senior DOCCS officers soon became aware of the problem.  One inmate reported a false positive to DOCCS Defendant and Acting Commissioner Anthony Annucci in January 2019.  Annucci received a similar complaint from another inmate in February.  By April, he had received more than two dozen.  Annucci referred these complaints to Kelly and Finnegan, Kelly's successor as head of Special Housing and Inmate Disciplinary Programs.  "Neither Annucci nor anyone in his chain of command ordered an investigation into these obviously problematic test results."  Complaint ¶ 303.

In May 2019, senior staff at DOCCS's Attica Correctional Facility ("Attica") had seen so many questionable test results that they reported their concerns about the Indiko Plus system to Booth, who passed them on to Venettozzi.  Booth asked the Microgenics Defendants to check the testing machines at Attica.  Collum responded not only that the machines were working correctly, but that the unusually high number of positive results demonstrated Indiko Plus's superiority at detecting illicit drug use that other tests would miss.

No one at DOCCS sought to verify Collum's explanation.  Booth relayed the explanation to her supervisors, Rodriguez and Venettozzi.  In turn, Venettozzi suggested to his superior, Finnegan, that the issue should be reported to DOCCS senior management.  Finnegan responded that Venettozzi and his subordinates

"were not qualified to question the validity of the new tests." Complaint ¶ 310.

Yet he rebuffed repeated attempts by Booth, Rodriguez and Venettozzi to escalate

the issue, and took no steps to inform O'Gorman or Annucci about the problem at

Attica.

By this time, Annucci was receiving letters of concern from attorneys for

inmates and even members of Congress. He discussed the matter with his

management group and assigned Kelly, now his executive assistant, to investigate.

Kelly enlisted Bedard to help with the investigation. He later told O'Gorman that

he had "complaints coming in about testing from all around the DOCCS system."

Complaint ¶ 315

In June 2019, the superintendent of DOCCS's Eastern Correctional Facility

("Eastern") informed Kelly about problems with the Indiko Plus system. After a

discussion with Venettozzi and Booth, Kelly temporarily halted testing at Eastern

the following month. Testing at all other DOCCS facilities continued.

After the testing pause at Eastern, Booth sent six positive samples from the

facility to the Microgenics Defendants to confirm the presence of buprenorphine.

A month later, two independent laboratories informed the Microgenics Defendants

that four of the six samples were negative. No one from DOCCS followed up on

the confirmatory tests and the Microgenics Defendants did not inform anyone at

10

DOCCS of the damning results.

Apparently unaware of the tests on the samples from Eastern, Annucci told O'Gorman and other senior staff that DOCCS should begin sending positive samples directly to independent laboratories for confirmatory testing; he did not pause testing in the meantime.  In August of 2019, Kelly learned that five of six such samples were false positives.  He informed O'Gorman and Annucci but did not personally pause testing or attempt to reverse any discipline that had been imposed based on the five false positives.  Ten days later, however, O'Gorman— with Annucci's approval—ordered all DOCCS facilities to stop using Indiko Plus tests for buprenorphine. Indiko Plus testing for other substances continued.

Annucci then appointed O'Gorman, Kelly, Finnegan, Venettozzi and Rodriguez to a task force to address any other testing issues.  Finnegan allegedly told Venettozzi that "there was no reason to reverse discipline or even release people who were confined based on tests DOCCS knew were unreliable." Complaint ¶ 327.

The Microgenics Defendants finally admitted uncertainty about their buprenorphine tests in early September 2019.  They told Booth, Kelly and Annucci that those tests "might be too sensitive to rule out false positives and may not be appropriate in correctional contexts." Complaint ¶ 329.  Annucci immediately

11

ordered the other DOCCS Defendants to begin the process of reversing any discipline based on an Indiko Plus buprenorphine test and expunging the discipline from the records of the affected inmates.  This process resulted in the release of more than 140 inmates from punitive segregation and took five weeks.  In the meantime, the false positives jeopardized parole applications and subjected inmates to increased discipline for other infractions.

Moreover, DOCCS continued to use Indiko Plus to test for drugs other than buprenorphine.  Finally, in November 2019, the New York State Inspector General—who had been conducting her own investigation—advised Annucci not to impose discipline based on *any* Indiko Plus test unless the result was confirmed by an independent laboratory.  Annucci took this advice.  A month later, DOCCS began reversing previously imposed discipline based on any Indiko Plus test.

Plaintiffs allege, in sum, that the DOCCS Defendants refused and delayed remedial action in the face of hard evidence that the Indiko Plus tests were faulty. More specifically, they allege that for almost a year, the DOCCS Defendants "refused to believe that incarcerated individuals and their advocates were telling the truth" about the false positives, "refused to consider the science behind the testing [or] question the Microgenics Defendants' representations," and "refused to even consider that their disciplinary system was fundamentally flawed."

12

Complaint ¶ 337.

## II

Plaintiffs allege that the DOCCS Defendants violated two constitutional rights: (i) the right to be free from cruel and unusual punishment under the Eighth Amendment and (ii) the right to substantive due process under the Fourteenth Amendment.  Although prescinding between Eighth Amendment and Substantive Due Process violations is not simple, since the two often intertwine in their application to a particular set of facts, they are analytically distinct.

Two recent cases from the Second Circuit have cobbled together from Supreme Court precedent the broad strokes defining the distinct standards governing Eighth Amendment and Substantive Due Process claims.  *See Matzell v. Annucci*, ____ F.4th ____, 2023 WL 2762751 (2d Cir. Apr. 4, 2023); *Hurd v. Fredenburgh*, 984 F.3d 1075 (2d Cir.), *cert. denied*, 142 S. Ct. 109 (2021).  While factually inapposite, *Matzell* and *Hurd* guide the Court's effort to untangle and apply those standards to this unique case.

As explained in those cases, an Eighth Amendment claim first requires the plaintiff to "show that the alleged deprivation is objectively 'sufficiently serious' to constitute 'cruel and unusual punishment.'"  *Matzell*, 2023 WL 2762751, at *6 (quoting *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019)).

The Eighth Amendment is concerned with punishments that are "repugnant to the conscience of mankind." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). "Actions are repugnant to the conscience of mankind if they are incompatible with evolving standards of decency or involve the unnecessary and wanton infliction of pain." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (internal quotation marks omitted).

Second, "a plaintiff must show that the charged official acted with a 'sufficiently culpable state of mind.'" *Matzell*, 2023 WL 2762751, at *6 (quoting *Fiacco*, 942 F.3d at 150). To satisfy that subjective element, "a plaintiff must show that the prison officials had 'a state of mind that is the equivalent of criminal recklessness,' or that the prison officials acted with deliberate indifference." *Id.* (quoting *Fiacco*, 942 F.3d at 150).

The Substantive Due Process Clause also embraces two standards. First, the Plaintiff must "identify a constitutional right at stake." *Id.* (quoting *Hurd*, 984 F.3d at 1087). "The general liberty interest in freedom from detention is perhaps the most fundamental interest that the Due Process Clause protects." *Id.* at *8 (quoting *Fiacco*, 942 F.3d at 141).

The second step "is to determine whether Defendants' conduct shocks the conscience." *Id.* (citing *Hurd*, 984 F.3d at 1087). "Negligently inflicted harm will

14

not constitute a constitutional violation, but 'conduct intended to injure in some way unjustifiable by any government interest' can satisfy the shock-the-conscience standard," *id*. at *7 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)), "as can, in some circumstances, conduct that 'resulted from deliberate indifference.'" *Id*. (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018)).

## A.    Eighth Amendment Claim

Eighth Amendment claims generally concern one of two types of harm: harm caused by the conditions of a prisoner's confinement, like being denied basic necessities, *see Estelle v. Gamble*, 429 U.S. 97 (1976) ("deliberate indifference to serious medical needs"), and harm directly inflicted by prison personnel, such as the use of force, *see Crawford*, 796 F.3d at 257 ("intentional contact with an inmate's genitalia").  Recognizing the differences between these two types of harm, courts have fashioned different criteria for determining when each rises to the level of "punishment" under the Eighth Amendment.

For suits challenging conditions of confinement, the caselaw requires extreme deprivation, such as the denial of "the minimal civilized measure of life's necessities." *Walker v. Schult*, 45 F.4th 598, 620 (2d Cir. 2022) (internal quotation marks omitted).  By contrast, courts often allow use-of-force claims to proceed if

they allege "the infliction of pain . . . totally without penological justification." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks omitted).

Plaintiffs insist that their Eighth Amendment claim targets the absence of any justification for their discipline, rather than the conditions of their confinement.  They muddle the two analyses to take advantage of the former's broader definition of "punishment."  Thus, they cite *United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) for the proposition that any adverse consequence without a penological purpose is impermissible, even if it produces only a de minimis injury. *See id.* at 50.  But their reliance on *Walsh* is misplaced.  *Walsh* explained that the objective prong "is satisfied *in the excessive force context* even if the victim does not suffer serious or significant injury as long as the amount of force used is not de minimis."  *Id.* (emphasis added; internal quotation marks omitted).

However, Plaintiffs do not allege improper use of force.  Plaintiffs also cite *Crawford*, 796 F.3d at 257, a case concerning intentional contact with an inmate's genitalia, and *Rhodes v. Chapman*, 452 U.S. 337 (1981), which explains that "[a]mong unnecessary and wanton inflictions of pain are those that are totally without penological justification."  *Id*. at 346 (internal quotation marks omitted). Those cases are similarly inapposite.

16

Not every case falls neatly into the use-of-force/conditions-of-confinement dichotomy.  In *McCray v. Lee*, 963 F.3d 110 (2d Cir. 2020), the Second Circuit reversed a summary judgment against a prisoner who was denied access to outdoor exercise space because, it reasoned, the restriction lacked a "penological reason." *Id.* at 118.  It is unclear whether the circuit court intended to expand the scope of the "penological purpose" standard to claims regarding the conditions of confinement since the plaintiff alleged physical injuries stemming from his inability to exercise.

In *Hurd*, the Second Circuit held "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude under the first prong of the Eighth Amendment analysis."  984 F.3d at 1085.  Although the circumstances did not involve either a use of force or a condition of confinement, the circuit court reasoned that "there is no penological justification for incarceration beyond a mandatory release date because 'any deterrent and retributive purposes served by the inmate's time in jail were fulfilled as of that date.'"  *Id.* (quoting, with alteration, *Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989)).

Neither *McCray* nor *Hurd* justifies applying the "lack of penological purpose" standard to Plaintiffs' disciplinary actions.  A standard under which any

17

conduct by a prison guard taken without penological justification exposes them to liability, no matter how small the harm inflicted, would eviscerate the objective prong of the Eighth Amendment.

Plaintiffs were confined in keeplock and lost certain privileges.  These are not uses of force or "unnecessary and wanton inflictions of pain."  *Rhodes*, 452 U.S. 346 (internal quotation marks omitted).  Nor are they deprivations of basic human needs.  Rather, they are routine conditions of confinement, and "[i]t is well settled in the Second Circuit that these conditions of confinement [i.e., "confinement to his cell with recreation restrictions for 180 days"] do not violate the Eighth Amendment."  *Coleman v. Galgano*, 1996 WL 715533, at *2 (S.D.N.Y. Dec. 11, 1996).  Because the discipline Plaintiffs received was not a sufficiently serious harm, they cannot establish an Eighth Amendment violation.

## B.   Substantive Due Process Claim

Separate from their Eighth Amendment claim, Plaintiffs allege that their discipline violated their right to substantive due process under the Fourteenth Amendment.  While the Eighth Amendment limits the punishments that can be inflicted on those in state custody, the Fourteenth Amendment guarantees to all, incarcerated and free, that no state shall "deprive" them "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The substantive

18

component of this guarantee "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon v. Burch*, 494 U.S. 113, 125 (1990).

As previously explained, a plaintiff asserting a Substantive Due Process claim must first identify the constitutional right at stake and then establish that the defendant's conduct shocks the conscience.

### 1.   *Plaintiffs' Protected Liberty Interest*

"Because freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action, commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Hurd*, 984 F.3d at 1088 (internal quotation marks and alterations omitted). Although their liberty is restricted, prison inmates still retain Fourteenth Amendment protection. *See id.*

The DOCCS Defendants argue as a threshold issue that Plaintiffs challenge the procedures that led to their discipline—specifically the use of the Indiko Plus tests—instead of the discipline itself. But Plaintiffs do not claim that they were entitled to more procedural protections; they argue that the testing system used to justify their discipline was so defective that it was no better than imposing random discipline. Thus, their right to be free from such an obviously arbitrary system was

19

"not limited to the confines of procedural due process." *Id.*

The DOCCS Defendants principally argue that Plaintiffs have not plausibly alleged deprivations of a cognizable liberty interest because such claims fail to clear the requirement of *Sandin v. Connor*, 515 U.S. 472 (1995), that a restriction on an inmate's liberty must entail an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Second Circuit has made it clear that "restrictive confinements of less than 101 days[] do not generally raise a liberty interest" under *Sandin*. *Davis v. Barrett*, 576 F.3d 119, 133-34 (2d Cir. 2009). However, *Sandin* has been applied only to claims under the procedural component of the Due Process Clause. *See Thomas v. Russell*, 2000 WL 32040 (6th Cir. 2000) (unpublished) (substantive due process claim "does not fit neatly under *Sandin*'s purview"); *Daker v. Head*, 2020 WL 5269802, at *4 (S.D. Ga. Sept. 4, 2020) ("*Sandin* deals with a prisoner's procedural due process rights, as opposed to his substantive due process rights, and therefore, is not applicable to Plaintiff's substantive due process claims."); *Bannerman v. Hursh*, 2007 WL 80927, at *6 (W.D. Mich. Jan. 8, 2007) ("*Sandin* applies to deprivations of procedural due process[.]"). The Second Circuit apparently endorses this view: *Hurd* discusses a substantive due process claim at length without mentioning *Sandin* even once.

20

Raising a separate point, Finnegan reduces Plaintiffs' due process challenge to a claim that they were disciplined based on false evidence. "In general, a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (internal quotation marks omitted). But like *Sandin*, *Willey* deals with procedural due process. *See id.* (noting that inmate must show "that he was disciplined without due process as a result of the [false] report"). Plaintiffs, by contrast, allege systemic reliance on a demonstrably unreliable source of evidence, a shortcoming that no amount of procedural protection in an individual disciplinary hearing could correct. That is precisely the sort of deprivation substantive due process is meant to address.

### 2.    *Whether Defendants' Conduct "Shocks the Conscience"*

As *Matzell* makes clear, conduct that shocks the conscience can, in some circumstances, result from deliberate indifference. *See* 2023 WL 2762751, at *7. The circumstances matter because "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Lewis*, 523 U.S. at 849. "The deliberate indifference standard may not be applicable in the context of a high-speed chase or a police riot in which an officer must make a snap decision, but it may be appropriately applied in the context of a custodial prison situation in

21

which prison officials can actually deliberate." *Matzell*, 2023 WL 2762751, at *7.

One such situation is particularly pertinent here. In *Hurd*, the Second Circuit cited *Fiacco* for the proposition that "prison officials can be found 'deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors.'" 984 F.3d at 1084-85 (quoting 942 F.3d at 151). *Fiacco*, in turn, cited *Haygood v. Younger*, 769 F.2d 1350 (9th Cir. 1985) (en banc), and *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). In *Haygood*, the Ninth Circuit held that evidence that a prison official refused to investigate an inmate's complaint about an error in the computation of his release was sufficient to support a finding of deliberate indifference. *See* 769 F.2d at 1355. In *Sample*, the Third Circuit held that evidence that a prison official had misinformed another jurisdiction that an inmate still had time left on his sentence supported a finding of deliberate indifference. *See* 885 F.2d at 1112. The latter case describes the standard at some length:

> To establish § 1983 liability in this context, a plaintiff must first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

> Among the circumstances relevant to a determination of whether the requisite attitude was present are the scope of the official's duties and the role he or she has played in the everyday life of the prison. Obviously, not every official who is aware of a problem exhibits indifference by failing to resolve it. A warden, for example, although he may have ultimate responsibility for seeing that prisoners are released when their sentences are served, does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter. On the other hand, if a prison official knows that, given his or her job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that the requisite attitude will be present.

*Id.* at 1110. Although *Haywood* and *Sample* addressed deliberate indifference in the Eighth Amendment context, they are conceptual cousins; there is no sound reason to view the concept of deliberate indifference differently when a plaintiff invokes the Substantive Due Process Clause "in the context of a custodial prison situation in which prison officials can actually deliberate." *Matzell*, 2023 WL 2762751, at *7.

Such deliberate indifference is at the heart of Plaintiffs' Substantive Due Process claim. They allege that the DOCCS Defendants did not stop testing until Microgenics admitted in September 2019 that its buprenorphine tests were not appropriate for use in correctional facilities after "[i]ncarcerated indviduals, their lawyers, and their advocates had been telling DOCCS Defendants exactly this for **nine months**." Complaint ¶ 329 (emphasis in original). The Court must decide

23

whether that fact and the other alleged factual circumstances support an inference that the DOCCS Defendants acted with deliberate indifference that shocks the conscience.

Two threshold matters bear emphasis.  First, the Court must make its assessment separately for each of the DOCCS Defendants because liability under § 1983 depends on each defendant's personal involvement in a constitutional violation.  *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  Second, it must make its assessment in the context of a Rule 12(b)(6) motion to dismiss. "Whether a defendant's conduct was so egregious as to 'shock the conscience' is a factual matter, inappropriate for decision on a motion to dismiss." *JG & PG ex rel. JGIII v. Card*, 2009 WL 2986640, at *5 (S.D.N.Y. Sept. 17, 2009) (citing *Dockery v. Barnett*, 167 F.Supp.2d 597 (S.D.N.Y. 2001), and *Rubino v. Saddlemire*, 2007 WL 685183, at *10 (D. Conn. Mar.1, 2007)).  That said, the Court must still decide whether the Complaint contains sufficient factual allegations to make a plausible claim of deliberate indifference shocking the conscience.

In sum, the inquiry at the pleading stage is whether—taking the factual allegations of the Complaint as true and drawing all reasonable inferences in Plaintiffs' favor—Plaintiffs have plausibly alleged that a particular defendant acted with deliberate indifference that would shock the conscience and was personally

24

involved in the constitutional violation.  For the following reasons, the Court concludes that the allegations rise to that level with respect to Annucci, O'Gorman, Kelly, Finnegan and Bedard, but not with respect to Venettozzi, Rodriguez and Booth.

### a.    Annucci

According to the Complaint, Annucci first learned of potential issues with the Indiko Plus tests when two inmates complained to him about false positives in January and February of 2019.  By May, he had received over 24 letters from inmates who had lost privileges due to alleged false positives.  Annucci also received reports of "faulty testing" from DOCCS personnel beginning in January 2019, as well as complaints from attorneys beginning in June 2019.

In June 2019, Annucci assigned Kelly to investigate the complaints.  In August, he intervened directly and ordered some positive samples to be sent for confirmatory testing.  Ten days after learning that five of the six samples were false positives, he approved O'Gorman's order to stop using Indiko Plus to test for buprenorphine but took no action to reverse existing discipline until September. Once prompted by the Inspector General, Annuncci stopped all Indiko Plus testing in November and began reversing discipline based on non-buprenorphine tests in December.

To be sure, bureaucracies as large as DOCCS take time to act, and the alleged concealment of problems by the Microgenics Defendants undoubtedly contributed to the delay.  Nevertheless, the Court cannot conclude, as a matter of law, that the Complaint does not plausibly allege that Annucci was deliberately indifferent to problems with the Indiko Plus tests to an extent that would shock the conscience.

### b.  O'Gorman

As Deputy Commissioner, O'Gorman signed off on the directive to use the Indiko Plus tests.  According to the Complaint, he first learned about widespread problems with the tests from Kelly in July 2019.  He was told about the five confirmed false positives at the same time as Annucci and issued the order to stop using Indiko Plus to test for buprenorphine ten days later.

It may well be that O'Gorman was not aware of the issue earlier because Finnegan did not inform him of the complaints.  As with Annucci, however, the Court cannot say that a jury could not find that his subsequent conduct did not rise to the level of deliberate indifference that would shock the conscience.

### c.  Kelly

As Assistant Commissioner for Special Housing and Drug Testing, Kelly was the top-ranking DOCCS official specifically assigned to oversee the Indiko

Plus tests.  As Annucci's executive assistant, he was in charge of investigating the growing number of complaints about the tests.

Annucci referred the complaints to Kelly in April 2019, but Kelly did not immediately take any action.  He learned of testing problems at Eastern in June.  He ordered Eastern to stop using Indiko Plus tests in July and only then began his investigation.  He learned about the five confirmed false positives in August but did not extend the testing pause to any other facility or reverse any discipline—not even for the five inmates whose samples were confirmed to be false positives.

Like the other DOCCS Defendants, Kelly seeks to blame the Microgenics Defendants for covering up the problems with their tests.  Again, the Court's focus is on Kelly's reaction once he did discover that the tests were faulty.  That reaction could plausibly be seen as deliberate indifference that shocks the conscience.

### d.    Finnegan

As Kelly's successor, Finnegan was allegedly aware that an Indiko Plus test had misidentified codeine as buprenorphine when he reviewed the proposal to switch testing systems.  He was aware of problems with the tests by May 2019 at the latest but refused to escalate the issue to Annucci and O'Gorman.  After being appointed to the task force, he allegedly said that there was no reason to reverse any discipline based on faulty testing.  These allegations satisfy the Court that

27

Finnegan's conduct could plausibly constitute deliberate indifference that shocks the conscience.

Finnegan argues that his refusal to escalate his subordinates' concerns was of no consequence because Annucci, O'Gorman and Kelly learned about the issue through other means, and because he had no authority to alter discipline. While proximate cause is a necessary part of a § 1983 claim, Plaintiffs need only plausibly allege it at this stage. Drawing all reasonable inferences in their favor, Finnegan's refusal to bring the issue to the attention of his superiors plausibly delayed their decision to stop using Indiko Plus tests and to reverse disciplinary actions based on them.

Finnegan further argues that he was not personally involved in the decisions to discipline Steele-Warrick and Schultz or the decisions to reverse their discipline. That argument misunderstands the nature of Plaintiffs' claims. Plaintiffs are not challenging the individual disciplinary decisions in their cases. Rather, they are challenging the broader decision to use and continuing using Indiko Plus to test them and thousands of other inmates. Finnegan's refusal to inform his superiors of problems and opposition to any corrective action by the task force constitutes personal involvement in that decision.

28

### e.    Bedard

Apart from being asked by Kelly to assist in his investigation, Bedard appears to have had no involvement in—and no authority over—the decisions to pause testing or reverse discipline.  Instead, Plaintiffs' claim against him is apparently premised on his role in making the switch from Siemens to the Microgenics Defendants.  He argues that his only mistake in that regard was an "inability to recognize the deceptive practices" of those defendants.  Bedard Mem. of Law at 23.

That conduct alone would not appear to be "anything worse than incorrect or ill-advised." *Catanzaro v. Weiden*, 188 F.3d 56 (2d Cir. 1999) (internal quotation marks omitted).  But the Complaint further alleges that Bedard knew from experience that the norm was to use confirmatory tests for parole urinalysis yet advocated a testing system without such protection.  In addition, he allegedly knew that a trial Indiko Plus test had misidentified codeine as buprenorphine.  These allegations plausibly suggest that he knew of and ignored the possible adverse consequences of his decision on inmates.  "[I]n the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory." *Lewis*, 523 U.S. at 851.

Bedard argues that he was not personally involved in the testing or discipline

29

of Schultz and Steele-Warrick.  Like Finnegan, he overlooks his involvement in the decision to use the Indiko Plus testing system, a decision which had a foreseeable impact on thousands on inmates in the DOCCS system, including Plaintiffs.

### f.    Venettozzi, Rodriguez and Booth

Plaintiffs allege that Venettozzi, Rodriguez and Booth failed to investigate suspicious positive results.  But each of those defendants clearly believed the tests were problematic and took whatever steps they could to address the problem.  Each asked Finnegan to raise their concerns with his superiors.  In addition, Booth sent six positive samples to the Microgenics Defendants for confirmatory testing.

Plaintiffs point out that Venettozzi, Rodriguez and Booth did not take any further action.  Booth, for example, did not ask the Microgenics Defendants for the results of the confirmatory tests.  These three defendants, however, lacked the authority of the other DOCCS Defendants.  None was responsible for the switch to Indiko Plus tests, and none had the power to do anything other than report concerns about the reliability of those tests, which they did.  For these reasons, the alleged conduct of Venettozzi, Rodriguez and Booth does not plausibly rise to the level of deliberate indifference that shocks the conscience.

## C.    Qualified Immunity

"[Q]ualified immunity is an affirmative defense that a defendant has the burden of pleading in his answer." *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994).  But "[b]ecause qualified immunity is an immunity from suit rather than a mere defense to liability, the issue should be decided at the earliest opportunity—preferably at the outset of the case—and may be resolved on a Rule 12(b)(6) motion." *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 411 (S.D.N.Y. 2021); *see also Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

That said, "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch" and, therefore, "usually not successful." *Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) (internal quotation marks omitted).  This is so because a plaintiff "need not plead facts showing the absence of such a defense" in the complaint. *Castro*, 34 F.3d at 111. Accordingly, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route," *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).  Under that standard, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also

31

those that defeat the immunity defense." *Id.*

All of the DOCCS Defendants except Bedard invoke qualified immunity. Since the Court has concluded that Plaintiffs do not plausibly allege an Eighth Amendment violation, it need not address qualified immunity for that claim. Similarly, the Court need not address whether Venettozzi, Rodriguez and Booth are entitled to qualified immunity for Plaintiffs' Substantive Due Process claim. Thus, the following analysis applies to the Substantive Due Process claim against Annucci, O'Gorman, Kelly and Finnegan.

Qualified immunity addresses the competing interests of allowing for the "vindication of constitutional guarantees," while at the same time providing "breathing room" for government officials "to make reasonable but mistaken judgments about open legal questions." *Ziglar v. Abbasi*, 582 U.S. 120, 150-51 (2017) (internal quotations omitted). The resulting balance bars claims against "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Courts apply a two-step process in evaluating whether qualified immunity applies: "qualified immunity shields federal and state officials from money damages unless the plaintiff pleads facts showing (1) that the official violated a

statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022). "[E]ven if the right was clearly established," a court can still find a suit blocked by qualified immunity where "it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation marks omitted).

For the reasons explained, Plaintiffs have plausibly alleged that Annucci, O'Gorman, Kelly and Finnegan violated their Substantive Due Process rights. The Court must now decide—based on the allegations of the Complaint and inferences drawn therefrom—whether any reasonable officer would have known that such conduct was unconstitutional in 2019.

In support of that proposition, Plaintiffs rely on *Chapman v. United States*, 500 U.S. 453 (1991), *Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2012), and *Hurd*. In *Chapman*, the Supreme Court held that punishment for a person convicted of a drug offense may be based on the quantity of the drug involved "so long as that penalty is not cruel and unusual," and "so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." 500 U.S. at 465. In *Southerland*, the Second Circuit held that a temporary removal of children from their parents pending an

33

investigation into abuse allegations was not unconstitutional but recognized that the Substantive Due Process Clause "safeguards persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective."  680 F.3d at 151.  *Hurd*, of course, held that an inmate is "entitled to substantive due process protection against egregious and arbitrary government interference" with mandatory conditional release.  984 F.3d at 1088. Although it was not decided until 2021, *Hurd* cites *Southerland* (decided in 2012); in addition, it cites *Foucha v. Louisiana*, 504 U.S. 71 (1992), for the proposition that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." 984 F.3d at 1088 (quoting 504 U.S. at 80).

Each of those cases reaffirmed the longstanding principle that the Substantive Due Process Clause prohibits arbitrary punishment.  Annucci, O'Gorman, Kelly and Finnegan contend that no case applies that principle in the context of unreliable drug testing.  While it is true that Plaintiffs have not identified a case mirroring the precise facts of the conduct at issue here, they need not do so. Indeed, it is not difficult to comprehend that there was never a case addressing the unprecedented facts of this case.  Thus, "[p]recedent directly on point is not required for law to be clearly established."  *Sabir*, 52 F.4th at 63.  Rather, "the

34

[Supreme] Court has explained that 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question,' even if the specific conduct has not already been held unlawful." *Matzell*, 2023 WL 2762751, at *10 (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). "Even if [the Supreme Court or Second Circuit] has not explicitly held a course of conduct to be unconstitutional, we may nonetheless treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks omitted).

Any reasonable officer would know that the Substantive Due Process Clause forbids arbitrary punishment. He or she would further know that deliberate indifference to such punishment can shock the conscience. Finally, *Sample* and *Haywood* instruct that such deliberate indifference can, depending on the officer's duties, be inferred from a failure to take effective action in the face of a known risk that prisoners are facing arbitrary punishment. The Second Circuit held in 2019 that neither *Sample* nor *Haygood* clearly foreshadowed a favorable result for the plaintiff in *Fiacco* because the defendants in the case before it "had nothing to investigate." 942 F.3d at 151. Nevertheless, it acknowledged that broader point of those out-of-circuit cases—which had been on the books since the 1980s—that

35

deliberate indifference could be based on "refusals to investigate well-founded [inmate] complaints." *Id*.

Unlike *Fiacco*, the present case involves an alleged failure to investigate inmate complaints.  Thus, well before 2019 the caselaw "clearly foreshadow[ed]" to any reasonable officer that constitutional liability would attach if the growing number of complaints about the Indiko Plus tests were not promptly investigated and corrected.

Annucci, O'Gorman, Kelly and Finnegan offer a host of reasons why their actions were appropriate in light of the knowledge they possessed. But the Court has concluded that, given all the inferences that the Court is obliged to credit under the stringent 12(b)(6) qualified immunity standard, the Complaint alleges sufficient facts to make out plausible claims against Annucci, O'Gorman, Kelly and Finnegan.

Discovery may well reveal other facts, and the issue of qualified immunity can be revisited in the context of a motion for summary judgment or if necessary, at a jury trial. *Stephenson v. Doe,* 332 F.3d 68, 80 (2d Circ. 2003) ("While ordinarily the qualified immunity issue should be resolved, as the Supreme Court has emphasized, early in the proceedings, there are material issues of fact set forth below that preclude summary judgment on that basis."); *Zellner v. Summerlin,* 494

F.3d 344, 368 (2d Cir. 2007) ("Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court.").

Given the highly factual nature of the Complaint and all the inferences that the Court must accept under the stringent standard for a Rule 12(b)(6) motion on qualified immunity, the issue of qualified immunity is not now meet for judicial resolution.

### III

For the reasons explained above, Plaintiffs have failed to plausibly allege an Eighth Amendment violation by the DOCCS Defendants.  They do, however, plausibly allege a Substantive Due Process claim against Annucci, O'Gorman, Kelly, Finnegan and Bedard.  Finally, Annucci, O'Gorman, Kelly and Finnegan are not entitled to qualified immunity at this stage of the litigation.  Thus, the Court reaffirms its prior order granting in part and denying in part the DOCCS Defendants' motions to dismiss.

    /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
April 26, 2023