1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - X
 3                                  :
 4  STEELE-WARRICK,                 :19CV6558 (FB)
                                    :
 5            PLAINTIFF,            :
                                    :
 6                                  :United States Courthouse
       -AGAINST-                    :Brooklyn, New York
 7                                  :
                                    :
 8  MICROGENICS CORPORATION ET      :March 24, 2023
    AL,                             :3:00 p.m.
 9                                  :
            Defendant.             :
10                                  :
                                    :
11
    - - - - - - - - - - - - - - - X
12
              TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
13            BEFORE THE HONORABLE FREDERIC BLOCK
                UNITED STATES DISTRICT JUDGE
14
15                   A P P E A R A N C E S:

16  For the Plaintiff:    EMERY CELLI BRINCKERHOFF ABADY WARD &
                          MAAZEL LLP
17                          600 Fifth Avenue, 10th Floor
                          New York, NY 10020
18                        BY:EMILY KANE WANGER, ESQ.
                            MATTHEW BRINCKERHOFF, ESQ.
19                        ERIC ABRAMS, ESQ.

20  For Defendants        BOWMAN AND BROOKE
    Microgenics Corp.,     317 George Street, Suite 320
21  Thermo Fisher         New Brunswick, NJ 08901
                          BY:CHRISTOPHER R. CARTON, ESQ.
22

23

    Court Reporter:  SOPHIE NOLAN
24                    225 Cadman Plaza East/Brooklyn, NY 11201
                      NolanEDNY@aol.com
25  Proceedings recorded by mechanical stenography, transcript
    produced by Computer-Aided Transcription
```

SN        OCR        RPR

2

```
 1   For Defendants        NYC LAW DEPARTMENT SPECIAL FEDERAL
     Anthony Annucci,      LITIGATION
 2   James O'Gorman            100 Church Street
                               New York, NY 10007
 3                         BY:SARANDE DEDUSHI, ESQ.
                               JENNIFER L. GOLTCHE, ESQ.
 4
     For Defendant         JEFFREY P. MANS, ESQ.
 5   Charles Kelly:            P.O. Box 11-282
                               Albany, NY 12211-O
 6
     For Defendant         CAPEZZA HILL, LLP
 7   Richard Finnegan:         30 South Pearl Street, Ste P-110
                               Albany, NY 12207
 8                         BY:BENJAMIN W. HILL, ESQ.
                               (Via teleconference)
 9
     For Defendants
10   Donald Venettozzi,    WHITEMAN OSTERMAN & HANNA
     Anthony Rodriguez,        One Commerce Plaza
11   Jennifer Booth            Albany, NY 12260
                           BY:WILLIAM S. NOLAN, ESQ.
12
                           HARRIS, CONWAY & DONOVAN, PLLC
13                             50 State Street, 2nd Floor
                               Albany, NY 12207
14                         BY:RYAN THOMAS DONOVAN, ESQ.

15                         CONWAY, DONOVAN & MANLEY PLLC
                               50 State Street 2nd Floor,
16                             Albany, NY 12207
                           BY:RYAN MANLEY, ESQ.
17

18

19

20

21

22

23

24

25
```

SN       OCR       RPR

3

1          THE COURTROOM DEPUTY:  Civil cause for oral

2    argument, *Steele-Warrick v. Microgenics Corp., et al.*

3          Counsel, state your appearances.

4          MR. BRINCKERHOFF:  Matthew Brinckerhoff from Emery

5    Celli for the plaintiff.

6          THE COURT:  Good afternoon.

7          MS. WANGER:  Emily Wanger from Emery Celli for the

8    plaintiff as well.

9          THE COURT:  I'll make a deal with you.  I won't yell

10   at you if you can speak louder also.  I will acknowledge the

11   fact that my voice is not as good as it was when I was a

12   terrific trial lawyer, and that when you get a little older

13   that's what happens, and also maybe my hearing is not as good

14   as it was.  Otherwise, I'm perfect.  So you can yell at me,

15   it's perfectly okay.  Try to keep your voices up.  We have

16   microphones.  Can you hear me okay?

17          So, where to start?  Let me start with the overview

18   that -- and I recognize that I think this is an important case

19   and it's one that has some conceptual nuggets to it, which you

20   folks have spent a lot of time analyzing and evaluating.  And

21   you know, I'm really fortunate we have high-skilled and

22   high-end lawyers dealing with a case of this magnitude which

23   is, obviously, something that shouldn't go up to the Circuit

24   Court of Appeals.  So it's sort of a weigh station to some

25   extent.  But if there's a non-final order, then I guess it

4

1   can't go up unless it's a qualified immunity dynamic.  Let me

2   start by asking Mr. Brinckerhoff.  I want to make sure I'm,

3   pronouncing it correctly.

4         MR. BRINCKERHOFF:  Brinckerhoff.

5         THE COURT:  Brinckerhoff.  All right.  Why doesn't

6   *Sandin* (ph) preclude you from having this case dismissed?

7         MR. BRINCKERHOFF:  You mean specifically on the

8   substantive -- I'm sorry, the due process argument?

9         THE COURT:  Well, we have the substantive due

10   process and we have the Eighth Amendment.

11         MR. BRINCKERHOFF:  Correct.

12         THE COURT:  Let's talk first about the substantive

13   due process aspect.  So there's a lot that's in here about

14   *Sandin*, okay.  And the question is why is it that you don't

15   think that this is a *Sandin* case?

16         MR. BRINCKERHOFF:  Judge, we do not think that

17   *Sandin* applies for -- well, one primary reason, which is

18   *Sandin* is about procedural due process protections that are

19   unique to the prison context, which we're certainly in prison,

20   of course, and -- but specifically trying to identify the

21   types of liberty interests that need to have procedural due

22   process protections.  Whereas --

23         THE COURT:  Let me ask you this, whether we talk

24   about it in the context of procedural due process or

25   substantive due process, we have to determine that there has

5

1   been a loss of liberty interest.

2            Okay.  And, so, what -- if a person is

3   incarcerated -- I think you have here an interesting mix of

4   things.  And I think you have a conceptual nugget we may to

5   some extent be dealing with apples and bananas, but we have to

6   try to articulate it so I can help the Second Circuit out as

7   best as I can.  So you have prison confinement.  So whether

8   it's procedural due process or substantive due process that

9   we're talking about, we have prison confinement.  So I don't

10  know if in the context of when someone is incarcerated whether

11  the loss of liberty obviously is automatically entailed.  The

12  person is incarcerated.  And it seems that the *Sandin* court is

13  saying that if somebody is incarcerated, then, you know, if

14  their loss of liability has to be what *Sandin* is talking

15  about, right?  So you have that.  If this person wasn't

16  incarcerated, it would be different.

17           You take a typical situation with false arrest,

18  right.  If a person is improperly arrested, any loss of

19  liberty is actionable, right.  But that person has yet to have

20  been found culpable in the first instance and the person is

21  not in prison.  Does it make a difference whether a person is

22  in prison or not in prison?  *Sandin* seems to address

23  situations where somebody is in prison already and subject to

24  enhanced punishment having been convicted, having been subject

25  to the Bureau of Prisons administration of the jails.  So to

6

1   that extent, it seems that *Sandin* does have a parallel here.

2   Nonetheless, I don't think it applies.  I have my own theory

3   about that, but I want to know what you think.

4        MR. BRINCKERHOFF:  Well, I have a theory as well.

5   Is it okay if I approach and I can -- and maybe you can hear

6   me better?  Is that okay?

7        THE COURT:  Come on up.  Sure.  If you folks want to

8   come up here, whatever is comfortable for you.

9        MR. BRINCKERHOFF:  The theory that I think is

10  consistent with the cases and the doctrine is, again, I am

11  just going to revert back to the distinction that I think

12  actually is material here between procedural and substantive

13  due process.  And I say that because, of course, due process,

14  as the Court pointed out with liberty and property interests.

15  And as you're pointing out, the liberty infringements that are

16  potentially actionable to someone who is not in prison are far

17  broader.  I mean, even stopped for a couple of minutes is a

18  deprivation of liberty.  All kinds of little infringements are

19  potentially protected by the due process clause to somebody

20  who is not in prison.

21       So, the way I read *Sandin*, which is unquestionably a

22  procedural due process case, is it's focused on the types of

23  procedures that the prison has to give to a prisoner before it

24  can effectuate a diminution in their liberty interest and

25  because of the prison context, the bar is quite high.  It

SN      OCR      RPR

1  can't be we're going to deprive you of an extra hour in the

2  yard today, even though that is a diminution of your liberty

3  interest, you don't get to have a due process hearing every

4  time that happens if you're in prison.

5          Now, that I juxtapose with a substantive due process

6  claim, which is also, of course, well-recognized, not super

7  common but well-recognized, that tries to get at the random

8  unauthorized arbitrary infliction of some kind of deprivation

9  of liberty on anyone that ought to apply and does indeed apply

10 and --

11         THE COURT:  It doesn't matter whether it's in the

12 prison context or not in the prison context.  If the acts of

13 the government are such that deprive a person of liberty, even

14 if it's five minutes, it should be actionable if it's

15 arbitrary.

16         MR. BRINCKERHOFF:  If it's arbitrary in the way and

17 -- I think a fair reading of our Complaint is -- our Complaint

18 basically alleges with -- and with well more than plausibility

19 that the drug testing regime that was instituted here was the

20 functional equivalent of randomly selecting people for

21 punishment without any basis whatsoever.

22         THE COURT:  Yes.

23         MR. BRINCKERHOFF:  And I think we would all agree,

24 and I assume the Court would agree, if they had decided that

25 they were going to randomly select DIN numbers and punish

8

1    people just based on whatever the last number was in their DIM

2    on any given day, one day would be the 8, the next day it

3    would be the 3s, if the punishment was not the deprivation of

4    liberty that would normally be protected in the procedural due

5    process --

6            THE COURT:  Go a little slower.  When I used to

7    practice law I used to talk as fast as you, if not faster.

8    And you can ask the court reporters how I've transitioned now

9    to talk slower.  It requires discipline.  It's not easy.  You

10   are a very smart guy and you have a lot of thoughts on your

11   head and you want to get them out.

12           MR. BRINCKERHOFF:  I apologize.  I will slow down.

13           But obviously, the fundamental point that I was

14   trying to make was that in this unique kind of context, which

15   I put under the umbrella of all substantive due process cases,

16   but you could make it more narrow and say they're the ones

17   where something is random and arbitrary is what we allege in

18   this complaint is at play the restrictions that would apply in

19   the procedural due process context and are set forth in *Sandin*

20   and other cases like it do not apply.  And they do not apply

21   because it's truly, I think, unquestionably conscience

22   shocking to have a --

23           THE COURT:  I'm going to interrupt you because

24   that's what my job description is.

25           MR. BRINCKERHOFF:  Of course.

9

```
1              THE COURT:  So, you have somebody who is
2    incarcerated and they're now subject to additional punishment.
3    So to that extent, whether it's procedural or substantive, I
4    don't think that really should be the dichotomy that we're
5    talking about by just saying it's procedural compared to
6    substantive.  I think you have to say why there's a
7    difference.
8              Let me speak to your counterpart.
9              Who is going to be the one who is going to be
10   courageous enough to answer Judge Block's questions from the
11   opposition.  Any volunteers?
12             MS. DEDUSHI:  Sarande Dedushi on behalf of Annucci
13   and O'Gorman.
14             THE COURT:  So do you want to come up here, and
15   speak louder so I can hear you better.
16             MS. DEDUSHI:  Sure.
17             THE COURT:  Or do you want to speak from there?  Put
18   the microphone on so I can hear you better.
19             MS. DEDUSHI:  Your Honor, I just wanted to make a
20   distinction between substantive due process and procedural due
21   process.
22             THE COURT:  Speak a little louder so I can hear
23   every one of your words clearly.
24             MS. DEDUSHI:  Your Honor --
25             THE COURT:  Come up here.  It might be easier.  Why
```

1  don't you do that.

2          MS. DEDUSHI:  Sure.

3          THE COURT:  Pending before the Second Circuit Court

4  of Appeals now.

5          I am going to ask you a question, okay?

6          So the Second Circuit recently in the *Herb* case

7  written by Judge Wesley for unanimous court, right, said that

8  keeping somebody in prison for an additional year beyond the

9  time when they should have been released was a substantive due

10 process violation.  They don't mention a word about *Sandin* in

11 that decision.

12         Do you think that the Second Circuit was wrong?

13         MS. DEDUSHI:  Your Honor, first, I would want to

14 start and say that Herd was decided in 2021, which would have

15 been after the alleged incident in this case and which would

16 then make Annucci and O'Gorman be, at minimum, entitled to

17 qualified immunity on --

18         THE COURT:  We're not there yet.  You're not

19 answering my first question.  How do you distinguish Herd?

20 That's a substantive due process case.  The person was in jail

21 for about a year longer than when he was supposed to be

22 released, and the Second Circuit said that's a substantive due

23 process violation.

24         MS. DEDUSHI:  I believe that case is

25 distinguishable, Your Honor, under the grounds that in order

1  to bring a substantive due process claim you actually have --

2  the Constitutional claim has to be covered by that specific

3  Constitutional provision.  The only two claims that --

4       THE COURT:  Loss of liberty, obviously.  So the

5  Second Circuit could not have reached that decision if it did,

6  at least implicitly, acknowledge that there was a loss of

7  liberty, right?

8       MS. DEDUSHI:  But in that situation, Your Honor, we

9  are talking about someone who was arguing that they should

10  have been conditionally released versus in this situation they

11  are challenging the disciplinary sanctions against them.

12       THE COURT:  Let me ask you this question.  Let's

13  assume somebody is on supervised release.  They are doing

14  great.  You know, they've been on supervised release for two

15  to three years and they're working, they're perfect citizens,

16  but, you know, they're subject to mandatory drug testing.  We

17  do that.  Probation does that all the time, right.  And lo and

18  behold, they flunk because of this drug and they're put back

19  in jail.  Would that be a substantive due process violation?

20       MS. DEDUSHI:  Your Honor, again, it would -- it --

21       THE COURT:  I am not trying to ask you simple

22  questions, by the way.

23       MS. DEDUSHI:  According to Herd, yes, that would be

24  substantive due process violation.

25       THE COURT:  So why is it different than this case

12

1   here?  You have the alleged arbitrary behavior on the part of

2   the State officials after they knew, or should have known,

3   that the testing was questionable and apparently accepting the

4   allegations as true, which we have to for 12(b)(6) purposes,

5   they sat on their haunches for eight months or nine months or

6   ten months, and they did nothing.  I think that's the essence

7   of what they're saying here, right?  Why would that not be a

8   substantive due process violation?

9       MS. DEDUSHI:  Your Honor, because under the facts

10  alleged in their Complaint actually, at least specific to

11  Annucci and O'Gorman, they do allege all of these claims --

12  they do allege all of these facts where Annucci and O'Gorman

13  actually took necessary steps as this information was coming

14  to them.  In the beginning, they weren't aware and they had no

15  reason to believe that the Microgenics machines were not

16  reliably --

17      THE COURT:  I'm going to ask you -- you have to

18  accept the allegations as true.  And the allegations as true

19  are that they knew about this and they should have done

20  something about it and they didn't do anything for maybe nine

21  months or ten months.  I think that's the basic allegations,

22  right?  And so accepting that as true, why is this not a

23  substantive due process violation?

24      MS. DEDUSHI:  Your Honor, this is not a substantive

25  due process violation because they are failing to allege a

13

1    liberty interest.

2             THE COURT:  Well, what was the liberty interest in

3    Herd?

4             MS. DEDUSHI:  The liberty interest in Herd, if my

5    memory serves me right, was that he already had done all the

6    good time credits and there was a miscalculation of his --

7             THE COURT:  They don't cite *Sandin* at all?

8             MS. DEDUSHI:  Well, in this situation we cited

9    *Sandin* because plaintiffs are challenging the disciplinary

10   sanctions imposed as a result of these false positives.

11            THE COURT:  See, I think we're mixing apples and

12   bananas here to some extent.  I think what you're really

13   saying is because these people are incarcerated, then it's

14   okay to have arbitrary behavior on the part of the officials,

15   they can arbitrarily all they want to unless they're

16   incarcerated for three years or something.

17            MS. DEDUSHI:  No, Your Honor, that is not what I'm

18   saying.  What I'm saying is that they --

19            THE COURT:  You think they should act arbitrarily?

20            MS. DEDUSHI:  No, Your Honor, that's not --

21            THE COURT:  Then why would that not be a substantive

22   due process violation if they allegedly are acting

23   arbitrarily?

24            MS. DEDUSHI:  Because Your Honor, I don't think

25   that -- the individuals in this case, I don't think they

1   allege enough facts to show that the Defendant Annucci and

2   O'Gorman actually acted arbitrarily.  That's what I'm getting

3   at.  The allegations in the Complaint actually show otherwise.

4         THE COURT:  Do you think there's any culpability on

5   the part of the State in this particular case because of the

6   bad drugs?

7         MS. DEDUSHI:  Your Honor, it is our position that

8   the State believes that the Microgenics machines were actually

9   reliable.

10        THE COURT:  But there came a point in time when they

11  allegedly knew that it was not so.  We have reports from the

12  State officials that tell you that this was not a good drug.

13  Nothing was done for many, many months after that report was

14  rendered.

15        MS. DEDUSHI:  Your Honor --

16        THE COURT:  And you think that's okay?

17        MS. DEDUSHI:  Your Honor, I can assure you that the

18  Complaint also lists all of the different actions that Annucci

19  and O'Gorman took from January until they eventually ended the

20  contract with Microgenics.  It started in January of 2019.  He

21  received letters --

22        THE COURT:  And it may well be that you can win at

23  trial, but I have to accept the allegations.  And the

24  allegations really, you know -- the inferences that can be+

25  drawn from them and say that they did not act expeditiously

15

1   once they knew that this drug was not such a good drug.

2           MS. DEDUSHI:  Our argument is that to the contrary,

3   the allegations show otherwise in the Complaint that --

4           THE COURT:  That is a factual matter.  That's not

5   for a 12(b)(6) motion.

6           MS. DEDUSHI:  Yes, Your Honor, but in order to

7   sufficiently allege an Eighth Amendment claim, they --

8           THE COURT:  We're talking about substantive due

9   process first.  We'll get to the Eighth Amendment next.  Okay.

10   So you know what, the Sixth Circuit, I think, you know, in an

11   unpublished decision in a case called Thomas versus Russell

12   way back in 2000, before three distinguished Circuit Court

13   judges, Judges Merritt, Kennedy and Silar, you know, were

14   faced with the substantive due process dynamic as well.  And

15   they say this -- which I say it took me as being probably what

16   we want to talk about.

17           Thomas's claim sounds there's a claim that prison

18   officials, like in our case, continue to punish him on the

19   basis of false evidence -- false evidence, the drugs probably

20   false evidence, right -- as proved by the party admission of

21   the Ohio Assistant Attorney General.  We have that admission

22   in this case as well by the State.  Cast in this form,

23   Thomas's claim does not fit neatly under Sandin's purview but

24   rather appears to present a claim of substantive due process

25   based on an alleged abuse of governmental authority.  I mean,

1   the Supreme Court's decision in County of *Sacramento versus*

2   *Lewis*.

3   So if you have arbitrary acts, and if somebody is

4   falsely accused or arrested or whatever based upon arbitrary

5   governmental authority, there's going to be an automatic loss

6   of liberty.  It could be ten minutes.  And I think that, to

7   me, triggers a substantive due process claim, and maybe that's

8   the distinction between *Sandin* and the procedure of new

9   process claims and the arbitrary acts of government.  Don't

10  you think that makes sound law?  That's what Herd is all

11  about.

12  I'm trying to explain.  I'm not going to hold in

13  your favor on this, so you're not going to be surprised.  But

14  I wanted you to engage me in this conceptual nugget that has

15  challenged the Court.  Okay.  I gave you an opportunity.  You

16  have done your best, but you haven't convinced me.

17  So now let's go on to talk about some other things.

18  The Eighth Amendment.  I'm not so sure now turning to your

19  adversary and giving you a chance to catch your breath, Mr.

20  Brinckerhoff.  This fits under the Eighth Amendment and I want

21  to give you an opportunity to tell me why you think it does.

22  And I think, once again, you know, you look to Herd and Judge

23  Wesley talks about the Eighth Amendment in that context also.

24  And I guess he says that this is an Eighth Amendment dynamic.

25  I should ask your adversary about that.  But let me ask you

1    that first why you think this fits under the Eighth Amendment.

2         MR. BRINCKERHOFF:  There's a somewhat similar

3    dichotomy going on with both of our Constitutional claims.

4    And in the Eighth Amendment context, there are many cases,

5    obviously, that are conditions of confinement cases under the

6    Eighth Amendment, and deal with far greater arguable

7    deprivations than some of the injuries that we're alleging

8    here.  But there's also a separate line of cases that

9    basically make it clear that if a prison official or -- sorry,

10   prison executives are engaged in conduct that has no

11   legitimate penological justification, that whatever that sort

12   of injury is caused by that can give rise to an Eighth

13   Amendment claim.  It's a separate doctrine and it's the one

14   that we're invoking here.

15        THE COURT:  I think that you really have a better

16   substantive due process claim than Eighth Amendment claim.

17   That's how I read this.  But even if I were to agree with you,

18   it seems that you would have a problem with the qualified

19   immunity dynamic vis-a-vis an Eighth Amendment claim as

20   compared to possibly the substantive due process claim.

21        MR. BRINCKERHOFF:  Can I tell you why I don't think

22   we do?

23        THE COURT:  Go ahead.

24        MR. BRINCKERHOFF:  Yes?  The penological

25   justification line of Eighth Amendment cases is -- existed

18

1  well before any of the facts in this case.  It's been clearly

2  established for decades based on Supreme Court authority and

3  Second Circuit binding precedent, you know, at least from

4  2002, which is well before any of these acts, that if a prison

5  official engages in an act that causes an injury to a prisoner

6  that has no justification penologically whatsoever, that that

7  can give rise to an Eighth Amendment claim.  And if -- if --

8  you may disagree with my reading of the law or the way I'm

9  presenting it, but if one were to agree with that it's 100

10 percent clearly established and there would be no qualified

11 immunity available to any of the individuals who engaged in

12 this, whether they were involved at the front-end of selecting

13 this particular drug testing system and regime when they ought

14 to have known that it was going to cause these kinds of

15 problems and was unreliable or the higher level officials who

16 knew that there were problems very early on and refused to act

17 or do anything meaningful to address it for many, many months,

18 you know, giving rise to almost a year of this taking place.

19         THE COURT:  Let me ask your adversary.  Once again,

20 Herd, the Court said this was an Eighth Amendment violation,

21 keeping him in jail for an additional year beyond the release

22 date.  They said was an Eighth Amendment violation.  How do

23 you distinguish that from this case?

24         MS. DEDUSHI:  Your Honor, that case is

25 distinguishable because, first of all, plaintiffs have

19

1  conceded in their opposition papers that they're not even --

2  they're not even challenging the conditions in which they were

3  confined in this case.  And -- again, I would say the same

4  thing for Herd.  I would say that that also was decided after

5  these incidents took --

6           THE COURT:  That deals with qualified immunity, but,

7  you know, we can get to that separately.  But get back to the

8  basic violation.  If the Second Circuit said -- I'm a preacher

9  of the Second Circuit, okay, that keeping him a year beyond

10  his release date satisfies the shocking of the conscience

11  standard, satisfies the Eighth Amendment standards.  And so

12  we're not talking about depriving somebody of food or medical

13  treatment here.  You know, typically, I think with the Eighth

14  Amendment is that type of severe type of thing.  But Herd

15  doesn't seem to have any of that at all involved.  He was just

16  kept a year beyond his release date.  They don't say he was

17  suffering, deprived of food or medical treatment, nothing like

18  that type of thing that triggers Eighth Amendment concerns.

19           MS. DEDUSHI:  Your Honor, in Herd, in that

20  situation, we would -- I would say that's also distinguishable

21  because in order to show an Eighth Amendment violation under

22  1983 lawsuit, you have to show how those people were

23  personally involved.  And we would say that --

24           THE COURT:  I'm sorry, you have to say what?  What

25  do you have to show?

SN        OCR        RPR

1          MS. DEDUSHI:  Defendants by Annucci and O'Gorman are

2    not shown to have been personally involved in any

3    Constitutional violation, including the Eighth Amendment.

4          THE COURT:  That deals with the standard of personal

5    involvement.  It may well be that some were personally

6    involved and some were not.  I do think that there are a

7    number of these folks that really are not going to be held to

8    be still in this lawsuit because I don't think they satisfy

9    personal involvement.  There are a couple of them that I don't

10   really see the personal connection, but that's a separate

11   analysis.

12         MS. DEDUSHI:  Your Honor, part of the Eighth

13   Amendment element is to show that the defendants were

14   deliberately indifferent to the harm and there's no -- the

15   allegations in the Complaint actually show the opposite.  The

16   moment that Annucci and O'Gorman were actually informed that

17   the Microgenics machines were, in fact, causing false positive

18   test results, they immediately took action.  They released all

19   the individuals that had tested positive, you know, with

20   Microgenics machines, starting with buprenorphine.  They also

21   in addition to that ordered that their disciplinary conviction

22   with, you know, reversed and expunged.  And, additionally,

23   Your Honor, they -- once they found out that even the other

24   drugs were affected once they started doing confirmatory

25   testing by GCMS, they --

1          THE COURT:  Weren't they deliberately indifferent to

2     the fact that these people were still being punished or still

3     incarcerated or whatever for a number of months?  Weren't they

4     indifferent allegedly in this pleading to their circumstances

5     when they were sitting in lock keep or whatever for eight or

6     nine months when they should not have been there?  Weren't

7     they indifferent to that?

8          MS. DEDUSHI:  But, Your Honor, in order to succeed

9     in an Eighth Amendment claim, you have to show knowledge.  And

10     the allegations in this Complaint show that DOCS

11     for a long time were told, they took steps to make sure that

12     the machines were accurately accurate, and they were told

13     everything was fine.  It's not like they sat on their hands

14     and did nothing.

15          THE COURT:  I'm a little confused.  Maybe you can

16     straighten it out.  Didn't there come a point in time when

17     there was a report by the -- I forget the name of the State

18     official --

19          MR. BRINCKERHOFF:  Inspector general.

20          THE COURT:  Inspector general.

21          MS. DEDUSHI:  That was in year 2022 when they

22     actually published that.

23          THE COURT:  I'll ask your adversary.  Tell me, is

24     there anything in this Complaint that alleges that they knew

25     or should have known that these people were improperly being

22

1   treated and did not do anything for nine months?  I think

2   that's the way I read your allegations.  Am I wrong?

3            MR. BRINCKERHOFF:  Yes, and that is a fair,

4   plausible reading of everything in the Complaint.  And if you

5   look at our brief, it tries to summarize all of it.  It -- the

6   -- the positive test results that were unreliable and ended up

7   proving to be false started immediately when they started

8   putting the machines in in January of 2019.  They did not

9   suspend the use of the machines until September of 2019 and

10  they didn't finally basically get rid of all of the

11  punishments that were being levied upon everyone until the

12  very end of the year.  And these complaints were made

13  systematically, repeatedly throughout this period.  And they

14  only very slowly started to respond basically in the summer of

15  2019.  And then --

16           THE COURT:  That is in your Complaint.  How do I

17  pronounce your name correctly?

18           MS. DEDUSHI:  It's Sarande Dedushi.

19           THE COURT:  Dedushi?

20           MS. DEDUSHI:  That's correct, Your Honor.

21           THE COURT:  So let's assume, okay, that they knew

22  about this, there's no question about it and they knew that

23  the drugs was a faulty drug and they knew that these people

24  should not have been punished the way they were punished and

25  they did nothing about it for ten months or nine months.

23

1  Let's assume that.  Do you think that would be deliberate

2  indifference and satisfy the Eighth Amendment?

3           MS. DEDUSHI:  Under those facts that Your Honor

4  just --

5           THE COURT:  Yes, just assume those.

6           MS. DEDUSHI:  That would be a stronger argument,

7  yes, that that would have been deliberate.

8           THE COURT:  Anyway, doesn't -- don't I have to

9  construe the Complaint.  It's a lengthy, lengthy Complaint in

10 all of its inferences in the face of the 12(b)(b) motion to

11 basically allege that?

12          MS. DEDUSHI:  Your Honor, if you look at the

13 plaintiffs' Complaint as it involves the Annucci and O'Gorman,

14 I can even cite you the different pages where they show

15 Annucci and O'Gorman taking action and eventually and actually

16 summoning someone to do an investigation and look into all

17 these complaints.  In order for a government agency to come to

18 a conclusion, they have to do an investigation.  And they took

19 all of those steps to mitigate any potential risks of harm.

20 So I think that that's another element that --

21          THE COURT:  Do you agree with that?

22          MR. BRINCKERHOFF:  No.  They did not have to conduct

23 an -- as soon as they were confronted with the overwhelming

24 complaints that were being made, these were complaints being

25 made by elected officials, by prisoners --

1          THE COURT:  Hundreds of people.  Prisoners, they

2    were telling it was falling on deaf ears.  That's what they

3    allege.

4          MR. BRINCKERHOFF:  Their duty was to do what they

5    eventually did many months later, which was immediately

6    suspend any discipline or any use of these machines until an

7    investigation was done.  Instead, after six months they

8    decided to actually conduct an investigation.  And over the

9    course of the next four months approximately, the results of

10   that investigation came back and, lo and behold, they

11   confirmed everything that we're saying in the Complaint, which

12   is completely unreliable, and they did -- and I give them full

13   credit for this, you know, which they deserve, they at least

14   confronted the reality that was before them and they cancelled

15   the contract, got rid of the machines, stopped using them and

16   expunged all of the records of everyone.

17          THE COURT:  Ultimately, they stepped up to the

18   plate, eventually.

19          MR. BRINCKERHOFF:  They did, and deserve credit for

20   that.

21          THE COURT:  Is there any effort being made to

22   compensate these people who have been improperly treated by

23   the State because of this drug?  Is there any effort to settle

24   this to resolve the matter?

25          MS. DEDUSHI:  Your Honor, in terms of this case or

1   are you --

2           THE COURT:  Well, this is the case I have.  I don't

3   know how many people you have here to deal with.  But has the

4   State made any effort to compensate?  You know, I have

5   wrongful conviction cases and, you know, I had the leading one

6   that triggered all of these horrible people that were

7   incarcerated for many years in Brooklyn.  Twenty-six have been

8   released so far.  And they're getting large compensation.

9   It's almost a cottage industry for some lawyers.  And I had

10  the -- I sort of was in the forefront of that, but they were

11  compensated.

12          How about here?  Why don't you compensate these

13  people?  You just want to walk away scot-free here?

14          MS. DEDUSHI:  No, Your Honor.  As alleged in the

15  Complaint DOCS, the moment they found out that -- it was

16  confirmed that the Microgenics were not reliable, as I stated

17  earlier, the prisoners were released, the ones that were, in

18  fact --

19          THE COURT:  Is that enough here?  I mean, shouldn't

20  there be some monetary compensation?  I mean, have you

21  negotiated?  Have you sat down and discussed a settlement in

22  this case?

23          MS. DEDUSHI:  No, we have not.

24          THE COURT:  Is there any reason why?  I'm asking

25  you.  It seems like that's the humane thing to do here.

1          MS. DEDUSHI:  Your Honor, that's a process and --

2          THE COURT:  It's not your department, right?

3          MS. DEDUSHI:  I apologize.

4          THE COURT:  Anyway, you want me to dismiss this case

5    and these people go without any remedy at all?  That's your

6    position?

7          MS. DEDUSHI:  Your Honor, this is a standard motion

8    to dismiss.  We believe the plaintiffs do not sufficiently

9    allege --

10         THE COURT:  What happens when I deny your motion to

11   dismiss?  Are you going to engage in settlement negotiations?

12         MS. DEDUSHI:  That's something we can consider, but

13   I --

14         THE COURT:  Well, maybe I can appoint somebody to

15   supervise that.  Maybe we can have some supervisory role here.

16   I'm going to deny it.  You know, I just can't fathom letting

17   the State get away with this and just say, I'm sorry, there's

18   no recourse or there's no responsibility that we have.  It

19   doesn't square with my sense of justice.

20         So if you want to talk to the authorities and see

21   whether I can help you, maybe put in a motion to process to

22   resolve this case, eventually it's going to have to be

23   resolved one way or the other.

24         What do you think of that idea?

25         MR. BRINCKERHOFF:  We're always willing to spend

1  time and energy to try to resolve a case without further

2  litigation?  Magistrate Judge Scanlon has suggested this idea

3  in the past, and at least with the corporate defendants

4  they've been unwilling to engage in any discussions that would

5  include relief for all of the putative class members because

6  this is a class action.  And so I think it may have to wait

7  until the class gets certified.

8          THE COURT:  Let's be practical, because you're not

9  going to a get -- you can appeal maybe a qualified immunity

10  issue, but otherwise you're not going to -- if I deny this

11  motion, you're not going to otherwise be able to appeal.  It's

12  a non-final determination.  You may not be able to get an

13  appeal here unless -- you have the qualified immunity issue, I

14  guess, that being can always been appealed.  But I'm willing

15  to help you help yourselves, because these people have not

16  been treated properly and they deserve a remedy.

17          You would say that if you were wearing the black

18  robes.

19          MS. DEDUSHI:  But, again, Your Honor, it's -- I

20  understand what Your Honor is saying, but --

21          THE COURT:  Why don't you talk to your people.  A

22  lot of them are here at the table.  A couple of these people

23  are going to be let off.  I don't think there's any personal

24  involvement.  I can get the names of those people, a few of

25  them.  And you may not like that, but, you know, I'm going to

1  give a couple of them -- I'll tell you who they are right now

2  so you know who we're talking about.

3       Bear with me.

4       I think Venettozzi, Rodriguez and Booth, I don't

5  think they have the necessary personal involvement here.  I'm

6  inclined to let them off, but the others will all be in the

7  suit.  So I'm going to write a decision and maybe it will come

8  out sooner than later, but, you know, I'm not playing any

9  games.  I'm just telling you straight out what I'm going to be

10  doing, right.  I just wanted to give you the opportunity to

11  help me conceptually sort this out.

12       But I think that since it's going to be denied, why

13  don't you think about how you can resolve this case.  I think

14  your worthy adversary is going to be open to it.  It's going

15  to be resolved eventually.

16       MS. DEDUSHI:  Your Honor, if they want to provide a

17  settlement demand, we'll take it into advisement.

18       THE COURT:  Think about it.  I don't know how long

19  it's going to take me to get a decision.  I'm going to try to

20  get it out pretty quickly.  I've done a lot of work on it

21  already, but I'm more concerned about getting litigation

22  resolved that ought to be resolved.  And, you know, why spin

23  your wheels and have this thing protracted and, you know --

24  when ultimately you're going to have to resolve, in all

25  probability, one way or the other.  I just can't see where

29

1   you're going to be successful at having this whole case

2   tossed.  I may be wrong, but it just doesn't sound --

3   especially in light of Herd.  I just don't see that happening.

4           What else do you want to say?  Does anybody else

5   want to talk?

6           You have all -- I admire your courage in taking the

7   heat.

8           If these other folks would like to speak.  Anybody

9   else want to talk?

10          MR. DONOVAN:  No, Your Honor.

11          THE COURT:  I hope I haven't silenced everybody

12  here.  Both of you, by all means, you know, tell me what else

13  we should be thinking about.

14          MR. BRINCKERHOFF:  The only thing I will say is I --

15  you've made it clear that you're intending to dismiss out the

16  three individual defendants that you mentioned.

17          THE COURT:  I think that's right.

18          MR. BRINCKERHOFF:  I would just urge you to consider

19  what you're already very focused on, I think appropriately,

20  which is just the procedural posture of the case at the

21  moment, which is obviously a motion to dismiss.

22          THE COURT:  Yeah.

23          MR. BRINCKERHOFF:  I do think that some of the

24  decisions that are out there dismissing people based off

25  personal involvement don't take adequate notice of the fact

SN        OCR        RPR

1   that those three defendants that you mentioned were all

2   responsible for discipline throughout the entire system, the

3   DOCS system throughout the state, and also involved for the

4   drug testing throughout the state.  And so it may be that at

5   the end of discovery, and we're not shy about dropping

6   defendants if in the end we don't end up with the goods, but

7   we have multiple allegations of their direct involvement

8   statewide in all of the prisons.

9            THE COURT:  Well, they administered the tests, I get

10  that.  You know, I understand that.

11           MR. BRINCKERHOFF:  And collect them and are the

12  first line of hearing the complaints, even before they moved

13  them up the ladder.

14           THE COURT:  Look, I'll reconsider it.  I'm just

15  being straight out with everybody.

16           MR. BRINCKERHOFF:  I appreciate that.  And I'm, of

17  course, I'm forthrightly telling you I'd like you to change

18  your mind, but that's okay.

19           THE COURT:  Look, you have plenty in here without

20  them.

21           MR. BRINCKERHOFF:  Understood.  I just think we can

22  get rid of them later and that would be just as efficient.

23           THE COURT:  You know, I am a little sensitive to the

24  fact that people are named as defendants who marginally maybe

25  should not be named as defendants.  It may be the prerogative

1    thing for you to consider whether you may want to voluntarily

2    let those three people out of the litigation.  You have plenty

3    of other people.  And these are human beings.  They have to be

4    subjected to litigation and the accusations against them.  So

5    I'm trying to be evenhanded as best as I'm capable of doing

6    that.  Think about whether you want to voluntarily dismiss

7    against those three.

8         MR. BRINCKERHOFF:  I understand, and we'll consider

9    that.  They're going to be deposed in any event.  And, so,

10   maybe we wait until then, but I appreciate your point.  I have

11   no interest in causing more trouble than need be to get remedy

12   for my clients.

13        THE COURT:  You have got plenty here.  And even if

14   it's marginal one way for the other, you know, cut a break for

15   these people.  I mean, they're trying to live their lives,

16   like we all are trying.

17        MR. BRINCKERHOFF:  But just to be clear.  All of

18   these people will be indemnified by the State.  We're not

19   seeking to harm them in any way personally.  But because of

20   the Eleventh Amendment and other concerns, we cannot sue the

21   State directly for this.

22        THE COURT:  Anyway, I want to give you both of you

23   things to think about.  Anything else you'd like to say?

24        MS. DEDUSHI:  Yes, Your Honor.  I just wanted to

25   state for the record that in Herd, even though the Court found

1    a liberty interest, they still dismissed the allegation --

2    they still dismissed -- I believe it was the -- one of the

3    claims against the defendant because they said that they -- I

4    apologize, no -- sorry, strike that.  I apologize.

5            THE COURT:  There's an aspect of qualified immunity

6    in Herd.  I understand that.

7            MS. DEDUSHI:  Yes, Your Honor.  I apologize.  Yes,

8    there's qualified immunity as to Herd.  I also wanted to note

9    for the Court that similar claims have been brought in this

10   courtroom in the Eastern District with similar allegations,

11   and which is the case of *Moreland versus Microgenics*, and the

12   Court found that there was -- that the Eighth Amendment was

13   not implicated in that case.

14           And additionally, Your Honor, in Taylor versus

15   Microgenics, which is another similar case with similar

16   allegations in the Southern District of New York, the Court

17   considered Herd in that case, but -- with similar allegations.

18   The Court did say that there was a liberty instant in the

19   substantive due process in that case.  However, the Court

20   still dismissed the substantive due process claim on the

21   grounds that they were not personally involved, the defendants

22   alleged --

23           THE COURT:  They're not personally involved, I agree

24   with you.  I mean, that's why I'm inclined to dismiss against

25   those three people.

33

1          MS. DEDUSHI:  But Annucci and O'Gorman were not

2    personally involved, Your Honor, in making the decision of the

3    disciplinary --

4          THE COURT:  The other people are personally

5    involved.  I think they really are personally involved.  And

6    so I'm satisfied -- look, it's an interesting case, but I've

7    given you a lot of things to think about.  Now, this was

8    originally to be just before Judge Scanlon.  Who was the

9    person who decided that Judge Block should be deciding this

10   case, which one?

11         MR. BRINCKERHOFF:  I'm not sure if I would join

12   quite the characterization, but there were new defendants that

13   were added, actually all of the DOC employees --

14         THE COURT:  And the new defendants wanted this case

15   to be decided by Judge Block.  Aren't you glad you made that

16   decision now?

17         You have to have a sense of humor in this world,

18   right?

19         Well, we're just going to try to lay it out, and,

20   ultimately, maybe if you really don't want to resolve this

21   case, which I think it ought to be, the Second Circuit, I

22   guess, will wrestle with it, right?

23         So it was nice to see all of you in court, and we'll

24   do the best we can to do what we're supposed to do as judges.

25         MR. BRINCKERHOFF:  Thank you, Judge.

34

1          MS. DEDUSHI:  Thank you.

2          THE COURT:  Nice meeting you all.

3

4

5      (Matter adjourned.)

6                    - ooOoo -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN      OCR      RPR