# Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------x
NADEZDA STEELE-WARRICK,

Plaintiff,

-against- Case No. 1:19-cv-06558

MICROGENICS CORPORATION and THERMO FISHER SCIENTIFIC, INC.,
Defendants.
---------------------------------------x

DATE: June 28, 2023

TIME: 9:41 a.m.

Deposition of DONALD VENETOZZI, a non-party witness, taken by the Respective parties, held via videoconference by all participants, before MICHAEL WILLIAMS, a Notary Public of the State of New York and Registered Professional Court Reporter.

Q. Was that in person or by video like this?
A. It was in person, and I believe this building in Albany.
Q. Okay.
And just to be clear, are you in the Attorney General's Office in Albany right now?
A. Yes.
Q. All right.
And before the deposition, you just mentioned about Ad-Seg.
When was the most recent deposition you participated in before that?
A. It's been a long time. I'm not really sure.
Q. Do you recall what -- withdraw that.
The other depositions you said you've done about a half dozen.
Can you recall what any of those depositions were about? What the cases were about?
A. I don't specially remember the details of those cases, no.
Q. Okay.
And just to be clear, as far as you

remember, have you ever been deposed in any lawsuit related to DOCCS' urinalysis testing program?

A. No, I don't believe so, no.

Q. So I understand you've done this before, but I'll just go over the ground rules again for this deposition.

Mikael, the court reporter, will be making a transcript. He'll be taking down every word that everyone speaks. So it is important to speak clearly so that he can record every word.

It is also important not to talk over each other. I find that that can be particularly challenging over Zoom like this. So I will be mindful to let you finish answering a question before I ask another one, and I just ask that you make sure you wait until I finish asking a question before you start answering. Okay?

A. Understood.

Q. And for any question, you need to give a verbal answer. If you nod or shake your head, the court reporter won't be able to take that down. Okay?

A. Yes.

Q. And if at any point I ask a question

one meeting?

A. I'm aware that they've had meetings, plural. Don't know how many after that. I just don't know.

(Madeline Story enters the Zoom)

Q. Do you remember what those meetings were about?

A. I do not.

Q. Do you remember whether at any point employees in the Office of Special Housing had concerns about the reliability of Microgenics' products in 2019?

A. Can you rephrase that? The folks in special housing having concerns about reliability of their equipment?

Q. Yes.

Do you recall whether in 2019 anyone working in the Office of Special Housing raised concerns about the reliability of the Microgenics' equipment for testing inmates?

A. Don't know specifically the dates, but we had received phone calls from at least two facilities that I'm aware of that were adamant about the positives that they were getting for incarcerated individuals have never been a

problem before and now they were positive.

Q. Okay.

Do you remember which facilities those were?

A. I believe at Attica Correctional Facility and Eastman Correctional Facility.

Q. And the communications from those facilities with the Office of Special Housing, were any of those communications directly to you?

A. I don't recall if they were directly to me or not.

Q. Do you recall about how many months DOCCS had been using the Microgenics products before these concerns were communicated to you from the facilities?

A. I do not.

Q. What, if any, steps did you take when you learned about these concerns from Attica and Eastern?

A. When I was told by my staff, that the concerns regarding this issue, I directly brought it to Assistant Commissioner Finnegan with the concerns.

Q. Okay.

And when you say "your staff," do

you remember who specifically brought this to you?

A. I do not remember specifically who brought it to my attention.

Q. But you're referring to the employees of the office of special housing at that time?

A. That is correct, yes.

Q. And you said you then brought -- you related those concerns to AC Finnegan, correct?

A. Yes. I immediately went to his office to explain the concerns, yes.

Q. Okay.

And what, if any, reaction did you have in the concerns you raised?

A. Say that again?

MR. HURLEY: Just note my objection to form -- Hurley -- in lumping together Attica and Eastern.

That's my only objection to form.

You can answer.

MR. STECKER: Understood.

Q. At some point, Mr. Venetozzi, at some point you were informed by your staff that concerns were being raised about urinalysis

testing from Attica and, also, Eastern; is that correct?

A. Yes, that is correct.

Q. Okay.

Do you remember -- I'm sorry. Let me withdraw that.

You said at some point you went to AC Finnegan to relay some concerns.

Do you recall whether those were the concerns raised by Attica or Eastern or both?

A. I don't recall. It was one specific facility that particular day. So whoever called in first had the issues or complaint and concerns, and that staff member -- again, I'm not sure who it was in the office, but that staff member and myself went to Mr. Finnegan's office and we spoke with Mr. Finnegan regarding the concerns of the facility.

Q. Okay.

And so just to be clear, this was in person in Mr. Finnegan's office?

A. That's correct, yes.

Q. And what, if anything, was discussed between you and Mr. Finnegan during that exchange?

A. Again, there's another staff member present. I'm just not sure who from our office went with me. Whoever took the phone call and brought it to my attention, we both went over to see him. And when I spoke to him, I made it very clear the facilities were very concerned about this issue.

And then he was -- he advised me that he thought the scientific principles and the testing was different than the Seaman's, and it was a little bit more sensitive than the Seaman's and that there was a possibility that people were coming back positive because of the scientific principles and the fact that the testings were more sensitive.

So he did not see it as alarming, in my opinion, at that point because, again, the testing was different than the Seaman's.

Q. Did he direct you to take any kind of action after that conversation?

MR. HILL: Objection to the form.

A. No direction was given to me to take any action regarding that all, only to inform me he did not see it as alarming at that point based on the different scientific principles.

Q. Do you know whether he gave any direction to anyone else in the Office of Special Housing following that conversation?
A. That, I do not know.
MR. HILL: Objection.
Q. Did AC Finnegan explain to you why he thought that the scientific principles should not be challenged?
MR. HILL: Objection to form.
MR. HURLEY: Same objection.
A. Mr. Finnegan never told me anything about not objecting to the process. He was just pointing out the fact that the scientific principles were different. In his opinion, he did not want to rush into saying that there was something wrong with something. He wanted to really take, I think, an additional look at it. Do you know what I mean? But what he did with it from that point, I don't know.
Q. Did you raise concerns about the reliability of the urinalysis testing program with AC Finnegan on any other occasion besides the one that you just described?
MR. HILL: Objection to form.
A. Yes, there were multiple times that

we got phone calls from facilities, superintendents calling. And when they called, I would directly go to him and let him be aware of the situation, yes.

Q. Okay.

Do you remember about how many times that occurred?

A. I believe three.

Q. Three times including the first occasion you described or in addition to that time?

A. Including.

Q. During any of these conversations -- I'm sorry. Withdraw that.

Were any of these conversations between you and AC Finnegan alone, or was there always somebody else present?

A. I believe one of them were alone and the other two had staff members there that received the phone calls.

Q. Did you ever tell AC Finnegan -- I'm sorry.

During any of those three occasions you mentioned, did you ever tell AC Finnegan that you felt the concerns about the urinalysis

testing should be relayed to someone in DOCCS higher up the chain than AC Finnegan?

MR. HILL: Objection.

A. I did, yes.

Q. Okay.

Do you remember -- I'm sorry.

Was that one time that you did that or more than once, as you recall?

A. I believe twice.

Q. Did you suggest that there was someone specific that AC Finnegan should go to?

A. I had only mentioned the deputy commissioner at that time.

Q. Was that Deputy Commission O'Gorman at that time?

A. I'm not 100 percent sure.

Q. Do you know whether AC Finnegan took your suggestion and raised these concerns to anyone further up the chain at that time?

A. Again --

MR. HILL: Objection.

A. Again, I just made a recommendation. I have no idea who he shared that information with. We had counsel providing it. We just provided the information to him, and I don't know

approve?

A. At times, yes.

Q. Okay.

Is there anything specific that you can recall?

A. Nothing specific.

Q. Do you recall telling interviewers from the Inspector General's Office that AC Finnegan bullied other people in the office?

MR. HILL: Objection to form.

MR. HURLEY: Same objection.

A. Yes, I'm sure I said that.

Q. Okay.

And as far as you recall, to whom was that bullying directed?

A. Specifically what person or persons he would bully?

Q. Right.

A. I think it's just part of his personality.

Q. Were you -- so just to be clear, were you -- I'll rephrase it.

Do you recall that you were ever on the receiving end of bullying from AC Finnegan?

MR. HILL: Objection.

(Demaris Shakesphere enters on the Zoom.)

A. We had differences.

Q. I understand you had differences, but I think, as you yourself said, you know -- you know, differences, you know -- well, I won't put words in your mouth.

But, I mean, people have differences, but I understand what you told the Inspector General's Office is that it wasn't just differences; he was -- he was bullying other people in the office.

So were you yourself one of the people you were referring to when you said that he bullied other people in the office?

MR. HILL: Objection to form.

A. Again, my response is that we had differences of opinions.

Q. Well, did he ever -- in your opinion, did he ever bully Jennifer Booth?

A. I don't recall that, no.

Q. How about Corey Bedard?

A. I don't have any specific examples.

Q. Okay.

You don't have any specific

MR. HILL: Objection.
Q. Did you ever contact any other officials in DOCCS above AC Finnegan about the -- about what you viewed as bullying by him?
A. Yes.
Q. Who did you contact?
A. The deputy commissioner and -- and that was O'Gorman at the time, and also Charles Kelly, also the Executive Deputy Commissioner Martuscello, Daniel.
Q. Okay.
So that's three individuals. So I'll just go through them one by one so we're clear.
Deputy Commissioner O'Gorman, when did you contact him?
A. I don't know the date.
Q. Okay.
Do you know if it was before or after your interview with the Inspector General's Office in November 2019?
A. I do not know whether it was before or after.
Q. Okay.
How about Charles Kelly, when did

Q. Okay.

Do you know whether he took any steps to address the issue after that?

A. I do not know.

Q. Did you have any further conversations with Deputy Commissioner O'Gorman about AC Finnegan's behavior after that time?

A. Yes, multiple.

Q. Okay.

Do you remember about how many?

A. Four or five.

Q. Okay.

About how long after the first conversation was the second conversation?

A. I'd say four weeks, approximately.

Q. And was that another in-person conversation in his office?

A. Yes.

Q. Was anyone else there?

A. Just him and I.

Q. Okay.

And who initiated that second meeting? Was it you or Deputy Commissioner O'Gorman or someone else?

A. All the meetings were initiated by

Q. Okay.

What, if anything -- I'm sorry.

Just to be clear, did you initiate that fourth meeting?

A. I did, yes.

Q. What, if anything, led you to initiate that fourth meeting?

A. No changes in the behavior.

Q. Do you recall whether there was any specific incidence between the third and the fourth meeting that led you to have that assessment of AC Finnegan's behavior?

A. I do remember at that meeting there was an issue with my assistant director and Mr. Finnegan where he was so worked up over the incident that his wife wrote a letter of cease and desist, and she wrote something -- she wanted to give it to Mr. Finnegan to stop harassing her husband, and that was shared with Mr. O'Gorman at that time.

Q. Just to be clear, who was the -- you said assistant director.

Are you referring to the assistant director of the Office of Special Housing?

A. Yes, correct.

Q. Was that Assistant Director Rodriguez at that time?
A. It was, yes.
Q. Okay.
And you said Assistant Director Rodriguez wrote a letter -- I'm sorry, Assistant Director Rodriguez' wife wrote a letter regarding AC Finnegan's behavior toward Assistant Director Rodriguez. Do I have the right?
MR. HILL: Objection.
A. Correct.
Q. Okay.
And this was a letter that you saw at that time?
A. Yes, he showed me what his wife had wrote.
Q. Assistant Director Rodriguez showed you the letter?
A. That's correct.
Q. Okay.
Do you know whether that letter was shown or sent to anyone else at DOCCS at that time?
A. I don't know if it was sent to anybody, but he was directed to see Mr. O'Gorman

correct?
A. Yes.
MR. HILL: Objection.
Q. And just to be clear for the record, you said correct?
A. I did, yes. Yes, that was correct.
Q. Okay.
So that fourth meeting between yourself and Deputy Assistant O'Gorman, as best as you can recall, what was discussed during that meeting?
A. Again, the behaviors that hadn't changed and now the concerns from my assistant director.
Q. What were your concerns?
A. Regarding the assistant director, I just explained that to you. The letter his wife wrote on his behalf, and he showed that to me and that was my concern.
Q. The letter that you saw from Assistant Director Rodriguez' wife, did that refer to one specific incident of behavior by AC Finnegan or more than one?
A. I believe it was more than one.
Q. Do you recall what any of those

How many meetings -- or I'm sorry. I will rephrase it.
Did you ever have an in-person meeting with Chuck Kelly during which you described AC Finnegan's behavior?
A. Yes.
Q. Do you know how many meetings you had?
A. I'd say three or four.
Q. Do you remember when those meetings took place in time in relation to the meetings you had with Deputy Commissioner O'Gorman?
A. During that same period of time.
Q. Do you remember who you met with first? Like, the first meeting with Deputy Commissioner O'Gorman, was that before the first meeting with Mr. Kelly? Do you remember that?
A. I'm not sure who I spoke with first.
Q. And the meetings you had with Mr. Kelly, was anyone else present at those meetings beside yourself and Mr. Kelly?
A. Just the two of us.
Q. Okay.
And starting with the first meeting, as best you can recall, what was discussed during

third meeting with Mr. Kelly?
A. Just the same type of issues that had been going on in the office and no change.
Q. Did Mr. Kelly ask you any questions during that meeting?
A. I don't recall if he had any follow-up questions or no.
Q. Do you recall whether he told you whether any steps were going to be taken in response to what you raised at the third meeting?
A. That's my recollection. It was very similar to the first and the second. He was going to talk to him and, hopefully, make some headway, but it didn't work out that way.
Q. I'm sorry. You said it didn't work out that way.
What are you referring to?
A. There was no change in behavior.
Q. No change after the third meeting?
A. Correct.
Q. Did you have a fourth meeting with Mr. Kelly about AC Finnegan's behavior?
A. I don't recall if I did or I didn't.
Q. Okay.
Earlier you had said you had also

contacted Deputy Commissioner Martuscello at some point regarding AC Finnegan's behavior. Correct?

A. That's correct, yes.

Q. Okay.

Did you have a -- did you have a meeting with him about those concerns at any time?

A. He has an open door policy, and his door was open and I requested to speak to him. And I spoke to him in his office, just the two of us.

Q. So was that just one occasion or more than one occasion?

A. I believe one, possibly two.

Q. The first meeting you had with EDC Martuscello, do you remember when that took place in time in relation to the meetings you had with Deputy Commission O'Gorman and Mr. Kelly?

A. It was during that period of time, and I'm assuming it's toward the end of the time period I met Mr. O'Gorman. So it was in that period of time.

Q. During that first meeting with EDC Martuscello, as best as you can recall, what was the substance of your decision with

Mr. Martuscello?
A. Issues I was having with Mr. Finnegan. And he had informed me that he was going to have it addressed or taken care of.
Q. Do you know whether EDC Martuscello took any steps regarding AC Finnegan's behavior after that first meeting with you?
A. None that I'm aware of.
Q. Okay.
I believe you said you thought you may have had a second meeting in EDC Martuscello's office but you're not sure; is that right?
A. I'm not sure, correct.
Q. Did you have any further communications with EDC Martuscello about AC Finnegan's behavior, whether in person, by phone, or any other means?
A. It would have been in person if I did; and if possible, a second meeting that I'm not 100 percent sure that I had.
Q. To your knowledge, at any time after the first meeting with EDC Martuscello, did EDC Martuscello take new steps to address AC Finnegan's behavior?

approved address, every effort should be made to get the inmate released within the 30 days and the TAC paperwork should reflect this date."

Did you see that?

A. Yes.

Q. So is your understanding of the instruction that was given here is that the conditional release date to be reflected in the TAC paperwork is to be the date that it's anticipated the individual can be released from prison?

A. That's typically what you'll see in a title log form that says conditional release date.

However, in this case, it looks like they're referring to whether or not he's got an approved address because if I don't have an approved address, it takes more time to find a level location or someone else who would take the incarcerated individual in to the residence.

Q. Okay.

So if somebody had, say -- I mean, I will just note this email is dated September 13, 2019.

Let's just say if someone had

originally been eligible for conditional release in July 2019 but they had lost that date based on a positive urinalysis violation that was now being reversed, they would not be given back the original July 2019 conditional release date, correct?

A. Correct, because the date has already gone by.

Q. Okay.

They would be given a date in the future, correct?

A. Only because, again, the time has already gone past, yes.

Q. Okay.

Is that -- you say because the date would have been in the past.

Is that some sort of general policy related to conditional release dates that you're referring to?

A. Well, I can ask you -- like, if I said to you, your conditional release date was in April, do you know what I mean, and now here it's almost the end of June and then it just got processed through. So I can't go back and say your CR date you left on was April if you're

still in our custody but to nullify until we sort out this issue.

Does that makes sense?

Q. Yes.

I mean, what's your basis for that understanding?

A. Well, based on what you're saying here is that some of these things, our CR date may have been prior to but they were released on another CR date, if they possibly could. And if they couldn't, they would do it as soon as possible.

Q. I'm going to stop to share this exhibit.

I just want to -- just so I'm clear, the issue you were referring to about the CR date being in the past, was that an issue specific to this process of making inmates whole related to the urinalysis issue, or is that a policy that would come up just in general any time somebody had a change in their good time status after their original conditional release date?

A. No, this was specific to the incident that took place with the drug testing.

So if there's someone who may have

been, their CR date was affected and then subsequently they made a determination that there's questionable issues with the assay that they had to end up stopping drug testing in all, finding people guilty for those, then they had to go back and make those folks whole. And if the CR date already passed, then they will make them as soon as possible to get them out.

Q. Do you know who, if anyone, within DOCCS made the decision to do preconditional release dates that way?

A. I have no idea. It was much higher than me. I have no idea.

Q. Okay.

MR. STECKER: Can we go off the record.

(A break in the record was taken.)

A F T E R N O O N S E S S I O N

Q. Mr. Venetozzi, I did just have a few more questions about the good time issue we were discussing before the break, but just to refresh your memory, let me just share the previous exhibit real quick.

So this is the same exhibit I was showing you before we took the break. This has

Again, this question appears to me, as I sent it to him, not sure of the answer and wanted to get some feed back from him.

Q. Okay.

Do you know if you ever got any feedback directly from Mr. Kelly?

A. These questions would have been brought up, I'm sure, at the SHU task force meetings. It is very possible they were addressed there and then I have gotten no other follow-ups that I'm aware of. That I'm aware of anyway.

So I'm not exactly sure what answer was given regarding this particulars issue.

Q. Okay.

So just to be clear, you don't recall a specific email or conversation from Mr. Kelly directly to yourself about this?

A. Not that I'm aware of, no.

Q. I'm going to take that exhibit down.

Mr. Venetozzi, I'm going to try not to take too much more of your time.

I just have a few questions to clarify a few things we have discussed earlier.

You know, earlier you told me about

And just to finish the audio that I just played to you, does that refresh your recollection that AC Finnegan told you in response to your concerns about the number of positive urinalysis results that if the hearing results -- if the hearing is procedurally correct, we hold them accountable until further notice?

MR. HILL: Objection to form.

A. That was the direction until further notice.

Q. And he gave you the direction to, quote/unquote, stand down, correct?

A. Yes.

Q. And he said to you, and I believe others from the Office of Special Housing, who are you to challenge scientific principles, correct?

MR. HILL: Objection.

A. I think he may have said, who are we to challenge the scientific principles of the machine. Something along those lines.

Q. I'm sorry. I didn't mean to cut you off.

All right. Thank you.

it himself, do something different with it.

But the direction I got was to proceed and everything is procedural as normal at this point, and whether he took it somewhere else, I don't know.

Q. Okay.

And when you say "deputy commissioner," are you referring to Deputy Commissioner O'Gorman?

A. That is correct, yes.

Q. Okay.

And he said that he was not going to get Deputy Commissioner O'Gorman involved at that time, correct?

A. At that time when we were in the room, correct.

Q. All right.

Thank you very much, Mr. Venetozzi, for your time. I think I have some time left so I'll reserve the right for some questions after everybody else goes. But, otherwise, thank you very much and thank you for taking time away from your retirement.

MR. VENETOZZI: I appreciate it.

MR. CARTON: May we have the time