UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NADEZDA STEELE-WARRICK and
DARRYL SCHULTZ, individually and on
behalf of others similarly situated,

               Plaintiffs,

      -against-

MICROGENICS CORPORATION,
THERMO FISHER SCIENTIFIC, INC.,
ANTHONY ANNUCCI, JAMES
O'GORMAN, CHARLES KELLY,
RICHARD FINNEGAN, and COREY
BEDARD,

               Defendants.

**<u>MEMORANDUM AND ORDER</u>**
Case No. 1:19-CV-6558 (FB) (VMS)

*Appearances:*
*For the Plaintiffs:*
MATTHEW D. BRINKERHOFF
Emery Celli Brinkerhoff Abady Ward &
Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York

KAREN L. MURTAGH
Prisoners' Legal Services of New York
41 State Street, Suite M112
Albany, New York 12207

*For Defendants Annucci and O'Gorman:*
LINDA FANG
NYS Office of The Attorney General
28 Liberty Street
New York, NY 10005

*For Defendant Kelly:*
JEFFREY PETER MANS
Law Office of Jeffrey P. Mans
P.O. Box 11-282
Albany, NY 12211

*For Defendant Finnegan:*
 BENJAMIN W. HILL
Capezza Hill, LLP
30 South Pearl Street
Ste. P-110
Albany, NY 12207

*For Defendant Bedard:*
LAUREN NICOLE MODACQ
Conway, Donovan & Manley, PLLC
50 State Street
Ste 2nd Floor
Albany, NY 12207

**BLOCK, Senior District Judge:**

In this putative class action under 24 U.S.C. § 1983, Nadezda Steele-Warrick and Darryl Schultz (collectively, "Plaintiffs") claim that they and thousands of others under the jurisdiction of the New York State Department of Corrections and Community Supervision ("DOCCS") were subject to discipline based on false-positive results of faulty drug tests developed by Microgenics Corporation and Thermo Fisher Scientific, Inc. (collectively, "Microgenics Defendants"). In addition to the Microgenics Defendants, Plaintiffs assert claims against five DOCCS employees (collectively "DOCCS Defendants") under the Substantive Due Process Clause of the Fourteenth Amendment, alleging that they failed to take corrective action after becoming aware that the tests were unreliable. Pending before the Court are the DOCCS Defendants' motions for summary judgment.

### Procedural History

The Third Amended Complaint ("TAC") alleged the Microgenics Defendants' violation of New York General Business Law § 349, various § 1983 claims, and negligence. The Microgenics Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss all the claims against them and under 12(f) to strike the Plaintiff's class allegations. *See* Dkts. 186, 187. The Court denied the motions except as they related to Plaintiffs' Eighth Amendment claims, which were dismissed with prejudice. *See* June 13, 2023 Memorandum and Order, Dkt. 225. The Microgenics Defendants filed a motion for reconsideration which the Court denied. *See* Dkt. 246, 256.

Originally there were eight individual DOCCS Defendants, including the five remaining DOCCS Defendants. Collectively, they moved to dismiss all claims against them. *See* Dkts. 144, 148, 159–163. On April 26, 2023, the Court issued an Opinion holding that Plaintiffs failed to

state a claim under the Eighth Amendment, but that their Substantive Due Process claims survived as to five of the DOCCS Defendants: Annucci, O'Gorman, Kelly, Finnegan and Bedard. *Steele-Warrick v. Microgenics Corp.* 671 F.Supp. 3d 229 (E.D.N.Y. 2023). The Court concluded that Plaintiffs had plausibly pled violations of the Fourteenth Amendment's guarantee of substantive due process; specifically, that they had been subjected to a drug testing regime so arbitrary "that it was no better than imposing random discipline. . . . [violating] their right to be free from such an obviously arbitrary system." *Id.* at 241 (*citing Hurd v. Fredenburgh,* 984 F.3d 1075, 1088 (2d Cir. 2021).

The Court made the threshold determination that the TAC plausibly alleged that these five DOCCS Defendants engaged in conscience-shocking conduct via deliberate indifference, specifically noting the case's parallels with *Hurd*, where the Second Circuit observed that "prison officials can be found 'deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors.'" *Id*. at 242 (*quoting Hurd*, 984 F.3d at 1084–85). The Court then proceeded to analyze each of the DOCCS Defendants' individual actions as laid out in the TAC, ultimately concluding that Plaintiffs plausibly pled substantive due process claims against each of them.

In their motions to dismiss, four of the five DOCCS Defendants—Annucci, O'Gorman, Kelly, and Finnegan—argued that they were entitled to qualified immunity, but the Court disagreed. *Id.* at 248. They appealed the denial, as was their right. Dkts. 194, 201, 202; *see X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir. 1999) (recognizing that denial of a motion to dismiss on the basis of qualified immunity satisfies the collateral order doctrine). However, the circuit court remanded to permit the completion of discovery, concluding that this "case involves complex factual questions, apparently intertwined with the legal ones, that are best resolved on

3

summary judgment." *Steele-Warrick v. Finnegan*, Nos. 23-743, 2024 U.S. App. LEXIS 13589, at *3 (2d Cir. June 5, 2024). Once discovery was completed, and in the interest of judicial economy, the Court ordered all five remaining DOCCS Defendants to limit their initial motions for summary judgment to the issue of qualified immunity. *See* Dkt. 308.

The five DOCCS defendants' motions for summary judgment are now before the Court. All five now argue that they are entitled to qualified immunity because they did not violate Plaintiffs' substantive due process rights, and if they did, those rights were not well established as to the conduct in question. For the following reasons, the DOCCS Defendants' motions are DENIED.

## Background

In its previous Order, the Court recounted the facts alleged in the TAC. *See* ECF 193. They remain unchanged, but the court summarizes details pertinent to the DOCCS Defendants' summary judgment motions.

DOCCS conducts urinalysis drug testing on incarcerated individuals in the state prison system. Annucci and O'Gorman 56.1 Responses ("AOG 56.1") ¶ 1, Dkt. 315-2. DOCCS's drug testing procedures are set forth in Directive 4937. AOG 56.1 ¶ 7. From 1987 until 2018, Directive 4937 directed prison officials to conduct drug testing using EMIT (an acronym for "enzyme multiple immunoassay technique") technology, specifically requiring that inmates' urine samples be tested twice, and produce two positive results, before misbehavior proceedings could be initiated. *Id.* at ¶¶ 4–11. In 1987, this testing protocol was analyzed by the Southern District of New York, which held that two repeated immunoassay screening tests without laboratory confirmation through mass spectrometry was "sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due

4

process." *Peranzo v. Coughlin*, 675 F. Supp. 102, 105 (S.D.N.Y. 1987), *aff'd per curiam*, 850 F.2d 125, 126 (2d Cir. 1988).

After using Siemens's EMIT testing system for decades, DOCCS decided in or around 2016 to find a different vendor. AOG 56.1 ¶ 25. DOCCS Defendant Lieutenant Corey Bedard was in charge of the DOCCS drug testing program for inmates from 2011 until 2019 and was tasked with looking for a new testing provider. *Id*. Brenda Collum was Bedard's primary contact at Siemens. In 2015, Collum left Siemens to become a sales representative at Thermo Fisher Scientific Inc. ("TFSI") and shortly thereafter contacted Bedard to advertise TFSI's drug testing products. *Id.* at ¶ 28. TFSI produces the Microgenics Indiko Plus immunoassays, which while similar to the Siemens EMIT system, rely on a different assay technology called CEDIA. Pl's 56.1 Counterstatement ("Pl's 56.1") ¶ 79. Collum repeatedly assured Bedard that EMIT and CEDIA were similar or equivalent. Annucci Exs. T, V, Dkt. 316-21, 316-23.

When Bedard began looking to replace Siemens in 2016, he primarily focused on Microgenics. Annucci Ex. S, Dkt. 316-20. To this end, he organized a side-by-side comparison of Siemens's testing system with TFSI's Microgenics system. AOG 56.1 ¶ 29. Bedard offered another company the chance to participate in this side-by-side test, but they declined. Bedard Dep. Tr. 109:15–110:11, Dkt. 320-3. The comparison was conducted in 2017 and 2018 and the results of 400 tested samples indicated that the Microgenics immunoassays were generally as reliable as Siemens's.[1] The only issue raised by the comparison testing was that the Microgenics

---

[1] There is some dispute as to how many times the Microgenics' tests differed from Siemens's, but the difference between the disputed numbers are small enough to suggest that the results of the comparison testing would reasonably support the conclusion that the two systems were comparable. AOG 56.1 ¶ 33, Pl.'s response.

Bupropion assay produced more false positives than Siemens's. *Id.* at 114:19–25. In the comparison testing, they used an assay called "Bup I," but Collum and other TFSI employees assured Bedard that TFSI's new "Bup II" assay would be more accurate and more sensitive than the assay they used in the comparison testing, specifically claiming that with Bup II "erroneous results will not be an issue." Annucci Ex. X, DOCCS 0110740, Dkt. 316-25. No one at DOCCS conducted follow-up testing on the Bup II assay to confirm TFSI's claims, but Bedard nevertheless recommended to his superiors that Bup II be used in DOCCS's facilities. Bedard 56.1 ¶ 55.

After completing this internal test, DOCCS initiated the procurement process and put out a formal request for information ("ROI") seeking information about drug testing systems from companies interested in bidding for the contract. Microgenics responded with informational materials claiming that their tests had accuracy rates of 96%+. AOG 56.1 ¶¶ 35–38. DOCCS subsequently issued an Invitation for Bid, and after a bidding process, awarded the contract to Microgenics. *Id.* at ¶¶ 42–52. Pursuant to the contract, Microgenics began providing DOCCS with benchtop urinalysis machines and CEDIA test assays for two types of synthetic cannabinoids and Buprenorphine, as well as non-CEDIA assays for THC and opiates. Pl's 56.1 ¶ 60.

Because Directive 4937 only addressed the use of EMIT testing, Bedard was tasked with updating the language to include CEDIA testing protocols. Annucci Ex. ZZZ, Bedard Dep. Tr. 209:9– 211:2, Dkt 318-26. Bedard worked closely with Collum to make these changes because "[s]he was the representative from the company . . . [a]ll the specifications and the scientific principles from the machine came from her." Pl's Ex. 3, Bedard Dep. Tr. 109:15– 110:11, Dkt. 320-3.

The updated Directive 4937 was identical to the previous version, except for added mentions of CEDIA and a handful of scientific references attesting to CEDIA's reliability. Not included in the updated Directive were the multiple examples of scientific research that Collum had provided to Bedard indicating that CEDIA had higher rates of false positives than EMIT. *See* Bedard Dep. Tr. 177:20– 178:12 ("The current on-market Buprenorphine assay has a high false positive rate. . . . CEDIA Buprenorphine has a false positive rate of 39 percent."). Also not included was any mention of the Microgenics Bup II assay's informational insert which states that the results are only "***preliminary***" and that a "***more specific chemical method***," such as gas or liquid chromatography coupled with mass spectrometry (some form of reliable "confirmatory testing"), "***must be used to obtain a confirmed analytical result***." Pl's Ex. 15, Bup II Insert, Dkt. 320-15 (bolded and italicized in original). Despite these issues, the updated Directive 4937 went into effect and all DOCCS prisons began using Microgenics testing systems in January 2019.

Within the first month, complaints about the new tests began to flood into DOCCS almost immediately, including many complaints from individuals who had never before tested positive for drugs. Pl's Ex. 20, IG Report at 13, Dkt 320-20. ("Multiple DOCCS employees testified . . . that they had noticed an increase in complaints since the implementation of Microgenics' drug testing systems."). The complaints were sent to Defendant Annucci, Acting Commissioner of DOCCS, who then forwarded them to Defendant O'Gorman (Deputy Commissioner for Facility Operations), Defendant Finnegan (Director of the Office of Special Housing), and Defendant Kelly (Assistant Commissioner of Special Housing). Pl's 56.1 ¶ 110. In addition to complaints from incarcerated individuals, DOCCS received letters from elected officials communicating concerns with the new tests. *See* Pl's Ex. 30, Weprin Response, Dkt. 320-30.

7

After months of mounting complaints, Annucci claims that his office first noticed "unusual complaints about buprenorphine results" in late June 2019. Annucci and O'Gorman Mem. ("AOG Mem.") at 21, Dkt. 315-1. An investigation was then initiated which did not yield "definitive information that validated the complaints" until August 12, 2019, when Kelly learned of confirmatory testing results that showed of six samples that had tested positive with the Bup II assay, only one was confirmed to contain buprenorphine. AOG 56.1 ¶ 89.

On August 19, 2019, Annucci suspended all discipline based on the Bup II assay, and subsequently reversed and expunged all disciplinary determinations based on Microgenics's Buprenorphine assays *Id*. at ¶¶ 91, 102. In September 2019, DOCCS referred the issue of the Buprenorphine tests to the New York State Inspector General's ("IG's") office for review. *Id.* at ¶ 104. The IG ultimately determined that Microgenics's assays had an average false positive rate of 28%. Pl's Ex. 40, IG Review of Confirmatory Testing at 2, Dkt. 320-40. By November, the IG directed DOCCS to "stop imposing discipline based on *any* positive immunoassay results unless such immunoassay results were confirmed by independent laboratory confirmation," drastically expanding the scope beyond DOCCS's initial exclusive focus on buprenorphine testing. AOG 56.1 ¶ 106 (emphasis added). After further investigation, the IG directed DOCCS to consider reversing and expunging all Microgenics immunoassay-based discipline. *Id*. at ¶ 110. In January 2020, after a year of faulty testing, Annucci and DOCCS executive staff decided to expunge and reverse the discipline resulting from Microgenics drug tests and to stop using all Microgenics drug testing equipment. *Id*. at ¶ 111.

### Summary Judgement

A court should grant summary judgment when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see*

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (A dispute as to a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). The movant bears the burden of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). At this stage of the litigation, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (1986) (internal citation omitted).

### Qualified Immunity

Federal and state employees are presumptively entitled to qualified immunity from suit unless the plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if the right was clearly established, however, the official is entitled to qualified immunity if "it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation marks omitted); *see Anderson v. Creighton,* 483 U.S. 635, 639 (1987). "At the summary judgment stage, a claim may be dismissed on qualified immunity grounds only when a court finds that an official has met his or her burden of demonstrating that no rational jury could find these two prongs to be satisfied." *Liverpool v. Davis*, 442 F. Supp. 3d 714, 733 (S.D.N.Y. 2020) (citing *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012)).

The Court previously considered the qualified immunity arguments of four of the five DOCCS Defendants—Annucci, O'Gorman, Kelly, and Finnegan—in their motions to dismiss.

9

As these arguments remain largely the same, the Court will address these four Defendants' motions before turning to a more fulsome examination of Bedard's.

In deciding the motion to dismiss, the Court concluded as a matter of law that the rights in question were clearly established. *Steele-Warrick*, 671 F.Supp.3d at 247 ("[W]ell before 2019 the caselaw clearly foreshadowed to any reasonable officer that constitutional liability would attach if the growing number of complaints about the Indiko Plus tests were not promptly investigated and corrected.") (cleaned up). Therefore, the only relevant issue before the Court is whether any facts newly revealed by discovery alter the Court's previous analysis of these four Defendants' individual liability. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (liability under § 1983 depends on each defendant's personal involvement in the constitutional violation). The Court will now examine the fully developed record as it relates to Annucci, O'Gorman, Kelly, and Finnegan to determine whether a reasonable jury could conclude that these Defendants engaged in conscience shocking conduct in violation of Plaintiffs' constitutional rights. As the Second Circuit has held, this standard may be satisfied where prison officials are "deliberately indifferent" to their own errors and refuse to investigate well-founded complaints regarding those errors. *See Hurd*, 984 F.3d at 1084–85; *Francis v. Fiacco*, 942 F.3d 126, 151 (2d Cir. 2019).

### Annucci and O'Gorman

Annucci and O'Gorman submitted a joint brief to the Court and therefore will be considered together. They argue that their conduct was not conscience shocking, claiming that "unusual complaints about buprenorphine results began to surface in late June 2019," that investigations were quickly organized, and that "definitive information that validated the complaints [did not come to light] until August 12, 2019." AOG Mem. 21–22. Annucci

10

subsequently halted discipline on August 19 and began reversing and expunging all buprenorphine disciplines on or around September 12. *Id.* at 22. Taken together, they argue that no jury could look at this timeline and find their conduct conscience-shocking.

This timeline, however, ignores the fact that the first complaints reached Annucci's office in January 2019, and that they were quickly flagged as unusual by prison officials. The Inspector General's report observed that multiple DOCCS employees testified "that they had noticed an increase in complaints at their respective facilities since the implementation of Microgenics' drug testing systems." IG Report at 13, n.22.

The record shows that these complaints made their way to Annucci and O'Gorman. Plaintiffs point to multiple prisoners who wrote directly to Annucci and O'Gorman raising questions about the tests' accuracy, flagging potential cross-reactivity with prescribed drugs, and imploring the Commissioner to do something about the new, and evidently faulty, drug testing system. *See e.g.* Pl's Exs. 20, 26, 29. The earliest of these letters came in January and they continued throughout the Spring of 2019. Pl's 56.1 ¶¶ 110–125. Annucci referred at least three complaints to O'Gorman between April and May of 2019. *Id.* ¶ 110.

Word of the testing problems even breached the walls of the prison, gaining public attention in April, when public officials began writing to Annucci's office. This was more than two months before Annucci says he heard "unusual complaints." AOG Mem. 21. The first of these letters came from New York Assemblyman David Weprin. *See* Pl's Ex. 30, Weprin Response. In it, Weprin elevated the complaints of a constituent whose incarcerated spouse had tested positive for buprenorphine but who "had no history of drug use, did not smoke or drink alcohol, had been participating in the work release program and was regularly drug tested since the prior October as a condition of that program, with no prior issues, and had been preparing for

11

a Board of Parole Review." Pl's Mem. 19. In all, Annucci's office received four letters from elected officials and community organizations about the tests prior to July 2019. Pl's 56.1 ¶ 137. Annucci did not order any changes to address the issues raised in these letters. *Id.* at ¶ ¶ 131–135.

While Annucci and O'Gorman's actions would likely not shock the conscience if their timeline of "unusual complaints" was true, evidence supports a longer timeline of inmate, correctional officer, and elected official complaints starting in January 2019. Therefore, the Court cannot conclude that no jury could find their actions conscience-shocking.

### Kelly

As Assistant Commissioner for Special Housing and Drug Testing, Kelly was the top ranking DOCCS official specifically assigned to oversee the Microgenics tests, and as Annucci's executive assistant, he was in charge of investigating the growing number of complaints about the tests.

Annucci directed Kelly to investigate the letter from Assemblyman Weprin and "prepare a Response for My Signature" in April 2019. Pl's 56.1 ¶ 130. In preparing that response, Kelly discovered that the Bup II Assay may have produced a false-positive because of cross-reactivity with Benadryl. Pl's 56.1 ¶ 132. Despite learning of this potential cross-reactivity, and admitting it to Assemblyman Weprin, Kelly took no further steps to investigate or address potential false positives caused by unidentified cross-reactivity issues. Pl's Ex. 30, Weprin Response**.**

Months later, in July 2019, Kelly decided to pause testing at Eastern but took no further steps to pause testing in DOCCS's fifty-one other facilities. Pl's Ex. 69, IG Interview of Venettozzi at 4, Dkt. 321-20. He also did not pause testing at the other facilities after learning that the July confirmatory testing showed that five out of six samples returned false positives for buprenorphine. IG Report, 27. More shockingly, he took no remedial steps to free the five

individuals vindicated by the confirmatory testing who were "still in confinement pending sentencing on their disciplinary charges." *Id.* He also told the IG that he "may have verbally advised his superiors" about the confirmatory testing, but he did not forward them the actual test results. *Id.* Taken together; these actions raise triable issues of fact as to whether his conduct evinces conscience-shocking deliberate indifference.

### Finnegan

Finnegan was Assistant Commissioner of the Office of Special Housing during the entirety of this scandal. Annucci's office forwarded the majority of the complaints about testing issues to Finnegan, and as such he was on notice of potential problems with the Indiko Plus systems at roughly the same time as Annucci and O'Gorman. In addition to the torrent of letters from incarcerated individuals, Finnegan received word directly from DOCCS staff at Attica Correctional Facility, who first noticed the increase in complaints in February and March 2019 and who went "immediately" to Finnegan's office. Pl's 56.1 ¶ 144. Plaintiffs contend that Director of Special Housing Donald Venettozzi twice told Finnegan to relay these complaints to O'Gorman, and Finnegan twice refused because of his personal feud with Venettozzi. Venettozzi Dep. Tr. 92:23– 93:13. Finnegan not only did not conduct any investigation, but the record suggests he instructed Venettozzi to "stand down" and stop asking questions. *Id*. at 190:12–14. Prioritizing personal feuds over the constitutional rights of incarcerated people raises more than the specter of conscience-shocking conduct. Based on the foregoing, the Court has no doubt that a reasonable jury could conclude Finnegan's conduct shocks the conscience.

Having re-examined the evidence, the Court maintains its previous ruling. Annucci, O'Gorman, Kelly, and Finnegan are not entitled to qualified immunity. A reasonable jury could conclude that they violated Plaintiffs' constitutional rights at a time when those rights were

13

clearly established. The Court will now examine Defendant Bedard's request for qualified immunity.

**Bedard**

Defendant Bedard is not alleged to have been directly involved in the lengthy process of deciding when to stop using the faulty tests. Rather, Plaintiffs claim that Bedard violated their rights via his involvement in the selection of Microgenics as the new testing provider. Bedard did not claim qualified immunity in his 12(b)(6) motion, so the Court has not yet had a chance to consider his arguments. As the nature of his alleged constitutional violation is different, the Court must consider both whether he violated Plaintiff's rights, and if the rights were well established at the time as to his conduct.

Bedard argues, as he did in his motion to dismiss, that he did not violate the Plaintiffs' rights. Bedard Mem. at 11, Dkt. 326-1. As the Court noted at the motion to dismiss stage, the Complaint alleged that Bedard knew from experience that the norm was to use confirmatory tests for parole urinalysis and that a trial Indiko Plus test had misidentified codeine as buprenorphine. *Steele-Warrick,* 671 F.Supp. 3d at 245. Bedard now argues that he did not know about this norm in parolee drug testing until long after his involvement in selecting Microgenics as the drug test provider, a claim that appears to be borne out by his deposition testimony. Bedard Exh. A, 226–229, Dkt. 326-4. As to the single faulty buprenorphine test, one false positive out of 400 is far from enough to suggest a constitutional violation. To the contrary, if Microgenics's immunoassays had a .0025% error rate (i.e. 1/400) they would be far more reliable than the EMIT tests endorsed by the Court in *Peranzo*. 608 F.Supp. 1504, 1510 (finding DOCCS's EMIT testing had accuracy rate above 95% and therefore complied with due process).

Unfortunately for Bedard, discovery has revealed evidence which raises new questions about whether he engaged in conscience-shocking conduct. Among this evidence is the fact that, while he was looking into alternative testing contractors, Collum provided DOCCS with scientific literature that suggested CEDIA buprenorphine assays had a false positive rate of 39%. Pl's 56.1 ¶ 84. Bedard evidently disregarded this evidence and did nothing to bring it to the awareness of his superiors. Bedard then allowed Collum—a salesperson interested exclusively in selling a product to DOCCS—to edit Directive 4937 to suggest that CEDIA tests could be used with the exact same procedure as DOCCS had been using with EMIT tests, i.e., without confirmatory testing. *See* Bedard Dep. Tr. 177:20– 178:12. Bedard knew that the CEDIA Indiko Plus instructions mandate confirmatory testing "be used to obtain a confirmed analytical result," Pl's Ex. 15, Dkt 320-15, and yet co-wrote Directive 4937 with a company salesperson to directly contradicted this mandate. This chain of intentional actions raises his conduct above the level of "negligently inflicted harm beneath the threshold of constitutional due process." *Daniels v. Williams*, 474 U.S. at 327, 338 (1986). Accordingly, the Court cannot say that no reasonable jury could not find that Bedard's conduct shocks the conscience and as such, he fails to satisfy this prong of the qualified immunity analysis.

As to the second prong, Bedard argues that Plaintiffs' rights were not clearly established as to his conduct. Any reasonable officer would know that the Constitution protects incarcerated people from being subjected to arbitrary punishment based on unreliable drug tests. The issue is therefore whether it was reasonable for Bedard to conclude that CEDIA tests were the functional equivalent of EMIT tests, and accordingly, that the logic of *Peranzo* would continue to govern DOCCS's actions.

15

As described previously, the most important detail in analyzing the difference between CEDIA and EMIT tests is the difference between the tests' respective instructions. The *Peranzo* court quoted Syva's (Siemens's predecessor and the maker of the EMIT test considered by that court) instructional insert for their testing protocols: "Syva *recommends* confirmation of positive results. Confirmation of positive results is important in certain environments. Repeating the test or obtaining verbal corroboration from the individual may be adequate confirmation in some situations. If greater accuracy is required, Syva *recommends* that results be confirmed by an alternative scientific method." 608 F. Supp. at 1514 n.16 (emphasis added). In analyzing this language, the Court observed that "[t]he inclusion of this recommendation, however, by no means renders the unconfirmed use of the EMIT test an unreliable procedure to follow." *Id.* at 1514. Indeed, a recommendation to do confirmatory testing is very different from a *command* to do so. Unfortunately, a command to conduct confirmatory testing is exactly what one finds in Microgenics's Bup II instructional insert. As previously revealed, the insert for the Buprenorphine CEDIA assay announces that "confirmatory testing must be used to obtain a confirmed analytical result." Pl's Ex. 15.

Bedard points to *Peranzo* to show the reasonableness of his belief that his conduct was lawful, but the difference between these two tests' instructions is fatal to his claim of immunity. "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Reyes v. Fischer*, 934 F.3d 97, 103 (2d Cir. 2019). Bedard is neither a lawyer nor a scientist, so the Court does not expect him to have a detailed understanding of all of *Peranzo*'s nuances, nor of the specific scientific mechanisms of CEDIA testing. However, one need be neither a scientist nor a lawyer to read instructions. Accordingly, the Court is confident that a reasonable official should have

16

asked "What do the test's instructions say must be done to achieve a reliable result?" and "Are those instructions different than the test we used previously?" As a jury could find Bedard's failure to follow the CEDIA testing instructions an unreasonable violation of the law that was clearly established in *Peranzo*, Bedard fails to bear his burden on this prong of the qualified immunity analysis, and he is therefore not entitled to qualified immunity.

### Conclusion

For the foregoing reasons, the DOCCS Defendants' motions for summary judgment are DENIED. The five DOCCS Defendants are not entitled to qualified immunity because a reasonable jury could conclude that they violated Plaintiffs' well-established rights via their involvement in the rollout of the Indiko Plus testing system in 2019.

The question of whether these five officers are entitled to qualified immunity must be reserved until after trial. *See, e.g., Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (explaining that after receiving the jury's decision as to "what the facts were," the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts."). At trial the jury will be given targeted special interrogatories to help the Court determine if the DOCCS Defendants engaged in conscience-shocking conduct. *See Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) ("If there are unresolved factual issues which prevent an early disposition of the [qualified immunity] defense, the jury should decide these issues on special interrogatories.").

**SO ORDERED.**

    /S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 6, 2025

17